# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

JEFFREY A. WOGENSTAHL,           :

                            Petitioner,

              -vs-

BETTY MITCHELL, WARDEN,

                   Respondent.           :

Case No. 1:99-cv-843

District Judge Thomas M. Rose
Chief Magistrate Judge Michael R. Merz

## REPORT AND RECOMMENDATIONS

This is a habeas corpus action brought by Petitioner Jeffrey A. Wogenstahl pursuant to 28 U.S.C. §2254 and seeking relief from both his conviction for aggravated murder with death specifications and his resulting death sentence.

Mr. Wogenstahl is represented in this proceeding by counsel appointed pursuant to 21 U.S.C. §848(q) who did not represent him in any direct appeal proceedings.[1]

The Ohio Supreme Court described the facts and circumstances leading to Mr. Wogenstahl's indictment, trial, convictions, and sentence of death as follows:

> Peggy Garrett was first introduced to Jeffrey A. Wogenstahl, appellant, in October, 1991. During October and November, 1991, appellant and Peggy became casual acquaintances. At the time, Peggy resided in a two-bedroom apartment at 301 Harrison Avenue, Harrison, Ohio, with her five children: Eric Horn, age sixteen, Justin

---

[1] Present counsel represented Mr. Wogenstahl in the state post conviction proceedings as well as in the proceedings which involved Mr. Wogenstahl's Motion for New Trial which he filed subsequent to filing the present Petition.  *See infra.*

Horn, age fifteen, Amber Garrett, age ten, Matthew Garrett, age eight, and Shayna Perkins, age four. During October and November, 1991, appellant visited the apartment on several occasions and came to know Peggy's family.

Appellant went to Peggy's apartment on Saturday afternoon, November 23, 1991. He asked Peggy if she had any plans for the evening. Peggy told appellant that she had no plans, and appellant left following a brief conversation. That night, Peggy put her three youngest children (Amber, Matthew and Shayna) to bed for the evening. At approximately 10:30 p.m., she decided to meet a friend, Lynn Williams, at a local bar. Justin was spending the weekend at a friend's house. Peggy left sixteen-year-old Eric in charge of the other children.

Peggy met Lynn Williams at the "Escape" bar sometime between 11:00 p.m. and midnight. From there, the women drove Lynn's car to the Miamitown Lounge, which was also known as "Hornsby's". At Hornsby's Peggy and Lynn saw appellant at the bar. He was wearing a brown leather jacket and jeans. Appellant joined the women for drinks and conversation. Appellant asked Peggy where Justin was and what Eric and the other children were doing. Peggy told appellant that Justin was away for the weekend, and that Eric was home baby-sitting the children. At some point, the trio went outside to appellant's car to smoke marijuana.

On Sunday morning, at approximately 2:15 a.m., appellant, Peggy and Lynn drove Lynn's car to the Flicker Inn. Later, the women drove appellant back to Hornsby's, where appellant's car was parked. Appellant invited the women to his apartment to smoke marijuana, but Peggy and Lynn told the appellant that they were going to the Waffle House restaurant. Peggy and Lynn then separated from appellant and drove directly to the Waffle House. After the women had arrived at the restaurant, a witness saw a car resembling appellant's dark-brown four-door 1978 Oldsmobile Omega pull into and then out of the restaurant parking lot.

At approximately 3:00 a.m., while the women were at the Waffle House, appellant drove to Peggy's apartment and spoke with Eric. According to Eric, appellant claimed that Peggy needed to see him (Eric) at Troy Beard's house. Beard was Peggy's friend who lived approximately three blocks from the apartment. Eric locked the door to the apartment leaving the children unattended, and drove with appellant to the vicinity of Beard's residence. Appellant dropped

2

Eric off approximately one block from Beard's apartment. According to Eric, appellant said that he would drive around the block and then pick Eric up to drive him home. When Eric arrived at the residence, Beard told Eric that he (Beard) had not seen Peggy at all that evening. Eric left Beard's apartment and waited for appellant to drive him home. Appellant did not return. Eventually, Eric walked home and found that the door to the apartment was unlocked. He checked on the children and noticed that ten-year-old Amber was missing. However, Eric mistakenly assumed that Amber might have been spending the night at a friend's house. Thus, he mentioned nothing to Peggy when she returned home later that morning.

On the morning of November 24, 1991, Vickie Mozena was working at a United Dairy Farmers store in Harrision, Ohio, near the Ohio-Indiana border. At approximately 3:15 a.m., Mozena saw a car resembling appellant's Oldsmobile drive past the store in the direction of Bright, Indiana. Mozena observed the silhouette of a man driving the vehicle, and what appeared to be a young girl next to him in the passenger's seat. Between 3:45 and 4:00 a.m., Mozena saw the same vehicle parked at a car wash across the street from the United Dairy Farmers store. The vehicle pulled out of the car wash and into the farthest corner of the United Dairy Farmers parking lot. The driver did not exit the vehicle for several minutes, and Mozena thought that she was about to be robbed. However, appellant exited the vehicle, came into the store, and purchased a pack of cigarettes. At that time, Mozena noticed what appeared to be dirt or blood under appellant's fingernails. Later that morning, Mozena once again saw appellant's car parked across the street at the car wash. According to Mozena, there was a man inside the car, presumably cleaning the interior.

Harold Borgman lived on Jamison Road between Harrison, Ohio, and Bright, Indiana. Borgman's home was located in a rural area of West Harrison, Indiana, approximately four miles from Harrison. At 3:13 a.m. on the morning of November 24, 1001, Borgman got out of bed to use the bathroom. Sometime later, he looked out the window and saw a car driving very slowly on Kamison Road toward the direction of Harrision. The driver pulled off to the side of Jamison Road, stopped, and turned off the headlights. Borgman continued to watch for several minutes, and observed two or three vehicles pass the parked car on Jamison Road.

On November 24, at approximately 3:40 a.m., Brian Noel was

3

driving on Jamison Road toward Bright, Indiana. While driving near the location of Borgman's residence, Noel saw a late 1970s-model, dark colored, four-door vehicle parked off to the side of Jamison Road, the vehicle facing in the opposite direction. Noel came to a rolling stop alongside the vehicle and observed a man apparently retrieving something from the trunk of the automobile. The man was wearing a dark jacket and blue jeans. Noel later identified appellant as the man he had seen on Jamison Road in the early morning hours of November 24. He also identified appellant's 1978 Oldsmobile as the car that had been pulled off to the side of Jamison Road.

On November 24, at approximately 3:40 a.m., Kathy Roth was driving on Jamison Road toward Bright, Indiana. While driving near the location of Borgman's residence, Roth saw a man wearing a brown leather jacket and blue jeans standing near a parked car off to the side of Jamison Road. As Roth drove past the vehicle, the man turned to face her, dropped his head, and then turned around to face the woods. Roth later identified appellant as the man she had seen on Jamison Road.

Frederick G. Harms was driving on Jamison Road on November 24, at approximately 3:40 a.m. Harms also saw the vehicle parked off to the side of Jamison Road. According to Harms, the vehicle resembled appellant's 1978 Oldsmobile Omega.

On Sunday afternoon, November 24, Peggy Garrett finally realized that Amber was missing. At that time, Eric told Peggy about appellant's 3:00 a.m. visit to the apartment. Peggy and others went to appellant's residence and knocked on the door for over an hour. When appellant finally answered, Peggy asked him why he had taken Eric to Troy Beard's apartment earlier that morning. Appellant stated that he had been "messing with Eric's head," and claimed to have no knowledge of Amber's whereabouts. On the evening of November 24, 1991, appellant gave a similar statement to Officer Charles Lindsey of the Harrison Police Department.

On Monday, November 25, 1991, police executed a search warrant at appellant's residence. During the search, appellant was questioned concerning his movements on the morning of November 24. Appellant admitted to having visited the Harrison Avenue apartment on November 24 at approximately 3:00 a.m. Appellant told police that he had duped Eric out of the Harrison Avenue apartment as a practical joke. However, appellant stated that he went directly home to bed after having taken Eric to the vicinity of Troy Beard's

4

apartment. Police then requested that appellant accompany them to the Harrison Police Department. Appellant agreed to go to the police station and asked for his leather jacket. Officer Lindsay retrieved the jacket from the bedroom closet. Lindsay noticed that the jacket was soaking wet and that the lining was discolored. According to police, appellant explained that his cat had urinated on the jacket on *Friday* evening, November 22, 1991. Appellant further explained that he had washed the jacket on Friday night. Police were suspicious, since appellant had worn the jacket on Saturday night, November 23, 1991.

Police found several bloodstains in appellant's bathroom. However, if could not be determined whether the blood was human blood. The items seized from appellant's residence included drugs and drug paraphernalia. Police contacted the appellant's parole officer and a parole holder was placed against appellant. On November 25, 1991, police also attempted to search a dumpster near appellant's apartment. However, the dumpster had been emptied earlier that morning. Two witnesses had seen appellant near the dumpster on November 24, at approximately 5:15 a.m.

On the morning of November 27, 1991, appellant made another statement to law enforcement authorities. This time, appellant claimed that he had driven Eric to the vicinity of Troy Beard's apartment on November 24 because Eric had wanted to deliver marijuana to Peggy. Appellant once again asserted that he had proceeded directly home to sleep after dropping Eric off in the vicinity of Beard's residence.

Meanwhile, the search for Amber Garrett continued. On November 27, 1991, Harold Borgman reported to the police that he had seen a suspicious vehicle on Jamison Road in the early morning hours of November 24. Borgman led police to the location near his house where he had seen the suspicious vehicle. Sergeant Kenneth J. Greves of the Indiana State Police searched the area and discovered Amber's partially frozen body down a steep embankment off to the side of Jamison Road.

The location where Amber's body was discovered was heavily wooded and overgrown with thorny bushes and vegetation. Amber was wearing a dress and a pair of panties. Her dress had been rolled up from behind and pulled down over her arms. She had been stabbed approximately eleven times, mostly in the chest and neck. Additionally, she had been repeatedly struck in the head with a blunt instrument. The blunt force injuries were consistent with having

been caused by an automobile jack handle or some other blunt stick or rod. Superficial wounds on the body indicated that a knife had been held to the base of Amber's neck. The body was covered with postmortem scratches that had apparently been caused by the vegetation in the area. The evidence at the scene indicated that the murder had occurred at a different location and that the killer had carried Amber's body through the dense vegetation.

William L. Dean, a criminalist in the Trace Evidence Section of the Hamilton County Coroner's Laboratory, examined the leather jacket that appellant had been wearing on the morning of Amber's abduction. Thorn tips or "prickles" were removed from triangular tears in the jacket. Dean also examined a pair of appellant's shoes that were found to contain prickles and other plant material.

Douglas W. Deedrick, a special agent with the Federal Bureau of Investigation, compared the plant material recovered from appellant's jacket and shoes with known samples of vegetation collected from the area where the body was discovered. Deedrick found that the plant material from appellant's clothing was similar to the vegetation collected from the crime scene. Additionally, Dr. Robert D. Webster, a research botanist, concluded that there were no differences between the vegetation recovered from appellant's clothing and the type of vegetation in the area where the body was discovered.

Police found two car jacks in the trunk of appellant's Oldsmobile, a ratchet jack and a screw or "scissors" jack. The mental handle for the screw jack was missing. There were no identifiable fingerprints anywhere in the vehicle. The car was exceptionally clean, as if it had been thoroughly washed. However, criminalists in the Trace Evidence Section of the Hamilton County Coroner's Laboratory found a very small bloodstain in appellant's Oldsmobile. The specimen was sent to the Serological Research Institute in California for testing. DNA was extracted from the bloodstain and was tested using the HLA DQ (Haldo) Alpha genetic marker system. The HLA DQ Alpha classification of the blood removed from appellant's vehicle was consistent with the HLA DQ Alpha classification of a known sample of Amber's blood. According to Brian Wraxall, a forensic serologist, Amber's HLA DQ Alpha classification occurs in approximately 5.3 percent of the Caucasian population. The blood recovered from appellant's vehicle was not consistent with appellant's blood or blood samples taken from Eric and Justin Horn.

Special Agent Deedrick of the Federal Bureau of Investigation found

6

a single pubic pair inside the crotch area of Amber's panties. Deedrick compared the pubic hair to known samples of pubic hair that had been combed and plucked from appellant's pubic region. According to Deedrick, appellant's pubic hairs exhibited the same microscopic characteristics as the pubic hair recovered from the victim's panties. Deedrick testified to a reasonable degree of scientific certainty that the pubic hair recovered from the victim's underpants had come from appellant. Amber was prepubescent and, thus, the hair could not have come from her. Pubic hair samples taken from Peggy Garrett, Eric Horn and Justin Horn did not match the pubic hair recovered from Amber's panties.

...

Bruce Wheeler was the prosecution's final witness in the guilt/innocence phase of the trial. Wheeler and appellant had been fellow inmates in the same "pod" at the Hamilton County Justice Center. At trial, Wheeler testified that he had spoken with appellant on several occasional concerning appellant's involvement in the killing. According to Wheeler, appellant had said that there was very little evidence against him because he had been "too slick" and had "covered up" the evidence. Further, appellant allegedly admitted to Wheeler that he (appellant) had entered the Garrett apartment with a stolen key and had kidnaped Amber to have sex with her. Wheeler testified that appellant "said he stuck it in her but *** [did not] ejaculate *** so there would not be any evidence." Additionally, appellant told Wheeler that he had wanted to return Amber to the apartment because he thought he could get away with having removed her from the residence. However, someone was at the Garrett residence when appellant attempted to return Amber to her home. Thus, according to Wheeler, appellant said that he decided to have "sex" with Amber once again. Wheeler testified that appellant admitted stabbing Amber in the chest when she refused his further sexual advances. According to Wheeler, appellant admitted killing Amber, dumping the body, cleaning the car, and disposing of the evidence. Appellant also told Wheeler that police has planted Amber's blood in his (appellant's) car because appellant had "cleaned his car too well."

*State v. Wogenstahl,* 75 Ohio St.3d 344, 345-50 (1996).


**Procedural History**

7

On September 1, 1992, the Hamilton County Grand Jury indicted Mr. Wogenstahl on charges of aggravate murder, kidnaping, and aggravated burglary in connection with the November, 1991, death of Amber Garrett. Return of Writ, Joint Appendix attached thereto (hereinafter "Appendix"), Vol. I at 003-006. (Doc. 16).

A jury trial commenced on February 8, 1993, and on February 25, 1993, the jury returned a verdict of guilty on all counts. *Id.*, Vol. II at 559-606; see also, Transcript of Proceedings (hereinafter "Transcript"), Vol. XVIII at 2650-55. The mitigation phase of the trial started on March 2, 1993. On March 3, 1993, the jury returned a verdict finding that the aggravating circumstances outweighed the mitigating factors and recommending a sentence of death. Appendix, Vol. II at 606; see also, Transcript, Vol. XX at 2870-73.

The court imposed sentence on March 15, 1993. Appendix*, Vol. II at 614; see also*, Transcript, Vol. XXI at 2885-91. The court sentenced Mr. Wogenstahl to a term of incarceration of not less than fifteen years nor more than twenty-five years on the charge of kidnaping and a term of incarceration of not less than fifteen years nor more than twenty-five years on the charge of aggravated burglary, to run consecutively. *Id.* The court also sentenced Mr. Wogenstahl to death on the charge of aggravated murder. *Id.* Judgment was entered accordingly. *Id.* at 614. On March 18, 1993, the trial court issued its written sentencing Opinion as required by Ohio Revised Code § 2929.03(F) . *Id.* at 616-39[2].

Mr. Wogenstahl filed a Notice of Appeal on March 24, 1993. Appendix, Vol. III at 664. On February 2, 1994, Mr. Wogenstahl filed his appellate brief raising the following thirty-five assignments of error:

---

[2] The clerk's file stamp indicates a filing date of March 18, 1993, yet the court's signature is dated March 19, 1993. *Id.* The discrepancy is of no importance in these proceedings.

## ASSIGNMENT OF ERROR NO. I

The trial court erred to the prejudice of the Defendant-Appellant in that it failed to suppress evidence gathered from several searches of Defendant-Appellant's automobile and apartment.

## ASSIGNMENT OF ERROR NO. II

The trial court erred to the prejudice of the Defendant-Appellant in that it overruled Defendant-Appellant's objections to introduction into evidence of photographs of the decedent.

## ASSIGNMENT OF ERROR NO. III

The trial court erred to the prejudice of the Defendant-Appellant in that it admitted videotape testimony of Brian Wraxall, a non-expert, as to the identity of blood samples.

## ASSIGNMENT OF ERROR NO. IV

The trial court and the jury erred to the prejudice of the Defendant-Appellant in that they rendered a verdict that was manifestly against the weight of the evidence.

1. A judgment of conviction based upon direct and circumstantial evidence shall be overturned on appeal where the record shows that insufficient evidence was present upon which the trier of fact could reasonably have concluded that all elements of the offense had been proven beyond a reasonable doubt.

2. Where a conviction upon review can be shown to have been attained only by the trier of fact's enhancement of almost exclusively circumstantial evidence with conjecture and sympathy for the victim, the conviction shall not stand.

## ASSIGNMENT OF ERROR V

The trial court erred to the prejudice of the Defendant-Appellant in that it failed to grant Defendant-Appellant's motion for the appointment of a private investigator and a mitigation expert, and in that it failed to allow the court clinic expert to be given confidentiality as would otherwise be involved between doctor and patient.

1. Complicated cases require complicated preparation, and to prepare for a factual defense certain "legwork" is required.

2. In a capital case, from the onset the factual support underlying the defense portion of the penalty phase must be undertaken.

3. Without the right of confidentiality, it becomes difficult if not impossible to expect the defendant to disclose all factors relevant to the clinic's inquiry.

## ASSIGNMENT OF ERROR NO VI

The trial court erred to the prejudice of the appellant in imposing the death sentence, for the Ohio death penalty statutes are unconstitutional, violate the Eighth Amendment prescription [sic] of cruel and unusual punishments, the Fourteenth Amendment guarantees of due process of law and to the equal protection of the laws, and also by the concomitant provisions of the Ohio Constitution.

## ASSIGNMENT OF ERROR NO VII

The trial court erred to the prejudice of appellant by denying his motion to submit a written questionnaire to be completed by prospective jurors prior to the voir dire thus unlawfully an impermissibly interfering with appellant's constitutionally guaranteed right to question and examine prospective jurors in a meaningful manner.

## ASSIGNMENT OF ERROR NO VIII

The trial court committed reversible, prejudicial error by denying appellant's motion to allow him individually twelve peremptory challenges to prospective jurors.

      1. In a capital case where the ultimate sanction is to be imposed, there is a correspondingly greater need for the reliability of the jury's verdict and recommendation.

      2. In a bifurcated capital case, the jurors selected sit in two trials, and make separate deliberations as to guilt and punishment; and both the guilt trial and the penalty trial must satisfy due process requirements, necessitating the use of additional peremptory challenges in order to decide the case on the basis of the evidence before them and not otherwise.

## ASSIGNMENT OF ERROR NO. IX

The trial court committed plain error to the substantial prejudice of Defendant-Appellant by instructing the jury that their sentencing decision was merely a "recommendation" thus improperly diminishing the jury's responsibility, thereby violating Defendant-Appellant's rights under the Eighth and Fourteenth Amendments to the United States Constitution and their corresponding provisions under the Ohio Constitution.

## ASSIGNMENT OF ERROR NO. X

The trial court committed plain error to the substantial prejudice of

Defendant-Appellant by submitting to the jury a verdict form at the penalty phase stating that the jury's verdict would only be a "recommendation".

       1. Was it constitutionally proper for the trial court to instruct the jury that their verdict is merely a recommendation, thereby diminishing its sense of responsibility in sentencing Defendant/Appellant.

### ASSIGNMENT OF ERROR NO. XI

The trial court erred to the substantial prejudice of Defendant-Appellant in denying his motion for individual examination of prospective jurors and for the sequestration of those passed for cause and provisionally seated.

### ASSIGNMENT OF ERROR NO. XII

The trial court erred to the substantial prejudice of Defendant-Appellant by refusing to allow two separate juries for deciding the guilt and penalty phases respectively, thereby denying Defendant-Appellant his right to a fair trial under the Sixth Amendment to the United States Constitution.

       1. Was the Defendant-Appellant denied a fair trial when the trial court refused to have separate juries decide the guilt and penalty phases?

### ASSIGNMENT OF ERROR NO. XIII

The trial court committed plain error in failing to instruct the jury that, in the event of a life sentence, the accused must either serve twenty full years before parole eligibility attaches or thirty full years before parole eligibility attaches, resulting in violation of Appellant's Constitutional right to reliability in the determination of his sentence.

### ASSIGNMENT OF ERROR NO. XIV

The judgment of the trial court, as well as the jury, that the aggravating factor of which Appellant was convicted outweighed the mitigating factors presented by the defense is contrary to the manifest weight of the evidence and to be free from cruel and unusual punishment under the Eighth Amendment, and under Art. I., Sec. 9 of the Ohio Constitution. [sic].

### ASSIGNMENT OF ERROR NO. XV

The trial court erred to the prejudice of Appellant's constitutional right to reliability in the imposition of the sentence of death by basing it's [sic] decision to impose the death sentence upon the nonstatutory aggravating factor of the nature and circumstances of the offense, by

giving insufficient consideration to valid mitigating factors, and by considering the nonexistence of some statutory mitigating factors as nonstatutory aggravating factors.

      1. The consideration of the nature and circumstances of the offense as an aggravating factor in an Ohio capital prosecution is unconstitutional both under the Eighth Amendment requirement of reliability in capital sentencing, also contained in the Ohio Constitution, and a further violation of the right to due process under the Ohio and Federal Constitutions.

### ASSIGNMENT OF ERROR NO. XVI

The lower court committed prejudicial error in sentencing the Appellant to death where the sentence of death was excessive and disproportionate in terms of the underlying facts to similar cases in other jurisdictions where the death penalty was imposed.

### ASSIGNMENT OF ERROR NO. XVII

The requirement that jury must recommend death upon proof beyond a reasonable doubt that the aggravating circumstances outweigh only to the slightest degree the mitigating circumstances renders the Ohio capital statutes even though the mitigating evidence falls just short of equipoise with the aggravating factors, with the result that the risk of putting someone to death when it is practically as likely as not that he deserves to live renders the Ohio capital process arbitrary and capricious, and, in the absence of a requirement that, before death may be imposed, aggravating factors must substantially outweigh mitigating factors, unconstitutional.

The Ohio capital statutes are constitutionally infirm in that they do not permit the extension of mercy by the jury even though aggravating factors may only slightly outweigh mitigating factors.

### ASSIGNMENT OF ERROR NO. XVIII

The lower court committed prejudicial error in overruling the appellant's motion to require the prosecutor to disclose prior to trial all statements of witnesses whom he intended to call at trial.

### ASSIGNMENT OF ERROR NO. XIX

The lower court erred in overruling appellant's motion for the court to instruct the jury to consider mercy in their mitigation phase deliberations.

### ASSIGNMENT OF ERROR NO. XX

The lower court erred in overruling Appellant's motion to suppress

12

identification testimony.

## ASSIGNMENT OF ERROR NO. XXII
Appellant was denied his right to effective assistance of counsel by the decision of counsel to submit to the jury for their determination the specification as to Counts II and III of the Indictment as to whether or not the Appellant had been previously convicted of aggravated burglary and thus denied the Appellant his rights under the Sixth and Fourteenth Amendments of the United States Constitution and his concomitant rights under Article One Section 10 of the Ohio Constitution.

## ASSIGNMENT OF ERROR NO. XXIII
The lower court committed prejudicial error in overruling the Appellant's motion for change of venue.

## ASSIGNMENT OF ERROR NO. XXIV
Appellant was denied his constitutional right to effective assistance of counsel during the void [sic] dire of the jury.

## ASSIGNMENT OF ERROR NO. XXV
The lower court erred in the admission of testimony as to the results of the haldo alpha test done on the blood found in the Appellant's car since it did not establish to a reasonable degree of scientific certainty that said blood was that of the decedent.

## ASSIGNMENT OF ERROR NO. XXVI
The lower court erred in refusing to grant a mistrial after the prosecutor improperly commented in his opening statement at the guilt phase of the trial that the Defendant's offense was that of alibi.

## ASSIGNMENT OF ERROR NO. XXVII
The lower court committed prejudicial error and denied the Appellant due process of law by denying Appellant's counsel the right to cross examine the state's witness based upon their prior inconsistent statements.

## ASSIGNMENT OF ERROR NO. XXVIII
The lower court committed prejudicial error in admitting into evidence testimony as to the underlying facts committed by the Appellant in a previous aggravated burglary and thereafter charging the jury that they might consider those facts as proof that the Appellant murdered the decedent using the same type plan, design or scheme that he had employed in committing the previous aggravated

13

burglary.

## ASSIGNMENT OF ERROR NO. XXIX

Appellant was denied due process of law and a fair trial as a result of the prosecutor offering into evidence testimony he knew to be inadmissible as to how Appellant committed a previous aggravated burglary and thereafter arguing said facts to the jury as constituting proof that the Appellant committed the within murder using the same plan, design, scheme or method.

## ASSIGNMENT OF ERROR NO. XXX

The lower court committed prejudicial error in admitting the jailhouse testimony of a former fellow inmate of the Appellant which the court knew to be totally unreliable and unworthy of belief.

## ASSIGNMENT OF ERROR NO. XXXI

Appellant was denied due process of law and a fair trial because of gross misconduct committed by the prosecutor in offering the testimony of a former fellow inmate of the appellant which he knew to be totally unreliable and which would contain statements that would prejudice the jury against the Appellant.

## ASSIGNMENT OF ERROR NO. XXXII

The lower court committed prejudicial error in the admission as well as the exclusion of evidence at trial.

## ASSIGNMENT OF ERROR NO. XXXIII

Appellant was denied due process of law and a fair trial because of gross misconduct consisting of totally improper and prejudicial argument made by the prosecutor in both the guilt phase and the mitigation phase of the trial.

## ASSIGNMENT OF ERROR NO. XXXIV

The trial court erred to the prejudice of the Defendant-Appellant in that it refused to admit into evidence each and every defense exhibit that was not submitted without objection.

## ASSIGNMENT OF ERROR NO. XXXV

The trial court erred to the prejudice of the Defendant-Appellant in that it denied Defendant-Appellant's request to have the jury charge include specific instructions as to the reliability (of lack thereof) of so-called witness testimony.

*Id.* at 695-815.

14

On November 30, 1994, the Hamilton County Court of Appeals rejected all of Mr.

Wogenstahl's claims and affirmed the trial court verdict and sentence. *Id.*, Vol. VI at 1005-41; *State*

*v. Wogenstahl,* No. C-930222, 1994 WL 686898 (Ohio App. 1st Dist. Nov. 30, 1994).

Mr. Wogenstahl filed a Notice of Appeal on January 9, 1995.  Appendix, Vol. V, at

1130-32.  On March 27, 1997, Mr. Wogenstahl filed his brief with the Ohio Supreme Court raising

the following Propositions of Law:

### PROPOSITION OF LAW NO. 1
Specifications under R.C. 2929.04(A)(3) and (A)(7) are duplicative, and must be merged prior to the weighing by the sentencing jury, the trial judge, and an appellate court considering the appropriate sentence in a capital case.  The failure to merge such specifications constitutes a violation of the rights of the accused under the United States Constitution and the Ohio Constitution as well where the death sentence is imposed thereafter.

### PROPOSITION OF LAW NO. 2
The power conferred by R.C. 2929.05 upon appellate courts to review aggravating and mitigating factors, and to determine the appropriateness of a given death sentence, is subordinate to the right of the accused to trial by jury under Art. I. Secs. 5 and 10 of the Ohio Constitution.

### PROPOSITION OF LAW NO. 3
Unless it can fairly be held beyond a reasonable doubt that penalty phase error in a capital trial had no effect upon the jury's sentencing verdict, appellate courts are rendered powerless by the right to trial by jury set forth in the Ohio Constitution, Art. I. Secs. 5 and 10, from purporting to "cure" the error and to affirm the death sentence; any such affirmance violates the right of the accused to trial by jury, and the death sentence must be vacated and set aside

### PROPOSITION OF LAW NO. 4
.The affirmance of a death sentence by an appellate court which has reweighed the aggravating and mitigating factors without merging specifications required to be merged, where the jury which recommended the death sentence upon unmerged specifications, and the trial judge also did not merge the specifications in determining the sentence, constitutes a violation of the right to the accused under

the Eighth Amendment to have the death sentence imposed only after the proper procedures have been followed under the state scheme for imposing the death sentence, and also constitutes a violation of the right to due process of law in that such appellate reweighing abrogates the liberty interest created by state law, which requires jury participation in the capital sentencing process.

      1.   The trial court committed prejudicial error in failing to merge the capital specifications for felony murder and escaping detection.

      2.   The imposition of the death sentence by the trial court constitutes an independent violation of Ohio law, the Ohio Constitution, and the Eighth and Fourteenth Amendments to the Constitution of the United Stats.

      3.   The affirmance of the death sentence by the Court of Appeals constitutes an independent violation of Ohio law, the Ohio Constitution, and the Eighth and Fourteenth Amendments to the Constitution of the United States.

      4.   Even if an appellate court, in presuming to substitute its judgment for that of the jury by merging the specifications as the trial court ought to have done, and then itself reweighed the aggravating and mitigating factors, it would deny the Appellant the right to have his jury participate in the sentencing process, which right is secured to him by the Ohio Constitution, the Revised Code, and the Sixth, Eighth and Fourteenth Amendments, together with his right to due process of law under the Fourteenth Amendment to the U.S. Constitution and Art. I. Sec. 16 of the Ohio Constitution.

      5.   The due process clause of the Fourteenth Amendment protects the right of Ohio capital defendants under the Revised Code and the Ohio Constitution to jury participation in the sentencing process, and is violated where appellate courts usurp the function of the jury and make specific factual findings with respect to mitigating factors, and purport to re-weigh the aggravating circumstances against the mitigating factors as the jury would have done absent error in penalty phase proceedings involving the presentation to, and consideration by, the jury of improper duplicative aggravating factors.

      6. The Eighth Amendment requires that states adhere to their own constitutional procedures for implementation of the death sentence; where the state courts deny to the defendant his state-protected right to jury participation in sentencing, the Eighth Amendment has been violate, though neither the Sixth nor the Eighth Amendment protects the right of a capital defendant to jury participation in sentencing.

**PROPOSITION OF LAW NO. 5**

Where a trial court, in its opinion justifying a death sentence, incorporates verbatim therein *as the trial court's own conclusions* negative statements about the accused made in the prosecutor's opening statement five weeks prior to the sentencing proceedings, and also incorporates practically verbatim from similar opinions of other judges, and of the same judge, in prior capital cases, conclusions purportedly resulting from the sentencing process in the case at bar, then the offender has been denied his Eighth Amendment right to individualized and independent consideration by the trial court of the appropriate sentence in his case, and his Fourteenth Amendment right to due process. (emphasis in original).

      1.   The Eighth Amendment requirement of individualized sentencing determinations in capital cases is violated where the trial court, in its sentencing opinion, merely parrots prior sentencing opinions by the sentencing judge and other judges in the jurisdiction, in other capital cases totally unrelated to that in which the death sentence is imposed.

      2.  Where the trial court, in its opinion purporting to justify the sentence of death imposed upon an offender, adopts verbatim from the prosecutor's opening statement in a capital trial negative and pejorative comments about the accused, the accused has been denied his Eighth Amendment right to an individualized sentencing determination, and to his right to due process under the Fourteenth Amendment by an impartial court, and to the fundamental fairness required by the due process clause. Similar provisions of the Ohio Constitution were also violated by these actions of the trial court.

**PROPOSITION OF LAW NO. 6**

Where, in a capital case, the sentencing court considers and weighs invalid or improper aggravating factors in imposing the death sentence, that sentence offends the Eighth Amendment to the Constitution of the United States, and the right to due process under the Fourteenth Amendment, and their counterparts in the Ohio Constitution, and must be reversed.

      1.  The consideration of the nature and circumstances of the offense as an aggravating factor in an Ohio capital prosecution is unconstitutional both under the Eighth Amendment requirement of reliability in capital sentencing, also contained in the Ohio Constitution, and a further violation of the right to due process under the Ohio and federal Constitutions.

17

2.   The nature and circumstances of the case were unlawfully considered and relied upon as nonstatutory aggravating factors, were improperly and illegally weighed, and thus contributed to an unconstitutionally unreliable decision for death.

3.   Reliance upon the heinousness, malice, or cruelty implicit in the facts of a homicide as an aggravating factor is unconstitutional, and a death sentence imposed in reliance upon such factors is unconstitutional.

4.   Reliance upon nonstatutory aggravating factors in the weighing process is unlawful, and requires reversal of the resulting death sentence.

5.   The consideration of the history, character and background of the offender as a (nonstatutory) aggravating factor by a sentencing court in a capital case is contrary to law and to the Eighth and Fourteenth Amendments to the Constitution of the united states, and to their counterparts in the Ohio Constitution.

6.   Where the trial court's sentencing opinion in a capital case fails to state the reasons why aggravation outweighs mitigation, the death sentence imposed must be reversed as contrary to Ohio law and to the Eighth and Fourteenth Amendments to the Constitution of the United States.

## PROPOSITION OF LAW NO. 7

The defendant in a capital case is entitled to 12 peremptory jury challenges, and the restriction of the defense to 6 peremptory challenges violates Ohio law and the rights of the accused to a fair and impartial jury under the Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution, and under Art. I. Secs 5 and 9 of the Ohio Constitution.

## PROPOSITION OF LAW NO. 8

The denial of the right of the accused to jury instructions as to the mitigating factors of residual doubt and mercy violates the right of the accused to consideration by the sentencer in a capital prosecution of all relevant mitigating factors, in violation of his rights under the Eighth Amendment to the Constitution of the United States, to due process under the Fourteenth Amendment, and to his rights under the Ohio Constitution, Art. I. Secs. 9 and 16.

## PROPOSITION OF LAW NO. 9

The application against the accused by an intermediate appellate court of a change in the law occurring between the imposition of a death sentence and the decision of the appellate court to affirm, which change deprives the accused of the benefit of mitigating

18

factors to which he was entitled when his case was tried, violates his protection against *ex post facto* laws, in violation of Art. I. Sec. 10 of the United States Constitution, and Art II 28 of the Ohio Constitution, as well as R.C. 1.48.

## PROPOSITION OF LAW NO. 10

The trial court committed error prejudicial to Appellant's Eighth Amendment and due process rights in permitting the prosecution to argue that the jury's death verdict was only a recommendation, and also in instructing the jury, and providing verdict forms to the effect that the jury's verdict was only a recommendation, and was not binding upon the trial court.

## PROPOSITION OF LAW NO. 11

The denial of defense requests for funds to retain the services of an investigator, and for a mitigation specialist, denied Appellant the right to the equal protection of the laws, secured to him by the Fourteenth Amendment to the U.S. Constitution, and rendered his death sentence constitutionally infirm under the Eighth Amendment, as well as violating his right to due process of law under the U.S. and Ohio Constitutions.

## PROPOSITION OF LAW NO. 12

Where the prosecution, at the penalty phase of a capital prosecution, is permitted, over objection and motions for mistrial, to adduce evidence of a single incident of a prior "bad act" occurring ten years prior to the offense at bar, and the nature of such act, and even its existence, was not shown to have occurred; the accused was not indicted for a specification based upon such incident; and no conviction resulted from such incident, then the imposition of the death sentence was the result of unconstitutional weighing and consideration of a nonstatutory aggravating factor, the right of the accused under the Eighth and Fourteenth Amendments has been violated, and reversal of the death sentence is required.

## PROPOSITION OF LAW NO. 13

Egregious misconduct by the prosecutor in the penalty phase of capital proceedings requires reversal of the death sentence, and where the prosecutor, in the guise of rebuttal, offers grossly prejudicial and inadmissible evidence of a nonstatutory aggravating factor, and his final argument for death argues nonstatutory aggravating factors, misstates the evidence, contains inflammatory remarks and invective against the accused and his counsel, a death sentence based on a jury verdict following such arguments violates due process and the Eight

Amendment of the United States Constitution, and their counterparts in the Ohio Constitution.

## PROPOSITION OF LAW NO. 14

It is error for the trial court in a capital prosecution to refuse a defense request to submit a questionnaire promulgated by defense counsel to prospective jurors prior to voir dire, in violation of the rights of the accused under the Eighth and Fourteenth Amendments to the Constitution of the United States, and Art. I. Secs. 9 and 16 of the Ohio Constitution.

## PROPOSITION OF LAW NO. 15

It is error for the trial court in a capital prosecution to refuse a defense request to conduct individual, sequestered voir dire, in violation of the rights of the accused under the Eighth and Fourteenth Amendments to the Constitution of the United States, and Art. I. 9 and 16 of the Ohio Constitution.

## PROPOSITION OF LAW NO. 16

It is error for the trial court in a capital prosecution to refuse a defense request to argue first and last to the jury at the penalty phase of the prosecution, in violation of the rights of the accused under the Eighth and Fourteenth Amendments to the Constitution of the United States, and Art. I. 9 and 16 of the Ohio Constitution.

## PROPOSITION OF LAW NO. 17

It is error for the trial court in a capital prosecution to refuse a defense request for separate juries for the guilt and, if necessary, the penalty phases of the prosecution, in violation of the rights of the accused under the Eighth and Fourteenth Amendments to the Constitution of the United States, and Art. I. Secs. 9 and 16 of the Ohio Constitution.

## PROPOSITION OF LAW NO. 18

The Ohio death penalty statutes are unconstitutional, violating the Eighth Amendment proscription of cruel and unusual punishments, the Fourteenth Amendment guarantee to due process of law and to the equal protection of the laws, and also violating the concomitant provisions of the Ohio Constitution.

(A) The death penalty is so totally without penological justification that it results in the gratuitous infliction of suffering, and that consequently, there is no rational state interest served by the ultimate sanction.

(B) Both locally, statewide, and nationally, the death

20

penalty is inflicted disproportionately upon those who kill whites as opposed to those who kill blacks, and even within Hamilton County, the death penalty is selectively imposed, rendering the penalty as applied in Hamilton County arbitrary and capricious on the one hand, and the product of racial discrimination on the other.

(C) The use of the same operative fact to first elevate what would be "ordinary" murder to aggravated murder, and then to capital, death-eligible aggravated murder permits the state (1) to obtain a death sentence upon less proof in a felony murder case than in a case involving prior calculation and design, although both crimes are ostensible [sic] equally culpable under the Revised Code, and (2) fails to narrow the capital class to those murderers for whom the death penalty is constitutionally appropriate.

(D) The requirement that a jury must recommend death upon proof beyond a reasonable doubt that the aggravating circumstances outweigh only to the slightest degree the mitigating circumstances renders the Ohio capital statutes quasi-mandatory and permits the execution of an offender even though the mitigating evidence falls just short of equipoise with the aggravating factors, with the result that the risk of putting someone to death when it is practically as likely as not that he deserves to live renders the Ohio capital process arbitrary and capricious, and, in the absence of a requirement that, before death may be imposed, aggravating factors must *substantially* outweigh mitigating factors, unconstitutional. (emphasis in original).

[Mr Wogenstahl's brief does not contain a subclaim denominated as "(E)"]

(F) The provisions of Crim. R. 11(C)(3) permitting a trial court to dismiss specifications upon a guilty plea only under the nebulous and undefined concept "in the interests of justice" (1) needlessly encourages guilty pleas and the concomitant waiver of the right to jury, to compulsory process and to confrontation and (2) reintroduces the possibility that the death sentence will be imposed arbitrarily and capriciously.

(G) The Ohio capital sentencing scheme is unconstitutional because it provides no standards for sentencing or review at several significant stages of the process and consequently death sentences are imposed, and reviewed, without sufficient statutory guidance to juries, trial courts, and reviewing courts to prevent the unconstitutional arbitrary and capricious infliction of the death penalty.

## PROPOSITION OF LAW NO. 19

A conviction and death sentence for aggravated murder must be

reversed as violations of the fundamental fairness required by the due process clause of the Fourteenth Amendment, and the Sixth Amendment right to trial before a fair and impartial jury, as well as their counterparts in the Ohio Constitution, as well as the Eighth Amendment[] prohibition against cruel and unusual punishment, where the conviction and death sentence were obtained through use of repetitive, cumulative photographs of the corpse of [the] deceased, the net prejudicial effect of which far outweighed their probative value.

### PROPOSITION OF LAW NO. 20

Unless and until the accused puts his character in issue, it is improper, prejudicial error to permit the state to present evidence in its case in chief purporting to demonstrate that the accused is a bad person, in violation of the right of the accused to due process of law and to a fair and impartial jury, under the Sixth and Fourteenth Amendments, respectively, to the Constitution of the United States, and, where a death sentence is the result of the proceedings, in violation of the Eighth Amendment as well; similar rights protected by the Ohio Constitution were similarly violated.

### PROPOSITION OF LAW NO. 21

It is prejudicial error, and a violation of the right of the accused to due process of law, secured by the Fourteenth Amendment to the Constitution of the United States, to admit evidence of a prior offense which is temporally remote, and not at all similar to the offense in the case at bar, under the purported "same and similar act" exception to the general rule that evidence of prior criminal conduct is not admissible to prove an element of the subsequent offense then being tried.

### PROPOSITION OF LAW NO. 22

A death sentence must be reversed as contrary to the Revised Code, as well as the Eighth Amendment, where the trial court fails to instruct the jury that the aggravating circumstances under R.C. 2929.04(A)(7) contains two mutually exclusive alternatives, and thus permits conviction of the aggravating circumstance upon less than a unanimous vote of the jury; such an error is also an independent violation of the right of the accused to due process of law; similar rights secured by the Ohio Constitution are also violated thereby.

### PROPOSITION OF LAW NO. 23

Admission of an expert opinion with respect to a haldo-alpha blood

22

test insufficient to establish to a reasonable scientific certainty that blood found in the Defendant's auto was that of the deceased victim, where the expert possesses insufficient expertise, and where the Defendant owned the auto for but three days prior to the offense, and where the blood removed from the Defendant's auto could have been there as long as ten years, is prejudicial error, and a denial of due process.

## PROPOSITION OF LAW NO. 24

Where the identification of the accused by a witness is the result of overly suggestive police investigative tactics, the refusal of the trial court to suppress the witness' identification testimony violates the right of the accused to due process of law, requiring reversal.

## PROPOSITION OF LAW NO. 25

Where the state fails to prove beyond a reasonable doubt that the accused is the perpetrator of the crimes with which he has been charged, convictions for aggravated murder, aggravated burglary and kidnaping, and the capital specifications attendant thereto, must be reversed as contrary to the right of the accused to due process of law under the Ohio and federal Constitutions.

## PROPOSITION OF LAW NO. 26

Convictions for aggravated murder which are contrary to the manifest weight of the evidence must be reversed, as contrary to the right of the accused to due process of law under the Ohio and federal Constitutions.

## PROPOSITION OF LAW NO. 27

The aggravating circumstances Appellant was found guilty of violating do not outweigh the mitigating factors, and hence the death sentence imposed upon Appellant violates his rights under the Eighth and Fourteenth Amendments to the United States Constitution, and violate Ohio Law as well.

## PROPOSITION OF LAW NO. 28

Where convictions of capital murder and related offenses is tainted by prejudicial prosecutorial misconduct which deprives the accused of a fair trial, those convictions violate the fundamental fairness required by due process, and the conviction must be reversed as violative of the Ohio and federal Constitutions.

## PROPOSITION OF LAW NO. 29

A death sentence following a verdict of a jury from which one or

23

more venire persons were improperly excused because of their views with respect to capital punishment violates the right of the accused to a fair and impartial jury under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and their counterparts under the Ohio Constitution.

## PROPOSITION OF LAW NO. 30

Where one on trial for a capital crime is denied the effective assistance of counsel, in violation of his right thereto under the Sixth, Eighth, and Fourteenth Amendments to the Constitution of the United States, and under the Ohio Constitution, Art. I. Sec. 10, his conviction and sentence must be reversed.

## PROPOSITION OF LAW NO. 31

Where appellate counsel fail to raise on appeal the issue of ineffectiveness of trial counsel in failing to object to prejudicial prosecutorial misconduct in argument, the accused has been denied the effective assistance of appellate counsel secured to him by the Sixth and Fourteenth Amendments to the Constitution of the United States, and by Art. I. 10 of the Ohio Constitution.

## PROPOSITION OF LAW NO. 32

Where, during a criminal trial, there are multiple instances of error, and the cumulative effect of such errors deprives the accused of a fair trial and undermines the reliability of the conviction and the sentence of death imposed upon a jury verdict, the rights of the accused to due process and to be free from cruel and unusual punishment, under the Fourteenth and Eighth Amendments, respectively, of the United States Constitution, and their corollaries in the Ohio Constitution, have been violated, requiring reversal.

## PROPOSITION OF LAW NO. 33

To comport with due process under the United States and Ohio Constitutions, and the Ohio capital statutes, for purposes of proportionality review, death sentences must be compared with all other cases within the jurisdiction in which the death sentence was imposed, as well as those capital cases in which it was not imposed.

*Id.,* Vol. V at 1153-1325.

In a March 6, 1996, Opinion, the Ohio Supreme Court found that none of Mr.

Wogenstahl's claims afforded a basis for reversing his convictions or sentences and the Court

24

overruled all of his propositions of law. *State v. Wogenstahl,* 74 Ohio St.3d 344 (1996).  The Court also independently reviewed Mr. Wogenstahl's death sentences, as required by Ohio Revised Code § 2929.05(A) and affirmed the death sentences. *Id.*  The United States Supreme Court denied certiorari.  *Wogenstahl v. Ohio*, 519 U.S. 895 (1996).

On February 24, 1995, while his appeal was pending in the Ohio Supreme Court, Mr. Wogenstahl filed a *pro se* application for reopening pursuant to Ohio R.App.P. 26(B) and *State v. Murnahan*, 63 Ohio St.3d 60 (1992).  Appendix, Vol. VII at 1733-1842.  In that Motion, Mr. Wogenstahl alleged ineffective assistance of appellate counsel on the grounds that counsel had failed to raise thirty-two (32) claims in addition to the thirty-five (35) they had raised. *Id.* On May 23, 1995, the Hamilton County Court of Appeals denied Mr. Wogenstahl's motion on the ground that when an appeal to the Ohio Supreme Court is perfected, Supreme Court Rule of Practice II, Section (2)(D)(1) deprived the Court of Appeals of jurisdiction on an application to reopen.  *Id.* at 1853-54. The court noted that pursuant to *Murnahan, supra,* Mr. Wogenstahl could raise his ineffective assistance of counsel claim in his pending Ohio Supreme Court direct appeal.

Mr. Wogenstahl appealed to the Ohio Supreme Court the court of appeals' denial of his *Murnahan* motion and on June 12, 1995, he filed his merit brief *pro se*.  *Id.* at 1860-1974.  On March 6, 1996, the Ohio Supreme Court affirmed the court of appeals' denial of Mr. Wogenstahl's application to reopen.  *Id.* at 1996.  Mr. Wogenstahl then filed a  *pro se* motion for reconsideration which the Ohio Supreme Court denied on April 25, 1996.  *Id.* at 1998-2008; 2011.

On September 20, 1996, Mr. Wogenstahl filed a petition for post-conviction relief pursuant to Ohio Revised Code § 2953.21 in the Hamilton County Common Pleas Court pleading five claims for relief:

**First Claim**: **Bloodstain from Petitioner's Car**
[In this Claim, Mr. Wogenstahl argued that in contrast to what was available at the time of his trial,  recent advances in forensic science now made it possible to test a blood stain sample taken from his vehicle.  Mr. Wogenstahl's position was that the sample had always been in the state's custody, that he was therefore prevented from having tests performed on the blood stain, and that the court should order the appropriate testing so that it could be conclusively established that the source of the blood was not Amber Garrett.]

**Second Claim**: **Mitigation Phase Witness Preparation**
[In his Second Claim, Mr. Wogenstahl argued that the brief testimony from Mabel Long who was the first witness the defense called at the mitigation phase, opened the door for the prosecution to question Ms. Long about the burglary of her home by Mr. Wogenstahl, as well as other prior bad acts which Mr. Wogenstahl committed including a robbery, public indecency, and parole violations.  Mr. Wogenstahl's position was that his counsel did not adequately prepare Ms. Long and asked her "open-ended" questions which resulted in the opening of the door to the damaging revelations on cross-examination.  Mr. Wogenstahl claimed this was ineffective assistance of counsel in violation of his Sixth Amendment rights.]

**Third Claim**: **Cellmark Evidence**
[Mr. Wogenstahl essentially argued in support of this claim that his counsel failed to  effectively cross-examine the state's DNA expert, Brian Wraxall.  Mr. Wogenstahl claimed this was ineffective assistance of counsel in violation of his Sixth Amendment rights.]

**Fourth Claim**: **Absence of blood in the Car**
[Mr. Wogenstahls' Fourth Claim was essentially a claim pursuant to *Brady v. Maryland,* 373 U.S. 83, 87 (1963), Mr. Wogenstahl argued that during its investigation, the state failed to properly examine and test the interior of his vehicle.  Mr. Wogenstahl also argued that a report the defense received from the state did not indicate whether or not the state used blood visualization enhancing techniques when examining the interior of his vehicle.  Mr. Wogenstahl claimed that these deficiencies amounted to a *Brady* violation.]

**Fifth Claim**: **Mitigation Phase Investigation and Preparation**
[In support of his Fifth Claim, Mr. Wogenstahl  argued that his counsel failed to make any significant preparations for the sentencing phase including investigating his personal, social, and family history and that counsel failed to interview possible or prospective witnesses

26

> for the purpose of presenting a meaningful picture of him (Mr. Wogenstahl), his background, and his character. Mr. Wogenstahl's position was that based on these circumstances, he was denied his Sixth Amendment right to effective assistance of counsel.]

Appendix, Vol. VIII at 2013-74. After the State filed its Motion for Judgment, *Id.* at 2099-2125,

Mr. Wogenstahl filed a *pro se* "Supplemental Motion to Petitioner's Petition for Postconviction

Relief Under R.C. §2953.21". *Id.* at 2126-28. On February 24, 1997, the trial court filed its findings

of fact and conclusions of law and dismissed Mr. Wogenstahl's petition. *Id.* at 2129-34.

On March 25, 1997, Mr. Wogenstahl filed a Notice of Appeal, *Id.* at 2145, and on

August 15, 1997, Mr. Wogenstahl filed his brief in which he raised the following assignments of

error:

### First Assignment of Error
The trial court erred in finding that a definitive, identity-specific DNA test that completely excludes Amber Garrett as the source of the bloodstain would not affect the outcome of the trial and in concluding that the claim of the availability of a definitive DNA test does not state a constitutional claim [Finding of Fact, Conclusions of Law and Entry Dismissing Petition for Post Conviction Relief, T.D. 9474 at page 2][3].

### Second Assignment of Error
The trial court erred in finding that the test results of Brian Wraxall of the Serological Research Institute and the test results of Cellmark with respect to the source of the semen on the victim's comforter was not in conflict and in concluding that the failure of defense counsel to use the conflicting results to impeach Wraxall as to the reliability of his DNA test of the bloodstain was not ineffective assistance of counsel [Findings of Fact, Conclusions of Law, and Entry Dismissing Petition for Post Conviction Relief, T.D. 9474 at pages 3-4].

### Third Assignment of Error
The trial court erred in finding that the evidence did not support the conclusion that the prosecution failed to disclose the use of forensic

_____

[3] The bracketed language appears in brackets in Mr. Wogenstahl's original brief.

blood visualization enhancement techniques to determine whether non-visible traces of blood were present in Appellant's car and in finding that defense counsel were not ineffective in failing to cause blood visualization enhancement techniques to be used on Appellant's car to show that the victim was not killed in Appellant's car [Findings of Fact, Conclusions of Law, and Entry Dismissing Petition for Post Conviction Relief, T.D. 9474 at pages 4-5].

### Fourth Assignment of Error

The trial court erred in finding that the affidavits submitted with the petition did not show the deficient performance of defense counsel in failing to investigate and prepare witnesses for the mitigation phase of the trial and in concluding that the defense mitigation was not shallow, ineffectual, and damaging to Appellant [Findings of Fact, Conclusions of Law, and Entry Dismissing Petition for Post Conviction Relief, T.D. 9474 at pages 2-3 and 5-6].

*Id.* at 2167-2215.

The Hamilton County Court of Appeals rejected all of Mr. Wogenstahl's arguments and affirmed the trial court's dismissal of his post conviction petition on June 12, 1998. *Id.* at 2269-74; *State v. Wogenstahl,* No. C-970238, 1998 WL 306561 (Ohio App. 1st Dist. June 12, 1998). Mr. Wogenstahl appealed the judgment to the Ohio Supreme Court raising the following propositions of law:

### Proposition of Law No. I

The request to conduct a definitive, identity-specific DNA test which could exclude the victim as the source of the bloodstain which was the key piece of evidence used by the prosecution to connect the victim to the defendant states a constitutional claim under R.C. 2953.21 in a postconviction death penalty case.

### Proposition of Law No II

*Res judicata* does not bar a claim of ineffective assistance of counsel based on the failure of defense counsel to impeach the prosecution's DNA expert on the reliability of the DNA test of the bloodstain, where the claim is based on conflicting DNA test results from the DNA expert and another DNA lab as to the source of semen on the victim's comforter, and where the claim is based on lab reports from

28

the DNA expert and the DNA lab which the trial court refused to admit into the record and where the claim could not have been determined from evidence in the record.

### Proposition of Law No. III

*Res judicata* does not bar a claim of ineffective assistance of counsel based on the failure of defense counsel to cause forensic blood visualization enhancement techniques to be used on the interior of a defendant's car to show that the victim was not killed in the front seat of the defendant's car, where the availability of such techniques is based on evidence outside of the record.

### Proposition of Law No. IV

A defendant states a post conviction claim under *Brady v. Maryland* (1963), 373 U.S. 83. 83 S.Ct. 1194, 10 L.Ed.2d 215, where the prosecution disclosed that it conducted forensic testing on a defendant's car but failed to disclose whether that testing included blood visualization enhancement techniques which would show that the victim was not killed in the front seat of the defendant's car as asserted by the prosecution at trial.

### Proposition of Law No. V

*Res judicata* does not bar a claim of ineffective assistance of counsel based on the failure of defense counsel to interview and prepare witnesses for the mitigation phase of a death penalty trial, where the claim is based on evidence outside the record in the form of affidavits showing that defense counsel did not prepare the witnesses for their testimony and did not call witnesses who could have provided relevant, beneficial testimony, where the record shows that the defendant was severely damaged by evidence introduced as a result of defense counsels' lack of preparation.

Appendix, Vol. VIII at 2280-2322.

On October 7, 1998, the Ohio Supreme Court declined jurisdiction and dismissed Mr. Wogenstahl's appeal as not involving any substantial constitutional question. *Id.* at 2359; *State v. Wogenstahl,* 83 Ohio St.3d 1449 (1998)(table).

On January 26, 1998, Mr. Wogenstahl filed a motion for leave to file a motion for a new trial on the basis of newly-discovered evidence. Appendix, Vol. IX at 2360-74. Essentially,

29

Mr. Wogenstahl argued that much more definitive identity-specific DNA testing had developed since the time of his  1993 trial and that it was now possible to exclude the victim, Amber Garrett, as the source of the bloodstain found in his vehicle.  *Id.*  The trial court denied Mr. Wogenstahl's motion on February 4, 1998.  *Id.* at 2375.

Mr. Wogenstahl appealed the denial of his motion for leave to file a motion for a new trial, *Id.* at 2377, and on June 8, 1998, he filed his brief raising the following assignment of error:

**First Assignment of Error**

> The trial court abused its discretion and violated Appellant's right to
> due process under the Fourteenth Amendment to the United States
> Constitution and his right to be free from cruel and unusual
> punishment under the Eighth Amendment to the United States
> Constitution by denying Appellant's motion for leave to file a motion
> for a new trial based on newly discovered evidence, namely, evidence
> of a definitive, identity specific DNA test which could exclude the
> victim as the source of the bloodstain which was the key piece of
> evidence used by the prosecution to connect Appellant to the victim.
> [Order (denying Motion of Defendant for Leave to File Motion for a
> New Trial Based on Newly Discovered Evidence), Appendix A-1][4]

*Id.* at 2398-2428.  On February 19, 1999, the Hamilton County Court of Appeals affirmed the trial court's denial of Mr. Wogenstahl's motion for leave to file a motion for a new trial.  *Id.* at 2460-66; *State v. Wogenstahl,* No. C-980175, 1999 WL 79052 (Ohio App. 1ˢᵗ Dist. Feb. 19, 1999)  The court found that Mr. Wogenstahl's motion was barred by *res judicata* because he had previously raised the DNA issue in his petition for post conviction relief and both it (the court of appeals) and the Ohio Supreme Court had rejected the claim.  *Id.*   Mr. Wogenstahl's filed an Application for Reconsideration on February 23, 1999,  *Id.* at 2467-74, which the court denied on March 18, 1999. *Id.* at 2492.

---

[4]  The bracketed language appears in brackets in Mr. Wogenstahl's original brief.

Mr. Wogenstahl appealed the court of appeals' decision on the new trial motion and on April 5, 1999, he filed his brief in the Ohio Supreme Court raising the following propositions of law:

### Proposition of Law No. I

The egregious misapplication of the rule of *res judicata* to preclude review of a constitutional claim for relief which neither was not could have been fully litigated in a prior action is a denial of fundamental fairness resulting in a violation of the due precess guaranteed in the Fourteenth Amendment to the United States Constitution.

### Proposition of Law No. II

A trial court abuses its discretion and violates a defendant's right to due process under the Fourteenth Amendment to the United States Constitution and his right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution by denying a motion for leave to file a motion for a new trial based on newly discovered evidence, namely. a DNA test which could be potentially exculpatory to the defendant or raise a reasonable doubt about the defendant's guilt.

*Id.* at 2499-2538.  The Ohio Supreme Court declined jurisdiction to hear the case and dismissed the appeal as not involving any substantial constitutional question.  *Id.* at 2562; *State v. Wogenstahl*, 85 Ohio St.3d 1497 (1999)(table).

While he was litigating his new trial matter, specifically on March 4, 1998, Mr. Wogenstahl filed in the Hamilton County Court of Appeals a  *pro se* Motion for Leave to File Delayed Application for Reopening with Good Cause Shown.  Appendix, Vol. X at 2563-69.  In support of his motion, Mr. Wogenstahl argued that his appellate counsel were ineffective for failing to raise seven additional assignments of error.  *Id.*  In addition, Mr. Wogenstahl argued that he had shown good cause for the delay in filing this application because the court of appeals had denied his first, timely application for lack of jurisdiction but that since May, 1995, when the court denied his first motion to reopen,  S.Ct.Prac.R. II (2)(D)(1) was amended effective April 1, 1996, to provide

that the court of appeals retains jurisdiction to rule on a reopening application while the case is

pending in the Ohio Supreme Court. *Id.*  The appeals court granted Mr. Wogenstahl's Motion for

Leave to File and denied his Application for Reopening on May 19, 1998. *Id.* at 2577-78.  The court

first determined that Mr. Wogenstahl could have filed his motion anytime after the April 1, 1996,

rule change but had failed to do so for almost two years after the rule change.  *Id.*  In addition the

court found that the issue of the ineffectiveness of appellate counsel was raised in Mr. Wogenstahl's

direct appeal to the Ohio Supreme Court which concluded that Mr. Wogenstahl had received

competent representation both at trial and on appeal and therefore reopening was barred by the

doctrine of *res judicata*.  *Id.*

Mr. Wogenstahl filed his *pro se* Notice of Appeal to the Ohio Supreme Court on June

9, 1998, *Id.* at 2580-2583, and on that same day filed his merit brief raising the following:

> LEGAL ARGUMENT
> The Court of Appeals erred in denying Appellant's application for
> delayed reopening when stating that Appellant failed to demonstrate
> "good cause" for going beyond the allowed 90 day time period.
>
> PROPOSITION OF LAW NO. 1
> It was reversible error for the trial judge to restrict what the
> sentencing jury could consider on the matter of sentence thereby
> making Appellant's death sentence unreliable and in violation of the
> Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States
> Constitution.
>
> PROPOSITION OF LAW NO. II
> It was reversible error for the trial judge to inform the jury that
> unanimity was required to impose a life sentence thereby making
> Appellant's death sentence unreliable and in violation of the Fifth,
> Sixth, Eighth, and Fourteenth Amendments of the United States
> Constitution.
>
> PROPOSITION OF LAW NO. III
> Jury verdict forms which defines [sic] aggravating circumstances that
> do not specify either "principal offender" or "with prior calculation

32

and design" but gives the jury both alternatives are erroneous and
made Appellant's conviction and sentence of death in violation of the
Eighth and Fourteenth Amendments of the United States
Constitution.

PROPOSITION OF LAW NO. IV
It was reversible error for the trial judge to deny Appellant's pretrial
motion for the disclosure of any evidence which could show bias in
state's witnesses thereby making Appellant's conviction and death
sentence in violation of the Fifth, Sixth, Eighth, and Fourteenth
Amendments of the United States Constitution.

*Id.* at 2584-2605.  The Ohio Supreme Court affirmed the appeals court on November 10, 1998.  *Id.*

at 2664-65; *State v. Wogenstahl*, 83 Ohio St.3d 516 (1998).  In doing so, the court noted that it had

previously determined that Mr. Wogenstahl's claim of ineffective assistance of appellate counsel

lacked merit, that he now he was simply raising the same errors, and that application of *res judicata*

was not unjust.  *Id.* at 518.  Mr. Wogenstahl filed a *pro se* Motion for Reconsideration, Appendix,

Vol. X at 2666-73, which the Ohio Supreme Court denied on December 23, 1998.  *Id.* at 2674.

After Mr. Wogenstahl filed his Petition for Writ of Habeas Corpus, see, *infra*, this

Court granted his motion to amend his Petition, (Doc. 89), and Mr. Wogenstahl did so on June 17,

2003.  (Doc. 90).  Mr. Wogenstahl raised claims in his amended Petition which he had not exhausted

in state court and after briefing by the parties on the issue, this Court ordered that the matter held

in abeyance pending exhaustion.  (Doc. 98).

On September 12, 2003, Mr. Wogenstahl filed in the state trial court a Motion for

New Trial Based on Newly Discovered Evidence.  See, Doc. 102, Ex. A attached thereto; Doc. 103.

Mr. Wogenstahl's position was that there had been a *Brady* violation when the state failed to

disclose Eric Horn's juvenile adjudication which involved a drug offense. Mr. Wogenstahl also

argued that there was prosecutorial misconduct because the prosecutors failed to inform him or the

33

court that Eric Horn had committed perjury when he testified that he had not sold marijuana. The trial court denied Mr. Wogenstahl's Motion on December 4, 2003. (Doc. 104, Ex. A attached thereto). The court of appeals affirmed, *State v. Wogenstahl,* No. C-030945, 2004 WL 2567655 (Ohio App. 1st Dist. Nov. 12, 2004), and on March 16, 2005, the Ohio Supreme Court declined to accept the appeal for review. *State v. Wogenstahl,* 105 Ohio St.3d 1465 (2005)(table).

      Mr. Wogenstahl filed a Notice of Intention to File Habeas Corpus Petition on May 21, 1999, (Doc. 2), and filed his Petition on October 7, 1999, in which he raised Twenty-Eight (28) Grounds for Relief, several of which have subclaims. (Doc. 14). Respondent filed her Return of Writ on December 17, 1999, and Mr. Wogenstahl filed his Traverse on February 11, 2000. (Doc. 16; 19). On October 17, 2000, Mr. Wogenstahl filed motions for leave to conduct discovery and for an evidentiary hearing. (Doc. 35). On January 16, 2001, this Court denied, without prejudice to its later renewal, Mr. Wogenstahl's motion for an evidentiary hearing. (Doc. 38). The Court also granted in part Mr. Wogenstahl's motion to conduct discovery, thereby allowing discovery on the issues of DNA evidence, results of blood visualization enhancement testing, results of other forensic testing, and ineffective assistance of trial counsel. *Id.* Mr. Wogenstahl filed a motion for leave to conduct discovery regarding the state's witness Eric Horn, (Doc. 65), which the Court granted. (Doc. 70).

      Mr. Wogenstahl filed Amendments to the Traverse ... on January 24, 2003. (Doc. 82). As noted above, Mr. Wogenstahl filed an Amended Petition on June 17, 2003, in which he raised claims, *inter alia,* that he had not exhausted in state court, (Doc. 90), and the Court ordered this matter held in abeyance pending exhaustion of those claims. (Doc. 98). Upon completion of those state court proceedings, Mr. Wogenstahl filed a renewed motion for evidentiary hearing which

the Court granted.  (Doc. 117; 123).  An evidentiary hearing was held on December 5, 6, and 21, 2005, during which the Court heard testimony with respect to Mr. Wogenstahl's claims regarding the allegedly perjured trial testimony of Eric Horn and the alleged ineffective assistance of counsel for failure to properly prepare mitigation witness Mabel Long.  (Doc. 134, 137, 138). The parties have filed post-hearing briefs, (Doc. 146, 147, 148), and the matter is now ripe for Report and Recommendations.

## Generally Applicable Law

### I.  Antiterrorism and Effective Death Penalty Act of 1996

The Antiterrorism and Effective Death Penalty Act of 1996, Pub.L.No. 104-132, 110 Stat. 1214 (Apr. 24, 1996) ("AEDPA") applies to all habeas cases filed after April 25, 1996. *Herbert v. Billy,* 160 F.3d 1131 (6th Cir. 1998), *citing, Lindh v. Murphy,* 521 U.S. 320 (1997).  Since Mr. Wogenstahl filed his Petition well after the AEDPA's effective date, the amendments to 28 U.S.C. §2254 embodied in the AEDPA are applicable to his Petition.

At this juncture, the Court notes that Mr. Wogenstahl argues in his Traverse that application of the AEDPA to his petition would result in an impermissible retroactive application of the AEDPA.  Presumably, Mr. Wogenstahl bases his argument on the fact that although he filed his petition after the effective date of the AEDPA, his conviction occurred prior to the effective date of the AEDPA.  However, after Mr. Wogenstahl filed his Traverse, the Sixth Circuit decided *Lott v. Coyle,* 261 F.3d 594, 604 n.3 (6th Cir. 2001), *cert. denied* 534 U.S. 1147 (2002), in which it deemed as "wholly without merit" the  argument that application of the AEDPA to a petition

35

challenging a pre-AEDPA conviction would be unconstitutionally retroactive under *Landgraf v. U.S.I. Films,* 511 U.S. 244 (1994).  See also, *Williams v. Bagley,* 380 F.3d 932, 943 (6th Cir. 2004), *cert. denied sub nom, Williams v. Bradshaw,* 544 U.S. 1003 (2005).  As in *Williams,* Mr. Wogenstahl has not demonstrated that his case merits a different result given his failure to identify "any new legal consequences that, had he known of them in advance might have, in any way, affected his conduct before filing his habeas petition" and his failure to show that he had acquired any vested rights is pre-AEDPA standards of review.  See *Id.*

> Title 28 U.S.C. §2254, as amended by the AEDPA, provides:
>
> ...
> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254.

The AEDPA also provides that a factual finding by a state court is presumed to be correct, and a petitioner must rebut the presumption of correctness by clear and convincing evidence. 28 U.S.C. §2254(e).   In addition, pursuant to the AEDPA, before a writ may issue on a claim that was evaluated by the state courts, the federal court must conclude that the state court's adjudication of a question of law or mixed question of law and fact was "contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court."  28 U.S.C.

§2254(d)(1).

A state court's decision is contrary to the Supreme Court's clearly-established precedent if: (1) the state court applies a rule that contradicts the governing law as set forth in Supreme Court case law; or (2) the state court confronts a set of facts that are materially indistinguishable from those in a decision of the Supreme Court and nevertheless arrives at a result different from Supreme Court precedent. *Williams v. Taylor,* 529 U.S. 362, 405-06 (2000). A state court's decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal rule [from Supreme Court cases] but unreasonably applies it to the facts of the particular state prisoner's case", "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply[,] or [if the state court] unreasonably refuses to extend that principle to a new context where it should apply." *Williams,* 529 U.S. at 407-08. For a federal court to find a state court's application of Supreme Court precedent unreasonable, the state court's decision must have been more than incorrect or erroneous; it must have been "objectively unreasonable." *Wiggins v. Smith,* 539 U.S. 510, 520-21 (2003); *Williams,* 529 U.S. at 407, 409. An *unreasonable* application of federal law is different from an *incorrect* application of federal law. *Id.* at 410 (emphasis in original). In sum, Section 2254(d)(1) places a new constraint on the power of a federal court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. *Id.* at 412 (Justice O'Connor, concurring).

A state court decision is not "contrary to" Supreme Court law simply because it does not specifically cite Supreme Court cases. *Early v. Packer,* 537 U.S. 3 (2002). Indeed, "contrary to" does not even require awareness of Supreme Court cases, so long as neither the reasoning nor

37

the result of the state-court decision contradicts them. *Id.* at 8. The AEDPA prohibits the overturning of state decisions simply because the federal court believes that the state courts incorrectly denied the petitioner relief:

> By mistakenly making the "contrary to" determination and then proceeding to a simple "error" inquiry, the Ninth Circuit evaded Section 2244(d)'s requirement that decisions which are not "contrary to" clearly established Supreme Court law can be subjected to habeas relief only if they are not merely erroneous, but "an unreasonable application" of clearly established federal law, or based on "an unreasonable determination of the facts".

*Id.* at 366.

For the purposes of the AEDPA, the court reviews the last state court decision on the merits. *Howard v. Bouchard,* 405 F.3d 459, 469 (6th Cir. 2005), *cert. denied,* ___ U.S. ___, 126 S.Ct. 1032 (2006).

The AEDPA standard of review applies only to "any claim that was adjudicated on the merits in State court proceedings." *Danner v. Motley,* 448 F.3d 372, 376 (6th Cir. 2006). A state court's failure to articulate reasons to support its decision is not grounds for reversal under the AEDPA. *Williams v. Anderson,* 460 F.3d 789, 796 (6th Cir. 2006), *citing, Harris v. Stovall,* 212 F.3d 940 (6th Cir. 2000), *cert. denied,* 432 U.S. 947 (2001). Where the state court fails to adjudicate a claim on the merits, the habeas court conducts an independent review of a petitioner's claims. *Williams*, *supra.* That independent review, however, is not a full, *de novo* review of the claims, but remains deferential because the court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *Williams, supra.*

## II. Procedural Default

The standard for evaluating a procedural default defense is as follows:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an adequate and independent state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause of the default and actual prejudice as a result of the alleged violation of federal law; or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 749 (1991); *see also, Simpson v. Jones,* 238 F. 3d 399, 406 (6th Cir. 2000).  That is, a petitioner may not raise on federal habeas a federal constitutional right he could not raise in state court because of procedural default. *Wainwright v. Sykes*, 433 U.S. 72 (1977); *Engle v. Isaac*, 456 U.S. 107 (1982).   Absent cause and prejudice, a federal habeas petitioner who fails to comply with a State's rules of procedure waives his right to federal habeas corpus review. *Boyle v. Million*, 201 F. 3d 711, 716 (6th Cir. 2000); *Murray v. Carrier*, 477 U.S. 478 (1986);  *Engle v. Isaac*, 456 U.S. 107 (1982);  *Wainright*  433 U.S. at 87.

The Sixth Circuit Court of Appeals requires a four-part analysis when determining whether a habeas claim is barred  by procedural default.  *Reynolds v. Berry*, 146 F. 3d 345, 347-48 (6th Cir. 1998), *citing Maupin v. Smith*, 785 F. 2d 135, 138 (6th Cir. 1986); *accord Lott v. Coyle*, 261 F. 3d 594 (6th Cir. 2001), *cert. denied,* 534 U.S. 1147 (2002).

> First the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule.
>  . . .
> Second, the court must decide whether the state courts actually enforced the state procedural sanction, citing *County Court of Ulster County v. Allen*, 442 U.S. 140, 149, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979).
>
> Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim.
>
> Once the court determines that a state procedural rule was not

39

complied with and that the rule was an adequate and independent state ground, then the petitioner must demonstrate under *Sykes* that there was "cause" for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error.

*Maupin,* 785 F. 2d at 138.

## Analysis of the Merits

### Ground One

**The trial court committed prejudicial error in violation of Petitioner's constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments by denying Petitioner's pre-trial request for an investigator and mitigation expert.**

Mr. Wogenstahl argues that the trial court denied him a fundamentally fair trial by denying his request for the appointment of an investigator as well as a mitigation specialist. The parties do not dispute that this claim is properly before this Court.

### State court opinion

Mr. Wogenstahl raised this issue as his Eleventh Proposition of Law in the Ohio Supreme Court. *Wogenstahl,* 75 Ohio St.3d at 370. The Ohio Supreme Court rejected, without discussion, Mr. Wogenstahl's Eleventh Proposition of Law, see, *supra,* stating only:

> We have repeatedly held that this court is not required to address and discuss, in opinion form, each and every proposition of law raised by the parties in a death penalty appeal. See, *e.g. State v. Scudder* (1994), 71 Ohio St.3d 263, 267, 643 N.E.2d 524, 528. We adhere to that position today. Several issues raised by this appellant have been addressed and rejected under similar circumstances in a number of our prior cases. Moreover, a number of appellant's arguments have been waived. Upon a careful review of the record and the governing law, we fail to detect any errors that would undermine our confidence in the outcome of appellant's trial. We are convinced that appellant received a fair trial, a fair and reliable sentencing determination, and competent representation both at trial and on appeal. We address, in

40

opinion form, only those matters that merit some discussion.

*Wogenstahl,* 75 Ohio St.3d at 352.

Under these circumstances, this Court "looks through" the Ohio Supreme Court's

silence to the intermediate appellate court's reasoning in its resolution of the claim of error.  See *Ylst*

*v. Nunnemaker*, 501 U.S. 797, 803-4 (1991).

In addressing this claim, the court of appeals said:

Wogenstahl's fifth assignment of error is addressed to the trial court's
refusal to grant his motion for expert and investigative assistance in
the form of a private investigator to assist counsel in the preparation
of a defense and an independent mental-health expert to assemble,
under a cloak of confidentiality, a case for mitigation of punishment.
The requested assistance should have been provided, we are told,
because this was a "complicated" capital prosecution involving many
potential witnesses, where extensive preparation and "legwork"
beyond the capacity of appointed counsel were essential to the
presentation of an adequate defense.

Under R.C. 2929.024, an indigent capital defendant in Ohio is
recognized to have a right to investigative services and expert
assistance when they are reasonably necessary to insure proper legal
representation.   The appointment of such assistance involves the
exercise of discretion by the trial court and is largely dependent upon
a tangible and detailed demonstration of need by the defense.  *State
v. Smith* (1991), 61 Ohio St.3d 284, 574 N.E.2d 510;  *State v. Jenkins*
(1984), 15 Ohio St.3d 164, 473 N.E.2d 264.

In this case, there were two attorneys appointed to represent
Wogenstahl throughout the trial proceedings.  In view of the nature
of the defense, the extent of discovery, the trial court's order
providing for the disclosure of all prosecution witness statements to
the defense, and the court's willingness otherwise to provide
mental-health services for mitigation through its psychiatric clinic,
we cannot say that the denial of Wogenstahl's specific requests for
assistance amounted to an abuse of discretion.   Under the
circumstances, we are convinced that the court acted appropriately in
the absence of the requisite showing of reasonable need, and there is
nothing in the record to indicate how its ruling might have
compromised or prejudiced the actual preparation and presentation

41

of Wogenstahl's defense. His fifth assignment of error is, accordingly, without merit.

*Wogenstahl,* 1994 WL 686898 at *5.

### Clearly established federal law

A criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has *access* to the raw materials integral to the building of an effective defense. *Ake v. Oklahoma,* 470 U.S. 68, 77 (1985)(emphasis supplied). Accordingly, the Constitution requires that indigent defendants be provided "an adequate opportunity to present their claims fairly within the adversary system." *Id.*

### Analysis

Prior to the trial of this matter, the court heard argument of several motions. Transcript of Proceedings, Vol. II at 8-34. Those motions included Mr. Wogenstahl's motion for the appointment of an investigator and motion for the appointment of a mitigation specialist. *Id.*

With respect to his motion for the appointment of an investigator, Mr. Wogenstahl's counsel represented that Mr. Wogenstahl needed an investigator for the purpose of interviewing witnesses. *Id.* at 26-27. Counsel noted that Mr. Wogenstahl's counsel would, of course, also interview the witnesses. *Id.* at 27. In denying the motion, the court noted that Mr. Wogenstahl had two court appointed attorneys, one of whom, Mr. Schmidt, was formerly an investigator with numerous hours of experience. *Id.* 27, 29. The court also noted that the fact that Mr. Schmidt was an experienced investigator was one of the factors the court took into consideration when appointing him to represent Mr. Wogenstahl. *Id.* at 27.

Prior to the trial, the court also held evidentiary hearings on Mr. Wogenstahl's motions to suppress. *Id.*, Vol. IV at 63-139; Vol. V at 143-94. During those hearings, Mr.

42

Wogenstahl's counsel had to opportunity to conduct examinations of several police witnesses as well as fact witnesses.  *Id.*

   This Court cannot say that the denial of Mr. Wogenstahl's motion for the appointment of an investigator resulted in a fundamentally unfair trial.  As noted above, the only justification Mr. Wogenstahl gave for the need for an investigator was to interview witnesses, an activity counsel admitted he and co-counsel would perform themselves.   Additionally, one of Mr. Wogenstahl's lawyers was an experienced investigator. Further, prior to trial, Mr. Wogenstahl, through counsel, had the opportunity to examine several witnesses during the motions to suppress hearings.  This Court concludes that with respect to his motion for appointment of an investigator, these facts reflects that Mr. Wogenstahl had "access to the raw materials integral to the building of an effective defense."

   The Court turns to the issue of Mr. Wogenstahl's motion for appointment of a mitigation expert.  Contrary to Mr. Wogenstahl's argument, the trial court appointed the court's psychiatric clinic to assist Mr. Wogenstahl's counsel with preparation for a mitigation proceeding. *Id.* Vol. II, at 29.  Indeed,  Mr. Adams and/or Dr. Walter of the court's psychiatric clinic repeatedly attempted to interview Mr. Wogenstahl.  *Id.,* Vol. XIX at 2675.  However, Mr. Wogenstahl refused to cooperate. *Id.* at 2675-77.  In addition, prior to the commencement of the mitigation proceedings, Mr. Wogenstahl declined any further psychiatric examination.  *Id.* at 2677.  Again, this Court concludes that  Mr. Wogenstahl had "*access* to the raw materials integral to the building of an effective defense."

   The Ohio Supreme Court's rejection of Mr. Wogenstahl's claim regarding the appointment of an investigator and a mitigation expert is not contrary to clearly-established federal

law. Therefore, Mr. Wogenstahl's Ground One is not well taken and should be denied.

**Ground Two**

> **The trial court made a number of improper pre-trial rulings which either individually, or cumulatively, violated Petitioner's constitutional rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.**
>
> **i) The trial court erred in violation of Petitioner's constitutional right to due process of law in denying the defense motion for a change of venue.**
>
> **ii) The trial court committed error in violation of Petitioner's constitutional rights by denying the defense request for disclosure of evidence of bias of state's witnesses.**
>
> > **(a) The trial court's denial of the request for disclosure of evidence of bias violated Petitioner's Sixth Amendment constitutional right to confront the witnesses against him.**
> >
> > **(b) The prosecution's withholding of exculpatory and impeaching evidence violated Petitioner's constitutional right to due process under Brady v. Maryland.**
> >
> > **(c) The prosecutor's presentation and subornation of false testimony violated Petitioner's constitutional right to due process and a fundamentally fair trial.**
>
> **iii) The trial court violated Petitioner's constitutional rights by making the following erroneous rulings prior to trial:**
>
> > **(a) The trial court committed error in denying the defense motion to allow 12 peremptory challenges to prospective jurors.**
> >
> > **(b) The trial court committed error in denying the defense request to submit a jury questionnaire before voir dire.**
> >
> > **(c) The trial court committed error in denying the**

**defense motion for individual examination and sequestration of jurors during voir dire.**

**(d) The trial court committed error in denying the defense motion for separate juries for the trial phase and for the mitigation phase.**

**(e) The trial court committed error in excluding prospective jurors generally opposed to capital punishment.**

**(f) The trial court committed error in denying the defense motion to suppress witness identification testimony.**

**iv) The cumulative effect of the trial court's errors prior to trial violated the Petitioner's constitutional rights.**

**v) Petitioner's appellate counsel rendered ineffective assistance by failing to raise the trial court error in excluding prospective jurors generally opposed to capital punishment**.

Respondent argues that subclaims (i), (iii), and (v) are procedurally defaulted[5].


**Subclaims (i) and (iii)**

        As noted, Respondent argues that subclaims (i) and (iii) are procedurally defaulted.

Mr. Wogenstahl does not challenge Respondent's argument.  (Doc. 19 at 158-62, 166-78; Doc. 82).

Mr. Wogenstahl raised subclaims (i) and (iii) in Assignment of Error No. XXIII and Assignment of

Error No. XXXII on direct appeals to the Hamilton County Court of Appeals. Appendix, Vol. III

at 695-815; *Wogenstahl,* 1994 WL 686898 at *1-16.   However, Mr. Wogenstahl failed to pursue

those claims in the Ohio Supreme Court.  Appendix, Vol. V at 1152-1325; *Wogenstahl*, 75 Ohio

---

     [5] Respondent initially argued in her Return of Writ that subclaim (ii) was procedurally defaulted. However, Respondent made that argument prior to Mr. Wogenstahl presenting the amendments to his Petition and that argument no longer applies to subclaim (ii) as stated in the Amended Petition.

St.3d at 369-74. Although he had the opportunity to raise in the Ohio Supreme Court the alleged

trial court errors he now raises in subclaims (i) and (iii), Mr. Wogenstahl failed to do so. Therefore,

the first and second prongs of *Maupin* are satisfied. The third *Maupin* prong is met because while

he certainly had the opportunity to raise these trial record-based claims, he did not and therefore

waived his opportunity to do so. Waiver is an adequate and independent state ground to bar *habeas*

review. *Norris v. Schotten,* 146 F.3d 314 (6th Cir. 1998); *Rust v. Zent*, 17 F.3d 155, 161 (6th Cir.

1994). Finally, Mr. Wogenstahl does not suggest that there is cause for the default. (Doc. 19 at 158-

62, 166-78; Doc. 82).

       This Court concludes that subclaims (i) and (iii) of Ground Two are procedurally

defaulted.

### Subclaim (v)

       Respondent also argues that subclaim (v) is procedurally defaulted. Mr. Wogenstahl

fails to present any argument in opposition to Respondent's position with respect to default. (Doc.

19 at 158-79; Doc. 82). In addition, he fails to provide any argument in support of the merits of this

subclaim. *Id.*; Doc 19 at 158-79.

       Mr. Wogenstahl never raised in the Ohio state courts the claim contained in subclaim

(v) as an ineffective assistance of appellate counsel claim. Appendix, Vol. III at 695-815;

*Wogenstahl,* 1994 WL 686898 at *1-16; Appendix, Vol. V at 1153-1325; *Wogenstahl,* 75 Ohio St.3d

369-74. Indeed, Mr. Wogenstahl never attempted to raise the issue as one of ineffective assistance

of appellate counsel in his *pro se* Application for Reopening, (Appendix, Vol. VII at 1733-1842),

his *pro se* appeal of the denial of that Application, (*Id.* at 1860-1974), his *pro se* Motion for Leave

to File Delayed Application for Reopening ..., (*Id.*, Vol. X at 2564-69), or his appeal of the denial

46

of his Application for Reopening. *Id.* at 2580-83. The first two *Maupin* prongs are therefore satisfied. The third *Maupin* prong is satisfied because although he had the opportunity to raise this claim as an ineffective assistance of counsel claim, he waived that opportunity. Waiver, of course, is an adequate and independent state ground to bar *habeas* review. *Norris*, 146 F.3d at 314; *Rust*, 17 F.3d at 161. This Court concludes that subclaim (v) is procedurally defaulted.

### Subclaim (ii)

Subclaim (ii) addresses the issue of Eric Horn's testimony. That testimony and surrounding issues were the subjects of the Motion for New Trial Based on Newly Discovered Evidence which Mr. Wogenstahl filed in the state trial court in September, 2003. Doc. 102, Ex. A attached thereto; Doc. 103. As noted above, the trial court denied Mr. Wogenstahl's Motion, the court of appeals affirmed the trial court, and the Ohio Supreme Court declined to accept the appeal for review. These issues were also addressed in the evidentiary hearing which this Court held in December, 2005.

The thrust of Mr. Wogenstahl's claim is that there was a *Brady* violation because the State failed to disclose Mr. Horn's juvenile adjudication for drug trafficking, that Eric Horn perjured himself while testifying at Mr. Wogenstahl's trial, and that there was prosecutorial misconduct in that the prosecutor suborned that perjury.

### State court opinion

In addressing and rejecting Mr. Wogenstahl's claims, the court of appeals wrote:

*IV. First Assignment of Error*

In his first assignment, Wogenstahl argues that the trial court erred in denying his motion for a new trial based on newly discovered evidence-that Horn had been convicted of selling drugs and that the prosecutors had withheld evidence of Horn's arrest and prosecution

47

for trafficking in marijuana.

...

It is a fundament of American jurisprudence that the accused has the right to examine any exculpatory and material evidence related to guilt or punishment.  FN 11 Under *Brady v. Maryland,* FN12 the government must disclose any evidence favorable to the defense or detrimental to the government's own case.   This may include impeachment and exculpatory evidence.  FN 13 To establish a *Brady* violation, a defendant must show that (1) the evidence at issue was favorable to the accused (including impeaching and exculpatory evidence), (2) the evidence was suppressed by the state either willfully or inadvertently, and (3) prejudice ensued.

A new trial may be granted upon a defendant's motion when new evidence material to his defense is discovered that could not with reasonable diligence have been discovered and produced at trial.  FN 14 Failure to disclose the criminal record of a witness does not automatically warrant a new trial.  FN 15

In *State v. Petro* FN 16 the Ohio Supreme Court set forth a six-part test for granting a new trial based on newly discovered evidence.  The court held the following: "To warrant the granting of a motion for a new trial in a criminal case, based on the ground of newly discovered evidence, it must be shown that the new evidence (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence."  FN 17.

The evidence of Horn's drug arrest and delinquency adjudication undeniably contradicted his testimony at trial.  We agree that the new evidence meets several of the *Petro* prongs.  And it is arguable whether the new evidence is material to the issues and whether it merely impeaches of contradicts the former evidence.

But because the new evidence does not present a strong probability that it would change the result if a new trial were granted, we must affirm.

*V.  Overwhelming Evidence of Guilt*

48

The evidence in this case was overwhelming. Several witnesses saw Wogenstahl on the road at 3:40 a.m. the night of Amber's disappearance near where her body was later found. Experts from several crime laboratories identified plant material on Wogenstahl's jacket and shoes as being similar to that found around Amber's body. Wogenstahl's favorite leather jacket, which was in good condition earlier that night, was scratched as if it had been worn while walking through a wooded and brushy area similar to the one where Amber's body was found. A pubic hair was found in Amber's clothing that matched the characteristics of Wogenstahl's pubic hair. Police found evidence of blood in Wogenstahl's home and in his car. An expert testified that the blood from Wogenstahl's car matched Amber's blood to a degree that only about five percent of the population would have had the same blood characteristics. And Wheeler testified that Wogenstahl had told him the details of the crimes while they were both incarcerated in the Hamilton County jail.

Wogenstahl is correct that the new evidence tended to support his version of the events. But it does not matter whether Wogenstahl lured Horn out of the Garrett household or whether he merely drove Horn to Beard's apartment for a drug delivery. Any way you look at it, the evidence overwhelmingly demonstrated that Wogenstahl was guilty of the kidnaping and murder of Amber Garrett. There is no probability—let alone a strong one—that the results of a new trial would be any different than the first. And no prejudice to Wogenstahl ensued—he would have been convicted either way.

None of the crimes or specifications of which Wogenstahl had been accused had anything to do with the reasons for taking Horn out of the Garrett household. Regardless of Horn's activities that night, Wogenstahl's crimes against Amber were the only actions that mattered when determining his guilt.

The trial court therefore did not abuse its discretion in denying Wogenstahl's motion for a new trial on the basis of newly discovered evidence. We overrule Wogenstahl's first assignment of error.

### VI. Second Assignment of Error

In his second assignment, Wogenstahl argues that the trial court should have granted his motion for a new trial because the prosecutors knowingly allowed Horn to testify falsely and because they did not advise his trial counsel of the court or the false

testimony. Wogenstahl has presented testimony that calls the prosecutors' conduct into question—but the prosecutors' actions do not undo his conviction.

The state may neither suborn perjury nor introduce testimony it knows or should know is false without correcting it. FN 18 A conviction obtained by the knowing use of perjured testimony is fundamentally unfair and must be set aside if there is any reasonable likelihood that the false testimony could have affected the verdict of the jury. FN 19 That is, the law would require us to grant a new trial if there were any reasonable possibility that Horn's false testimony contributed to Wogenstahl's conviction.

At trial in 1993, Horn testified that he had never seen any marijuana around his house and had never sold it:
Q: And have you ever seen any marijuana around your house?
A: No.
Q: None at all?
A: No.
Q: Did you ever sell it?
A: No.

But in August 1992, Harrison police officers had executed a search warrant at Horn's house and found 63 grams of marijuana in two separate plastic bags, a "bong," and $769 in Horn's wallet. Horn was later charged with felony drug trafficking, but the charge was reduced to a first-degree misdemeanor, and Horn was adjudicated delinquent for trafficking in marijuana.

Two members of the Harrison Police force–both of whom had testified at Wogenstahl's trial–testified in their depositions for his new-trial motion that the prosecutors in the murder trial had known about Horn's drug arrest.

In May 2003, Harrison Police Detective Ed Bettinger testified at a discovery deposition that he had notified the then Hamilton County Prosecutor about Horn's arrest:

Q: Now, a moment ago, you indicated that because of Eric Horn's involvement in the investigation of Amber Garrett, you would have been notified right away?
A: Well, I mean, I'm not talking instantly, but I was made aware, and as recollection serves me, it was at like 8:00 or 9:00 a.m. the next morning when I was told. ...

50

Q: And you made the Hamilton County prosecutors aware of it?
A: Yes, I did.
Q: Do you know how soon after that?
A: Within an hour, and I can speak to that with some degree of certainty, because I know I called Joe Deters at his residence. I felt it was that significant.
Q: Did you talk to Mr. Piepmeier or Mr. Gibson [assistant prosecutors] about it?
A: I'm sure that there were conversations concerning it. As to whether I specifically notified them within a brief interval of finding it out, I don't recall that. I would have felt that in notifying their boss [Mr. Deters was at the time the Hamilton County Prosecutor; Messrs. Piepmeier and Gibson were assistants], I had fulfilled my obligation to make prosecution aware of it.
Q: Do you recall discussing it later on in preparation for the trial with Mr. Piepmeier or Mr. Gibson?
A: I'm sure. I'm sure that it was discussed, you know, what a turn of events this is, and that type of thing.

Later in the same deposition, Detective Bettinger went into greater detail about his conversation with the prosecutor:

Q: You stated earlier that when you first found out about the arrest of Eric Horn for drug trafficking in August of '92, you called Joe Deters at his residence?
A: Yes.
Q: Can you describe the content of that conversation?
A: More or less shock on both or our parts because Eric was a principal witness in this, and that was why I wanted to make him aware of this as soon as I could, you know, rather than waiting for business to resume Monday. I felt compelled to notify him at his residence, which is what I did.
Q: Do you recall any of the statements made by Mr. Deters at that time?
A: Oh, shit, you know, that was the-
Q: Okay.
A: You don't have to write that, do you? I mean, that was the general consensus, oh shit. I mean, what next.
Q: And you might have been asked this before, but did you have repeated or continued conversations with Mr. Deters about the impact of this arrest of Eric Horn on the Wogenstahl case?
A: I don't know how best to answer that, other than to reiterate. We had ongoing conversations with all the principals.

Wogenstahl also provided excerpts from the deposition of Harrison

51

Police Officer Steve Mathews, who testified that he had known about Horn's arrest and had notified the prosecutors:

Q: Let me be clear, you're saying that before Jeffrey Wogenstahl's trial in early '93, you were aware of Eric Horn's drug trafficking arrest in August of '92?

A: I don't know that I knew the specific date, but I was aware of the arrest, yes.

Q: Do you recall discussing it with other members of the team that was investigating the Amber Garrett death?

A: Sure, with Lieutenant Bettinger, and again, I can't recall if it was both Piepmeier and Gibson or just Piepmeier or just Gibson. We were in one of their offices when this was brought up.

Q: And that was before trial?

A: And, again, I don't recall that I specifically said it. Lieutenant Bettinger was bringing it up. And when you say "before trial," I'm not saying it was before the actual trial day. It could have been months or days or weeks beforehand. * * *

Q: And in terms of your preparation for testimony at trial, you indicate there was a meeting with either Prosecutor Piepmeier, Gibson or both, and there was discussion about Eric Horn's 1992 arrest?

A: Um-hum.

Q: Let me first ask you, where exactly did this take place?

A: It was at the prosecutor's office. I don't know whose office it was, but it was at the prosecutor's office. * * *

Q: And it's your recollection that it was Lieutenant Bettinger that brought it up with the prosecuting attorney?

A: Yeah.

Q: Do you remember what Lieutenant Bettinger said?

A: Generalized terms, it was that he was arrested for–from my recollection, generalized terms, he told him about the arrest of Eric Horn and the situation at hand.

It does not appear from the record that the prosecutors have responded to these charges–the state's brief does not comment on or deny the allegations. It simply states that they do not matter in the outcome of this case.

If the accounts contained in the depositions are true, they raise serious questions. But as they relate to Wogenstahl's conviction, we agree that these depositions do not change the outcome. As we have already stated, there is no likelihood whatsoever that the new evidence of Horn's delinquency could have affected the jury's verdict.

We therefore overrule Wogenstahl's second assignment of error. Accordingly, we affirm the trial court's judgment.

> FN11.  *Brady v. Maryland* (1963), 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215.
>
> FN12. Id.
>
> FN13. *Giglio v. United States,* (1972), 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104.
>
> FN14. Crim.R. 33(A)(6).
>
> FN15. See *State v. Kitzler* (Feb. 1, 1996), 8th Dist. No. 69076, 1996 WL 38871.
>
> FN16. (1947), 148 Ohio St. 505, 36 O.O. 165, 76 N.E.2d 370.
>
> FN17.  Id. at syllabus.
>
> FN18.  See *State v. Sanders* (2001), 92 Ohio St.3d 245, 750 N.E.2d 90, citing, *Mooney v. Holohan* (1935), 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791, and *Napue v. Illinois* (1959). 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed2d 1217.
>
> FN19.  See id.; *Kyles v. Whitley* (1995), 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490.

*Wogenstahl,* 2004 WL 2567655 at *4-*8.

## Clearly established federal law

The State has a duty to produce exculpatory evidence in a criminal case.  If the State withholds evidence and it is material, the conviction must be reversed.  *Brady v. Maryland*, 373 U.S. 83 (1963).  "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."  *United States v.*

*Bagley*, 473 U.S. 667, 683 (1985).  Impeachment evidence as well as exculpatory evidence falls within the rule.  *Bagley, supra.*  A reviewing court is to assess materiality in light of the evidence actually presented at trial.  *Kyles v. Whitley*, 514 U.S. 419 (1995).  Materiality does not require a showing by a preponderance that the ultimate result would have been acquittal.  *Kyles*, *supra*.  Once constitutional error under *Bagley* is shown, there is no need for further harmless error analysis. *Kyles*, *supra*; *Castleberry v. Brigano*, 349 F. 3d 286 (6th Cir. 2003); *United States v. Frost*, 125 F. 3d 346, 383 (6th Cir. 1997), *cert. denied,* 525 U.S. 810 (1998).  The *Bagley* test is to be applied to suppressed evidence collectively considered, and not on an item-by-item basis.  *Kyles*, *supra*.

There are three essential components of a true *Brady* violation: the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.  *Strickler v. Greene,* 527 U.S. 263 (1999).

> In *Brady*, this Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S., at 87, 83 S.Ct. 1194. We have since held that the duty to disclose such evidence is applicable even though there has been no request by the accused, *United States v. Agurs*, 427 U.S. 97, 107, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), and that the duty encompasses impeachment evidence as well as exculpatory evidence, *United States v. Bagley*, 473 U.S. 667, 676 (1985). Such evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id*., at 682; see also *Kyles v. Whitley*, 514 U.S. 419, 433-434 (1995). Moreover, the rule encompasses evidence "known only to police investigators and not to the prosecutor." *Id*., at 438. In order to comply with Brady, therefore, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police." *Kyles*, 514 U.S., at 437.

> These cases, together with earlier cases condemning the knowing use of perjured testimony, illustrate the special role played by the American prosecutor in the search for truth in criminal trials. Within the federal system, for example, we have said that the United States Attorney is "the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935).

*Strickler*, 527 U.S. at 280-81. *Accord, Jamison v. Collins*, 291 F. 3d 380 (6th Cir. 2002).

Due process is offended when a prosecutor knowingly suborns perjury to obtain a conviction. *Mooney v. Holohan,* 294 U.S. 103 (1935). In order to state a claim of subornation of perjury, it must be shown that the testimony referred to was false, that it was material, and that the prosecutor knew it was false. *Coe v. Bell,* 161 F.3d 320. 342-43 (6th Cir. 1998), *cert. denied,* 528 U.S. 842 (1999).

**<u>Analysis</u>**

As an initial matter, this Court notes that at the December, 2005, evidentiary hearing Detective Bettinger and Officer Mathews gave testimony which was substantially the same as the testimony they gave in their May, 2003 depositions. Transcript of December, 2005, Evidentiary Hearing, Vol. I at 11-30 (Mathews testimony); *Id.* at 31-58 (Bettinger testimony)(Doc. 141). In addition, Eric Horn essentially testified at that same evidentiary hearing that: (1) he was adjudicated delinquent on August 28, 1992; (2) he was released from probation on January 4, 1993; (3) his trial testimony was true; and (4) he pled guilty to the drug charge even though he was innocent. *Id.* at 64-89. Finally, the prosecutors involved in Mr. Wogenstahl's case each testified at the evidentiary hearing as follows: (1) Joseph Deters testified that he did not recall Detective Bettinger calling him to tell him about Eric Horn's arrest; (2) Mark Piepmeier testified that he did not recall getting any

information about Eric Horn's arrest; and (3) Richard Gibson testified that he did not recall having any information about Eric Horn's arrest. *Id.,* Vol. II at 97-135 (Dieters testimony); *Id.* at 136-76 (Piepmeier testimony); *Id.* at 176-210 (Gibson testimony)(Doc. 142).

Mr. Wogenstahl argues that his due process rights were violated when the state failed to disclose to him Eric Horn's juvenile drug related adjudication as delinquent.

The Court concludes that the evidence of Eric Horn's adjudication was favorable to Mr. Wogenstahl because it was impeaching of Horn State, either wilfully or inadvertently, suppressed that evidence. The question becomes whether, as a result, Mr. Wogenstahl was prejudiced. This Court concludes he was not.

There was an enormous amount of evidence introduced at trial upon which a rational trier of fact could base a guilty verdict. The following describes only some of that evidence.

Although Mr. Wogenstahl disputes *why*, during the early morning hours of November 24, 1991, he went to the apartment where Amber Garrett lived, he has never denied that he in fact went to that apartment. Whether Mr. Wogenstahl tricked Eric Horn into leaving the apartment or whether Eric Horn left with Mr. Wogenstahl to deliver marijuana to Peggy Garrett, the fact is that Mr. Wogenstahl and Eric Horn left the Garrett apartment together.

Vickie Mozena testified that during the early morning of November 24, 1991, she was working at the United Dairy Farmers (UDF) store in Harrison, Ohio, which is near the Ohio-Indiana border and that at about 3:15 a.m. she saw a car resembling Mr. Wogenstahl's car drive past the store going in the direction of Indiana and that there appeared to be a man driving and a young girl in the passenger seat. Transcript Vol. XI at 1438-59. Ms. Mozena also testified that between about 3:35 and 4:00 a.m. she noticed the same car parked at a car wash across the street from the

56

UDF store, that eventually Mr. Wogenstahl entered the UDF and bought a package of cigarettes, and that she noticed what appeared to be dirt or blood under his fingernails. *Id.* Finally, Ms. Mozena testified that later that morning she again noticed Mr. Wogenstahl's car at the car wash and that there was a man who appeared to be cleaning the interior of the vehicle. *Id.*

Harold Borgman testified that he lives about four miles from Harrison, Indiana, and that at about 3:13 a.m. on November 24, 1991, he had gotten out of bed and sometime later looked out the window and noticed a car driving very slowly on Kamison Road toward Harrison. *Id.,* Vol. XIII at 1645-62. Mr. Borgman also testified that he saw the vehicle pull off to the side of the Jamison Road and stop and that its lights went out. *Id.* Brian Noel testified that on November 24, 1991, while driving near Mr. Borgman's home, he saw a car parked off the side of Jamison Road and a man whom he later identified as Mr. Wogenstahl apparently getting something out of the vehicle's trunk. *Id.,* Vol. XII at 1508-46. Two additional witnesses, Kathy Roth and Frederick Harms, testified that they saw Mr. Wogenstahl and/or his vehicle on the side of Jamison Road at about 3:40 a.m. on November 24, 1991. *Id.* at 1546-95. It was in this heavily wooded area along Jamison Road that Kenneth Greves discovered Amber Garrett's body on November 27, 1991. *Id.* Vol XIII at 1662-73.

Criminalist William Dean testified that he examined clothing belonging to Mr. Wogenstahl and that he recovered thorn tips from Mr. Wogenstahl's jacket and thorn tips and other plant material from Mr. Wogenstahl's shoes. *Id.,* Vol. X at 1164-1242. Douglas Deedrick, an FBI special agent, testified that the plant materials recovered from Mr. Wogenstahl's clothing was consistent with the plant materials in the area where Amber's body was discovered. *Id.* at 1242-1326. Mr. Deedrick also testified that a single pubic hair found in the crotch area of Amber's

57

underwear had the same characteristics as Mr. Wogenstahl's pubic hair. *Id.*

Finally, Bruce Wheeler testified that at one time he was incarcerated in the same pod with Mr. Wogenstahl at the Hamilton County jail. *Id.,* Vol. XV at 2132-2180. Mr. Wheeler testified further that he and Mr. Wogenstahl spoke on several occasions about Mr. Wogenstahl's involvement in Amber's killing, that Mr. Wogenstahl told him about the kidnaping and killing and that there was very little evidence against him because he had been slick and covered up the evidence, that he (Mr. Wogenstahl) had kidnapped Amber so that he could have sex with her, and that he had "stuck it in her". *Id.*

Eric Horn played only a small role in the story of Amber Garrett's murder. His testimony did little more than provide a time line of the events. Mr. Wogenstahl was not charged with any offenses which involved his tricking Eric Horn into leaving the apartment or his providing transportation for Eric. In the absence of Eric Horn's testimony, there was much more than sufficient evidence upon which a jury could base a verdict finding Mr. Wogenstahl guilty. In other words, even if Mr. Wogenstahl had the information about Eric Horn's adjudication and his counsel had been able to use that evidence to impeach Eric Horn to the point where every juror found him to be completely incredible, there remained more than sufficient evidence to support a guilty verdict[6].

The Court reaches a similar conclusion as to Mr. Wogenstahl's claim that the prosecutor engaged in misconduct by suborning perjury.

There can be no doubt that suborning perjury is a serious matter. Indeed, as the

___

[6] Because the evidence at issue involves a juvenile adjudication, it is at least arguable as to whether Mr. Wogenstahl's counsel would have been permitted to use the evidence for impeachment purposes. However, this Court need not address that issue.

Hamilton County Court of Appeals noted, "[i]f the accounts contained in the depositions are true, they raise serious questions."  However, as this Court has already concluded, Eric Horn's testimony was not material to Mr. Wogenstahl's guilt or innocence.   Therefore, even assuming the prosecutor knowingly allowed Eric Horn to testify falsely, Mr. Wogenstahl's conviction was not a result of such misconduct nor did it result in a violation of Mr. Wogenstahl's due process or fundamentally fair trial rights.

Because this Court has determined that Mr. Wogenstahl's subclaims in Ground Two are either procedurally defaulted or are without merit, his "cumulative effect" claim contained in subclaim (iv) is without merit.

Mr. Wogenstahl's subclaims (i), (iii), and (v) of Ground Two should be rejected because they are procedurally defaulted. Mr. Wogenstahl's subclaims (ii) and (v), should be rejected because the state court decision on these claims is neither contrary to, nor an unreasonable application of, clearly established federal law.

## Ground Three

**Petitioner was denied his Sixth Amendment right to the effective assistance of counsel where trial counsel failed to adequately voir dire prospective jurors to prevent the selection of a jury predisposed to impose the death penalty, failed to request a pretrial hearing on the admission of the deposition testimony of Brian Wraxall concerning his qualification as an expert and the relevance and reliability of his DNA testing, and failed to request a pretrial hearing on the admission of the testimony of inmate Bruce Wheeler.**

This Ground for relief has three claims.  Respondent asserts that the claims with respect to Brian Wraxall and Bruce Wheeler are procedurally defaulted and Petitioner does not offer any argument in opposition.  (Doc. 19 at 181-84; Doc. 82).

59

Mr. Wogenstahl did not raise his claim with respect to Brian Wraxall on direct appeal. Appendix, Vol. III at 695-815, *Wogenstahl,* 1994 WL 686898 at *1-16; Appendix, Vol. V at 1153-1325, *Wogenstahl,* 75 Ohio St.3d at 369-74. While he did raise an issue with respect to Mr. Wraxall in his Petition for post-conviction relief, he raised it in the contexts of trial court error and error by trial counsel to not impeach Mr. Wraxall. Appendix, Vol. VIII at 2013-74, *Wogenstahl,* 1998 WL 306561 at *1-3. Therefore, Mr. Wogenstahl failed to give any Ohio state court the opportunity to address his claim with respect to Mr. Wraxall as he presents it in Ground Three.

On direct appeal to the Hamilton County Court of Appeals, Mr. Wogenstahl did raise in his Thirtieth Assignment of Error his claim with respect to Mr. Wheeler. Appendix, Vol. III at 695-815; *Wogenstahl,* 1994 WL 686898 at *1-16. However, Mr. Wogenstahl failed to raise the claim in the Ohio Supreme Court on direct appeal. Appendix, Vol. V at 1153-1325; *Wogenstahl,* 75 Ohio St.3d at 369-74. Nor did Mr. Wogenstahl raise the claim in his Petition for post-conviction relief. Appendix, Vol. VIII at 2013-74; *Wogenstahl,* 1998 WL 306561 at *1-3.

The first and second *Maupin* prongs have been satisfied with respect to Mr. Wogenstahl's claims about Wraxall and Wheeler. That is, Mr. Wogenstahl failed to pursue the claims through the direct appeal process nor did he raise them is his post-conviction proceedings. The third *Maupin* prong is met because while he certainly had the opportunity to raise these trial record-based claims, he did not and therefore waived his opportunity to do so. Waiver is an adequate and independent state ground to bar *habeas* review. *Norris*, 146 F.3d at 314; *Rust*, 17 F.3d at 161.

Mr. Wogenstahl does not argue that there was any cause for this default. Accordingly, this Court concludes the claims with respect to Mr. Wraxall and Mr. Wheeler

contained in Ground Three are procedurally defaulted.

The third claim in Ground Three is that Mr. Wogenstahl was denied his Sixth Amendment right to the effective assistance of counsel because his trial counsel failed to adequately voir dire prospective jurors to prevent the selection of a jury predisposed to impose the death penalty in that his trial counsel did not make serious efforts to try to rehabilitate prospective jurors Bauer, Otto, and Pittman.

### State court opinion

Although Mr. Wogenstahl raised his voir dire claim in the Ohio Supreme Court, that court rejected his claim without comment. *Wogenstahl,* 73 Ohio St.3d at 344-74.  However, the Hamilton County Court of Appeals addressed that claim and rejected it stating:

> With respect to Wogenstahl's separate claim of ineffectiveness in defense counsel's questioning of several potential jurors during voir dire, he asserts that the questioning was defective because it did not probe to a sufficient extent the prior knowledge prospective jurors had of the case, the impetus for feelings for or against the death penalty, and one juror's expression of views against repeat offenders. Most of the jurors in question were properly excused for cause, one was excused with a peremptory challenge, and two were seated on the trial panel after stating they could be impartial.  Nothing in defense counsel's questioning was unreasonable or ineffective. Wogenstahl's twenty-third and twenty-fourth assignments or error are, therefore, overruled.

*Wogenstahl,* 1994 WL 686898 at *8.

### Clearly established federal law

The governing standard for effective assistance of counsel is found in *Strickland v. Washington,* 466 U.S. 668, 687 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components.  First, the defendant must show that the counsel's

performance was deficient.  This requires showing that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

With respect to the first prong of the *Strickland* test, the Supreme Court has commanded:

Judicial scrutiny of counsel's performance must be highly deferential....  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Id.* at 689.

As to the second prong, the Supreme Court said:

The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to overcome confidence in the outcome.

*Id.* at 694; see also, *Darden v. Wainright,* 477 U.S. 168 (1986); *Wong v. Money,* 142 F.3d 313, 319 (6th Cir. 1998).

In *Wiggins v. Smith,* 539 U.S. 510 (2003), the Supreme Court recognized that the American Bar Association's Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases provide the guiding rules and standards to be used in defining the prevailing

62

professional norms for purposes of ineffective assistance of counsel claims. The 1989 Guidelines

adopted as "prevailing norms" in *Wiggins* merely represent

> ...[A] codification of longstanding, common-sense principles of representation understood by diligent, competent counsel in death penalty cases. The ABA standards are not aspirational in the sense that they represent norms newly discovered after *Strickland*. They are the same type of longstanding norms referred to in *Strickland* in 1984 as "prevailing professional norms" as "guided" by "American Bar Association standards and the like." ... The Court in *Wiggins* clearly holds ... that it is not making "new law" on the ineffective assistance of counsel either in *Wiggins* or in the earlier case on which it relied for its standards, *Williams v. Taylor*, 529 U.S. 362 ... (2000).

*Hamblin v. Mitchell,* 354 F.3d 482, 486 (6th Cir. 2003), *cert. denied,* 543 U.S. 925 (2004).

The United States Supreme Court has articulated a defendant's right to an impartial

jury as it relates to prospective jurors' views on the death penalty as follows:

> In *Witherspoon* [*v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d. 776 (1968)], this Court held that a capital defendant's right, under the Sixth and Fourteenth Amendments, to an impartial jury prohibited the exclusion of venire members "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." 391 U.S., at 522 . . . . It reasoned that the exclusion of venire members must be limited to those who were "irrevocably committed . . . to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings, "and to those whose views would prevent them from making an impartial decision on the question of guilt. *Id*., at 522, n. 21 . . . . We have reexamined the *Witherspoon* rule on several occasions, one of them being *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), where we clarified the standard for determining whether prospective jurors may be excluded for cause based on their views on capital punishment. We there held that the relevant inquiry is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Id*. at 424, . . . quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980).

*Gray v. Mississippi*, 481 U.S. 648, 657-58 (1987). In addition, the Supreme Court has long rejected

the notion that the erroneous dismissal of a prospective juror on account of her views on the death penalty is amenable to harmless error analysis.  *Id.* at 668, *citing Chapman v. California*, 386 U.S. 18, 23 (1967).  "The nature of the jury selection process defies any attempt to establish that an erroneous *Witherspoon-Witt* exclusion of a juror is harmless."  *Gray*, 481 U.S. at 665.

### Analysis

Marjorie P.. Bauer

The following dialogue took place between the trial court and prospective juror Marjorie P. Bauer:

> Q. [court] ... You have been present this morning and you heard the explanation and the possibility of two proceedings, have you not?
>
> A. [Ms. Bauer] Yes.
>
> Q.  The first proceeding you would hear evidence and you would make a decision based on either guilt or innocence.  Punishment would not be a consideration in the first proceeding.  Do you understand that?
>
> A.  Yes.
>
> Q.  Depending upon what your verdict is in the first proceeding, there could be a second proceeding called a penalty phase.  In that you would be called upon to make a recommendation to this Court as to what the sentence would be.  Do you understand that?
>
> A.  Yes.
>
> Q.  I might add if there is a second proceeding or penalty phase this Court would instruct you at that time that a jury recommendation to the Court that the death penalty be imposed is just that, a recommendation, and is not binding upon the Court.  The final decision as to whether the death penalty shall be imposed upon the defendant rests with this Court.  Therefore, even if you would recommend the death penalty the law requires this Court to decide whether the defendant will actually be sentenced to death.  Do you understand that?

64

A. Yes, I do.

Q. My question to you, ma'am, is if in a proper case where the facts warrant it and the law permits it, could you join in signing a verdict from which might recommend to the Court the imposition of the death penalty?

A. No, I could not.

Q. My question to you is are you consciously, religiously or otherwise opposed to the death penalty?

A. No, I am not.

Q. You must otherwise, if you are not consciously, religiously, you must be otherwise opposed [to] the death penalty.

A. Yes, I am.

Q. Well?

A. I am not opposed to the death penalty. It is a personal reason that I could not do it.

Q. For some personal reason that you can't do it?

A. Yes.

Q. Even though you have personal reasons why you feel or some personal reason why you are opposed to the death penalty?

A. There is a personal reason why I could not sign a document putting someone to death.

Q. Okay. Even though there is such a personal reason, could you, nevertheless, listen to the evidence and follow my instructions on the law and consider fairly the imposition of the death penalty if appropriate in this case?

A. No, I could not.

Q. Let's get it nailed down so everybody understands everybody. You are stating to me unequivocally that under no circumstances could you or would you follow the instructions of the law and will

65

not consider fairly the imposition of a sentence of death in this case; is that correct?

A.  That is correct.

Q.  Then you are stating to me unequivocally that you would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of this case?

A.  That is correct.

Q.  Thank you very much.

Transcript, Vol. VII at 528-31.

The prosecutor then moved to remove Ms. Bauer for cause, Mr. Wogenstahl's counsel declined to inquire, and the court excused Ms. Bauer.  *Id.* at 531.

Based on this exchange between the trial court and Ms. Bauer, it was not unreasonable for the trial court to conclude that Ms. Bauer was irrevocably committed to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings.  Ms. Bauer clearly stated to the court that her "personal reason" would prevent her from properly performing her duties as a juror in accordance with the court's instructions and her oath.  In response to questioning by the court, Ms. Bauer clearly and unequivocally stated  that she would not listen to the evidence nor follow the court's instructions on the law.

In view of Ms. Bauer's insistence in response to several inquiries from the court that she would not consider the evidence and not follow the court's instructions, this Court cannot say that Mr. Wogenstahl's counsels' conduct fell outside a wide range of reasonable professional assistance when counsel did not attempt to rehabilitate her.  Petitioner does not suggest any way in

which she could have been rehabilitated.

Lawrence J. Otto

During voir dire, prospective juror Lawrence Otto and the trial court engaged in the

following exchange:

> Q. [court] Good morning, Mr. Otto. I know that you have been seated back there and you heard all the explanations that the attorneys have given to you and you've heard the Court's explanation about the possibility of two proceedings. In the first proceeding you will determine the guilt or innocence. Depending upon what your verdict is in the first case or your decision, there could be a second proceeding called a penalty phase. If there is one you would [be] called upon to make a recommendation to the Court as to what the sentence should be and one of those recommendations would be the death penalty. Any my question to you is you understand that, do you not?
>
> A. [Mr. Otto] Yes, I do.
>
> Q. And my question to you is if in a proper case where the facts warrant it and the law permits it, could you join in signing a verdict [form which might] recommend to the Court the imposition of the death penalty?
>
> A. Yes, I could.
>
> Q. And if you are selected as a juror in this case, could you put all bias, prejudice and sympathies out of your mind and render fair and impartial verdicts based upon the evidence you hear and the law that this Court instructs you on?
>
> A. No, I could not.
>
> Q. You could not follow the law as this Court instructs you; is that correct?
>
> A. That is correct.
>
> Q. Is there some reason for that?
>
> A. There are three reasons. Number one, I have already formed an

opinion.

Q.  You formed an opinion in this case.  You have not heard any evidence.

A.  That is correct.

Q.  We are going to instruct you, if you decide this case, what somebody else said outside this courtroom or do you have any personal account of the facts in this case?

A.  No, sir.

Q.  All right.  So what you are saying, if you are selected as a juror in this case, you could not or we would—as we have been saying here, you are going to decide this case on what you hear in this courtroom, the evidence that you hear in this courtroom and not what somebody else says about it outside this courtroom.  You are going to decide this case on the law that this Court instructs you on and you are going to put all bias, prejudice and sympathies out of your mind, you will put that out of your mind what you think the law is or should be and follow the law that this Court gives you?

A.  I understand what the instructions are.  I am saying I am not ... capable of doing that.

Q.  Okay.

Transcript, Vol. VII at 516-18.

Following this dialogue between Mr. Otto and the trial court, the prosecutor asked that Mr. Otto be removed for cause.  *Id.* at 518.  However, the court allowed Mr. Wogenstahl's counsel to inquire at which time, the following exchange took place:

Q. [counsel] Mr. Otto, you say is this is not religious?

A. [Mr. Otto] No, it is not.

Q.  It is not.  Are you against the death penalty?

A. No, I am not.

68

Q. You are not.  You just cannot quite reach a decision.  Is that the case?

A.   I am saying that I have my personal—I have reached a conclusion.

THE COURT: You have reached a conclusion and you have not heard any evidence and you have made up your mind?

A.  That is correct.[7]

THE COURT: You are excused.  You may return back downstairs.

*Id.* at 518-19.

Contrary to Mr. Wogenstahl's argument, Mr. Otto did not express a "philosophical opposition" to the death penalty.  In fact, the above quoted exchange reveals that Mr. Otto clearly stated that he is *not* against the death penalty and that he would be able to sign a verdict that recommended death.  What Mr. Otto did say is that, without hearing any evidence whatsoever, he had already formed an opinion in the case and that he would not be able to put that opinion aside and follow the court's instructions.

It is clear that Mr. Otto's admitted inability to put aside his preconceived opinion would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.   As with prospective juror Ms. Bauer, this Court cannot say that that Mr. Otto was improperly excused for cause or that Mr. Wogenstahl's counsels' conduct fell outside a wide range of reasonable professional assistance when counsel did not attempt to rehabilitate Mr.

---

[7]  The transcript identifies Prospective Juror Gilligan (and not Mr. Otto) as the source of the answer to the court's inquiry.  *Id.* at 519.  However, that appears to be a typographical error.  First, voir dire of prospective juror Gilligan occurred prior to that of Mr. Otto.  *Id.* at 510-15.  Second, there are no pages missing from the transcript which would suggest that parts of the Otto voir dire are not included.  Finally, subsequent to the identification of prospective juror Gilligan as the source of the answer to the court's inquiry, and on the same page, the transcript reads: "Thereupon, Prospective Juror Otto was excused at 11:23 a.m."  *Id.* at 519.

Otto.

Carmen B. Pittman

Following the court's voir dire of Ms. Pittman, the prosecutor and then Mr. Wogenstahl's counsel inquired of her. *Id.* at 437-48. Both the prosecutor and Mr. Wogenstahl's counsel passed for cause. Transcript, Vol. VII at 435-37; 439; 448. At no time during voir dire did Ms. Pittman express opposition to the death penalty. *Id.* Indeed Mr. Pittman served on the jury. Appendix, Vol. II at 0564; 0595.

Mr. Wogenstahl's claim of ineffective assistance of counsel as it relates to Ms. Pittman is simply not supported by the facts and is without merit.

Conclusion

Mr. Wogenstahl's claims with respect to Mr. Wraxall and Mr. Wheeler in Ground Three are procedurally defaulted and his claims of ineffective assistance of counsel with respect to failure to attempt to rehabilitate three prospective jurors are without merit. Ground Three should be denied.

## **Ground Four**

**Petitioner was denied his Fourteenth Amendment right to due process of law by the prosecution's withholding of evidence of government testing of Petitioner's car with blood visualization enhancement techniques to detect non-visible traces of the victim's blood and by the prosecution's withholding of evidence of a multitude of other forensic tests revealed during trial; Petitioner was also denied his Sixth Amendment right to the effective assistance of counsel to have Petitioner's car tested with blood visualization enhancement techniques to show that the victim's blood was not present in Petitioner's car and that the victim was not killed by Petitioner.**

**i) The prosecution withheld material, favorable evidence of the testing of Petitioner's car with blood visualization enhancement**

70

techniques.

**ii) Petitioner's trial counsel failed to have Petitioner's car tested with blood visualization enhancement techniques to determine whether non-visible traces of the victim's blood were present.**

**iii) The prosecution withheld material, favorable evidence of a multitude of forensic tests performed by the Bureau of Criminal Investigation and Identification and by the Coroner's lab.**

This Court will first address subclaims (ii) and (iii).

In subclaim (ii), Mr. Wogenstahl claims that his counsel were ineffective for failing to have his car tested with blood visualization enhancement techniques to determine whether non-visible traces of Amber Garrett's blood were present. Mr. Wogenstahl has raised this same claim in subclaim (iii) of Ground Thirteen. For the same reasons explained in its analysis of Ground Thirteen, *infra*, this Court concludes that subclaim (ii) of Ground Four is procedurally defaulted.

Respondent argues that subclaim (iii) is procedurally defaulted. Mr. Wogenstahl does not dispute Respondent's argument. (Doc. 19 at 188-89; Doc. 82).

Under *Maupin*, *supra*, subclaim (iii) of Ground Four is procedurally defaulted. First, although he had the opportunity to do so, Mr. Wogenstahl failed to raise the claim on direct appeal to either the Hamilton County Court of Appeals or the Ohio Supreme Court or in the post conviction proceedings. Appendix, Vol. III at 695-815; *Id.*, Vol. V at 1153-1325; Vol. VIII at 2013-74. In addition, as noted above, waiver is an adequate and independent state ground to bar *habeas* review. *Norris, supra*; *Rust, supra*.

Mr. Wogenstahl seems to suggest that there was cause for the default of this claim. His argument is that his trial counsel was ineffective for not objecting when they became aware of the alleged withholding.

71

While Mr. Wogenstahl has raised in these proceedings claims of ineffective assistance of trial counsel, none of those claims involve the issue he presents in subclaim (iii), to wit: that counsel were ineffective by failing to object to the prosecution's alleged withholding of the results of multiple tests.  See, Grounds Three, Thirteen, subclaim (vii) of Ground Nineteen, and Ground Twenty-Three.  Therefore, this Court does not have occasion to determine the effectiveness of trial counsel as to this issue and any such alleged ineffectiveness cannot be cause for the default of subclaim (iii) of Ground Four.

Wogenstahl did not raise subclaim (i) of this Ground on direct appeal in the Ohio courts.  Appendix, Vol. III at 695-851 and *Wogenstahl*, 1994 WL 686898 at *1-16; Appendix, Vol. V at 1153-1325 and *Wogenstahl,* 75 Ohio St.3d at 396-74.  However, in the appeal of the trial court's denial of his post-conviction petition, Mr. Wogenstahl raised the issue before the Hamilton County Court of Appeals as his Third Assignment of Error.  Appendix, Vol. VIII at 2167-2215; *Wogenstahl*, 1998 WL 306561 at *2.  Mr. Wogenstahl also  raised the issue before the Ohio Supreme Court as his Fourth Proposition of Law. Appendix, Vol. VIII at 2280-2322.  As noted above, the Ohio Supreme Court declined to take jurisdiction of and dismissed Mr. Wogenstahl's appeal as not involving any substantial constitutional question.  *Id.* at 2359; *Wogenstahl,* 83 Ohio St.3d at 1149.

### State court opinion

In rejecting this claim, the Hamilton County Court of Appeals wrote:

As noted, part of appellant's third assignment of error alleges that "the prosecution failed to disclose the use of forensic blood visualization enhancement techniques to determine whether non-visible traces of blood were present in appellant's car" in violation of his Fourteenth Amendment right to due process as enunciated in *Brady v. Maryland* (1963), 373 U.S. 83, 83 S.Ct. 1194,

72

10 L.Ed.2d 215.  This argument was raised in appellant's fourth claim for relief, and was supported by the affidavit of Dr. Dan E. Krane (which, as we discussed in response to the first assignment of error, affirmed the availability of new DNA testing techniques) and by an article written by forensic scientist George Schiro entitled "Collection and Preservation of Blood Evidence from Crime Scenes."

Under this claim, appellant discussed the state's position that no traces of blood (other than the bloodstain from the rear inside door handle on the driver's side) were found in appellant's car because the appellant had cleaned his car shortly after the murder. Appellant cited to Dr. Krane's affidavit and to the above-referenced article as support for his speculative, if not convoluted, contention that blood-visualization-enhancement techniques could have been used to detect non-visible traces of blood, and that if such tests were performed by the state, the state's failure to disclose the results constituted a "*Brady*" violation.

A defendant's due process right to a fair trial is violated when the prosecution withholds exculpatory evidence in a criminal proceeding. *State v. Brady, supra.* A due process claim under *Brady* cannot be maintained in the absence of a showing of prejudice, *i.e.,* that the government's action deprived the accused of evidence that was favorable and material. *United States v. Valenzuela-Bernal* (1982), 458 U.S. 585, 102 S.Ct. 3440.

In the instant case, appellant has provided no documentary evidence to bolster his speculation that the prosecution possessed reports that it, in turn, did not provide to the defense during discovery. Consequently, appellant cannot establish that he was deprived of evidence favorable and material to his defense within the meaning of *Brady* and the trial court's refusal to grant an evidentiary hearing on this claim was proper.

*Wogenstahl,* 1998 WL 306561 at *2-3.

### **Clearly established federal law**

The law applicable to a *Brady* claim is set forth in the Court's consideration of Mr.

Wogenstahl's Ground Two, *supra*.

### **Analysis**

73

As an initial matter, the Court notes that Mr. Wogenstahl's position is based purely on speculation.  He has provided no evidence which even suggests that the State in fact employed forensic blood visualization enhancing techniques on his vehicle.

Mr. Dean, the criminalist in the trace evidence section of the Hamilton County Coroner's Laboratory, testified at Mr. Wogenstahl's trial that he examined Mr. Wogenstahl's vehicle and found no evidence that Amber Garrett had been in the vehicle.  Transcript, Vol. 10 at 1195.  In his guilt phase closing argument, Mr. Wogenstahl's trial counsel specifically referred to the absence of blood evidence.  *Id.,* Vol. 17 at 2508-10.  Indeed, the State never disputed that, with the exception of a blood speck found on the door handle of Mr. Wogenstahl's vehicle, none of the numerous items belonging to Mr. Wogenstahl[8] which were tested revealed the presence of blood.

Even assuming *arguendo* that the State had performed forensic blood visualization enhancing techniques on Mr. Wogenstahl's vehicle and the result was negative, it would not have been a violation of *Brady* had the State withheld that information.   Arguably, if the State had conducted the forensic blood visualization enhancing techniques on Mr. Wogenstahl's vehicle and the results were negative, that evidence would be exculpatory in nature.  However, as reflected by his trial counsel's closing argument, Mr. Wogenstahl already knew that the with the exception of the blood speck found on the door handle, all of the State's test results for the presence of blood were negative. In other words, the State had revealed, and Mr. Wogenstahl knew, that the results of the State's tests were negative.  Further, the State never denied that the results of the tests were negative.

The Ohio court's decision as to Mr. Wogenstahl's *Brady* claim is not contrary to or

---

[8]  The items tested included Mr. Wogenstahl's vehicle, jacket, and plumbing-related items from Mr. Wogenstahl's home.

an unreasonable application of clearly established federal law.

Mr. Wogenstahl's subclaims (ii) and (iii) of Ground Four are procedurally defaulted and subclaim (i) is without merit.

## Ground Five

**The trial court committed error in violation of Petitioner's right to due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution in failing to grant Petitioner an acquittal based on the insufficiency of the evidence.**

In this Ground, Mr. Wogenstahl essentially argues that his conviction was based on circumstantial evidence rather than forensic evidence and that such circumstantial evidence was insufficient to support his conviction. Mr. Wogenstahl argues at great length that there were "holes" in the State's case, that there was evidence introduced that was "suspect", and that some witnesses were simply not credible. He essentially invites this Court to re-evaluate the evidence presented at his trial.

### State court opinion

In addressing Mr. Wogenstahl's sufficiency-of-the-evidence claim, the Ohio Supreme Court wrote:

> In his twenty-fifth proposition of law, appellant contends that the evidence is insufficient to establish his identity as the perpetrator of the crimes. We disagree. In reviewing the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis *sic*.) *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573. The weight to be given the evidence and the credibility of the witnesses are issues for the jury to determine. See *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus. Upon a thorough review of the record, we are absolutely convinced that the evidence in this case was more

> than sufficient to prove appellant's guilt beyond a reasonable doubt.
> In this proposition, appellant essentially requests that we evaluate the
> credibility of witnesses and resolve evidentiary conflicts in his favor.
> This we refuse to do.  See, generally, *State v. Hawkins* (1993), 66
> Ohio St.3d 339, 344, 612 N.E.2d 1227, 1231.

*Wogenstahl,* 75 Ohio St.3d at 364-65.

### **Clearly established federal law**

In *Jackson v. Virginia,* 443 U.S. 306 (1979), the Supreme Court discussed the

standard applicable to a federal court's review of a state conviction on a sufficiency-of-the-evidence

claim in some detail.  The Court stated:

> In [*In re*] *Winship,* [397 U.S. 358, 364 (1970)] the Court held for the
> first time that the Due Process Clause of the Fourteenth Amendment
> protects a defendant in a criminal case against conviction "except
> upon proof beyond a reasonable doubt of every fact necessary to
> constitute the crime with which he is charged." ... The standard of
> proof beyond a reasonable doubt, said the Court, "plays a vital role
> in the American scheme of criminal procedure," because it operates
> to give "concrete substance" to the presumption of innocence to
> ensure against unjust convictions, and to reduce the risk of factual
> error in a criminal proceeding.  397 U.S. at 363....  At the same time
> by impressing upon the factfinder the need to reach a subjective state
> of near certitude of the guilt of the accused, the standard symbolizes
> the significance that our society attaches to the criminal sanction and
> thus to liberty itself.  *Id.* at 372 ... (Harlan, J., concurring).
>
> ...
>
> The *Winship* doctrine requires more than simply a trial ritual.  A
> doctrine establishing so fundamental a substantive constitutional
> standard must also require that the factfinder will rationally apply that
> standard to the facts in evidence.  A "reasonable doubt", at a
> minimum is one based on "reason".  Yet a properly instructed jury
> may occasionally convict even when it can be said that no rational
> trier of fact could find guilt beyond a reasonable doubt, and the same
> may be said of a trial judge sitting as a jury.  In a federal trial, such
> an occurrence has traditionally been deemed to require reversal of the
> conviction.  Under *Winship*..., it follow that when such a conviction
> occurs in a state trial, it cannot constitutionally stand.

76

> A federal court has a duty to assess the historic facts when it is called upon to apply a constitutional standard to a conviction obtained in a state court.
>
> ...
>
> After *Winship* the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be ... to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to "ask itself whether, *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the fact finder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution.

*Jackson,* 443 U.S. at 315-19 (citations and footnotes omitted)(emphasis in original).

Under the standard announced in *Jackson*, therefore, it is not the reviewing court's duty to rule out every hypothesis that might be conjured from the facts other than the petitioner's guilt. *Jackson,* 443 U.S. at 326. Instead, where the evidence supports conflicting inferences, the court must presume the fact finder resolved such conflicts against the petitioner and must defer to that resolution. *Id.* Moreover, circumstantial evidence may be sufficient to support a conviction. *United States v. Stone,* 748 F.2d 361, 363 (6th Cir. 1984). Finally, it is well established that the trier of fact at the state court level bears primary responsibility to choose which testimony or evidence to believe, and that a credibility determination by a state court is entitled to a presumption of correctness so long as the determination is fairly supported by the record. *Walker v. Engle,* 703 F.2d

77

959, 969-70 (6th Cir.); *Scott v. Perini,* 662 F.2d 428, 435 (6th Cir. 1981).  After enactment of the AEDPA, the presumption of correctness must be overcome by clear and convincing evidence.

### Analysis

First, as noted above, circumstantial evidence may be sufficient to support a conviction.  Therefore, a paucity, or even lack of, forensic evidence, which is itself circumstantial, does not automatically require a jury to return a not guilty verdict.

As this Court noted in its analysis of subclaim (ii) of Ground Two, there was indeed an enormous amount of evidence against Mr. Wogenstahl upon which a  rational trier of fact could base a guilty verdict.  While there may arguably have been a paucity of forensic evidence in this case, the above-referenced abundance of circumstantial evidence provided a sufficient basis for the jury's guilty verdict.

The Ohio Supreme Court's conclusion on Mr. Wogenstahl's sufficiency-of-the-evidence claim is neither contrary to nor an unreasonable application of clearly established federal law.  Mr. Wogenstahl's Ground Five should be rejected on the merits.

### Ground Six

**The trial court erred in admitting evidence and facts regarding a previous crime based on common plan, scheme and design in violation of Petitioner's constitutional rights as guaranteed by the due process clause of the Fourteenth Amendment to the United States' Constitution.**

Mr. Wogenstahl's argument in support of Ground Six is that the trial court erred by admitting evidence of his 1985 conviction for aggravated burglary.  His position is that the prior offense was not sufficiently similar to the facts of the present case to justify admitting that evidence for the purpose of establishing identity.

**State court opinion**

In addressing this claim, the Ohio Supreme Court wrote:

In his twenty-first proposition of law, appellant contends that the trial court committed reversible error in allowing Miller to testify concerning appellant's 1985 aggravated burglary conviction. We disagree.

R.C. 2945.59 provides that:

"In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant."

Evid.R. 404(B) provides:

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

Evidence of other crimes, wrongs or bad acts independent of, and unrelated to, the offenses for which a defendant is on trial is generally inadmissible to show criminal propensity. See *State v. Woodard* (1993), 68 Ohio St.3d 70, 73, 623 N.E.2d 75, 78, and *Wickline, supra,* 50 Ohio St.3d 114, 120, 552 N.E.2d 913, 920. However, the evidence of appellant's 1985 aggravated burglary conviction was not used for an impermissible purpose. We agree with the court of appeals' determination that there are "striking" similarities between appellant's 1985 conviction and the aggravated burglary in the case at bar. The similarities tended to establish a number of the items enumerated in R.C. 2945.59 and Evid.R. 404(B). Thus, the evidence of appellant's prior conviction was admissible for that limited purpose. See *State v. Broom* (1988), 40 Ohio St.3d 277, 533 N.E.2d

682, paragraph one of the syllabus.

Appellant protests that the prior offense was "dissimilar" to the aggravated burglary committed in this case. However, as we recognized in *State v. Jamison* (1990), 49 Ohio St.3d 182, 552 N.E.2d 180, syllabus, "[o]ther acts forming a unique, identifiable plan of criminal activity are admissible to establish identity under Evid.R. 404(B). * * * Although the standard for admissibility is strict, the other acts need not be the same as or similar to the crime charged." Moreover, we note that Miller's testimony concerning the prior aggravated burglary conviction was clearly admissible because the prosecution bore the burden of establishing the prior aggravated felony specification in connection with Counts Two and Three of the indictment.

Accordingly, appellant's twenty-first proposition of law is not well taken.

*Wogenstahl,* 75 Ohio St.3d at 365-66.

### Clearly established federal law

In *Huddleston v. United States,* 485 U.S. 681, 691 (1988), the Supreme Court discussed the circumstances under which the admission of other acts evidence is proper:

We share petitioner's concern that unduly prejudicial evidence might be introduced under [Federal Rule of Evidence 404(b)]. We think, however, that the protection against such unfair prejudice emanates not from a requirement of a preliminary finding by the trial court, but rather from four other sources: first, from the requirement of Rule 404(b) that the evidence be offered for a proper purpose; second, from the relevancy requirement of Rule 402-as enforced through Rule 104(b); third, from the assessment the trial court must make under Rule 403 to determine whether the probative value of the similar acts evidence is substantially outweighed by its potential for unfair prejudice; and fourth, from Federal Rule of Evidence 105, which provides that the trial court shall, upon request, instruct the jury that the similar acts evidence is to be considered only for the proper purpose for which it was admitted.

*Broom v. Mitchell,* 441 F.3d 392, 405-06 (6th Cir. 2006). Ohio Rule of Evidence 404(B) is substantially similar to Fed.R.Evid. 404(b). *Id.* at 406 n.20. Together, Ohio R.Evid. 404(B) and

O.R.C. § 2935.59  codify an exception to the common law with respect to evidence of other acts of wrongdoing.  *Id.* (citation omitted).

Trial court errors in state procedure and/or evidentiary law do not rise to the level of federal constitutional claims warranting relief in a habeas action unless the error renders the proceeding so fundamentally unfair as to deprive the petitioner of due process under the Fourteenth Amendment.  *Id.*, citing *McAdoo v. Elo,* 365 F.3d 487, 494 (6th Cir.), *cert. denied,* 543 U.S. 892 (2004), citing *Estelle v. McGuire,* 502 U.S. 62, 69-70 (1991).  Generally, state court evidentiary rulings cannot rise to the level of due process violations unless they offend  some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.  *Broom,* 441 F.3d at 406, citing *Seymour v. Walker,* 224 F.3d 542, 552 (6th Cir. 2000), *cert. denied,* 532 U.S. 989 (2001), quoting *Montana v. Egelhoff,* 518 U.S. 37, 43 (1996).

**Analysis**

Over Mr. Wogenstahl's objection, the trial judge permitted former Colerain Township police officer Kent Miller to testify about Mr. Wogenstahl's prior aggravated burglary conviction.  Transcript, Vol. XV at 2020-39.  The trial judge admitted the evidence for the purpose of establishing the prior offense, a specification charged in the indictment, and admitted it pursuant to R.C. 2945.59.  *Id.* at 2024.

Mr. Miller testified that: in November, 1984, Jeff Lawson reported  Two Hundred and Twenty Dollars ($220.00) had been taken from the basement of his home;  there was no sign of forced entry into Mr. Lawson's residence; Mr. Lawson gave Mr. Miller Mr. Wogenstahl's name as a possible suspect; Mr. Wogenstahl was a friend of Mr. Lawson's and knew that  from time to time Mr. Lawson kept money in the house and knew where it might be found; Mr. Wogenstahl had

been to Mr. Lawson's house the night of the theft; Mr. Wogenstahl denied any involvement;  Mr.

Wogenstahl had made plans with Mr. Lawson and another individual to go bowling but he changed

his mind and claimed he went home and straight to bed instead; Mr. Wogenstahl initially said that

he had gotten from his stepfather the One Hundred Dollar ($100.00) bill he had in his possession

but later said he had gotten the money from his girlfriend; Mr. Wogenstahl subsequently admitted

to the burglary of Mr. Lawson's residence; and in February, 1985,  Mr. Wogenstahl was charged

with and found guilty of aggravated burglary.  *Id.* at 2026-35.

        Immediately following Mr. Miller's testimony, the trial court instructed the jury:

> Ladies and gentlemen, concerning the testimony of this last witness,
> evidence of other acts by the defendant, if true, has a limited purpose.
> You may consider the defendant's other acts if and when those other
> acts tend to show his intent, motive, absence of mistake or accident,
> scheme, plan or scheme in doing the act charged in this trial.  Such
> evidence of other acts must not be considered for any other purpose.

*Id.* at 2039-40.  In addition, at the close of the evidence presented during the guilt phase, the trial

court again instructed the jury as to other acts evidence:

> Testimony was introduced, ladies and gentlemen, that the defendant
> was convicted of a criminal act.  This testimony may be considered
> for the purpose of helping you test the credibility or weight to be
> given his testimony. It cannot be considered for any other purpose.
> Except where it is an essential element or raises the degree of the
> crime.

> Evidence of other acts by the defendant, if true, has a limited purpose.
> You may consider the defendant's other acts if and when those other
> acts tend to show his intent, motive, absence of mistake or accident,
> scheme, plan or system in doing the act charged in this trial.  Such
> evidence of  other acts must not be considered for any other purpose.

*Id.,* Vol. XVII at 2609-10.

        Mr. Wogenstahl was indicted on three counts, two of which included the specification

that he "had previously been convicted of an offense which is substantially equivalent to an aggravated felony of the first degree,: to wit: Aggravated Burglary".  Appendix, Vol. I at 00003-05. The State, therefore, had the burden of establishing Mr. Wogenstahl's prior conviction for aggravated burglary in order to establish the specification identified in the Indictment.  While it is true that such a conviction could have been proved with a certified copy of a judgment, there are additional reasons why Mr. Miller's testimony was admissible.

Mr. Wogenstahl has long denied involvement in Amber Garrett's killing.  Transcript, Vol. XVI at 2243-2393.  Mr. Wogenstahl's trial testimony included knowing Peggy Garrett, being at her residence on November 23, 2001, and knowing that her son Eric, who was babysitting Amber and her siblings, left the residence in the early hours of the morning November 24, 1991.  *Id.*  Mr. Wogenstahl's version of the facts is that after taking Eric to Troy Beard's residence, he went home, watched television, went out to his vehicle to get music tapes, returned to his residence, and went to sleep at about 6 a.m.  *Id.*

These facts about which Mr. Wogenstahl testified are strikingly similar to the facts about which Mr. Miller testified with regard to Mr. Wogenstahl's 1985 conviction for aggravated burglary.  In both cases, Mr. Wogenstahl knew the adult resident of the home which was burgled, was at the target home the day before the burglary, took specific efforts to be sure no witnesses were present, and claimed that he was at his own home sleeping when the offense took place.  In addition to these similarities, the trial court instructed the jury twice as to the limited purpose for which Mr. Miller's testimony was admitted and for which the jury was to consider it.

In view of the substantial amount of evidence against Mr. Wogenstahl, the substantial similarities between the facts surrounding Mr. Wogenstahl's 1985, conviction for aggravated

burglary and those in the present case, and the trial court's limiting instructions, admission of the complained-of other acts evidence did not so materially affect the outcome of the trial as to render it fundamentally unfair.

The Ohio Supreme Court's decision on Mr. Wogenstahl's other acts evidence claim is neither contrary to nor an unreasonable application of clearly established federal law.  Mr. Wogenstahl's Ground Six should be denied.

### Ground Seven

**The trial court erred in admitting into evidence prejudicial photos and a videotape of the decedent in violation of Petitioner's constitutional rights as guaranteed by the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.**

In his Ground Seven, Mr. Wogenstahl alleges that his trial was constitutionally unfair because the court admitted into evidence several photographs of Amber's body taken either at the scene where it was discovered or at the morgue.  Mr. Wogenstahl also challenges the trial court's admission into evidence a videotape of the scene where Amber Garrett's body was found.

### State court opinion

Mr. Wogenstahl raised this issue as his Nineteenth Proposition of Law on direct appeal to the Ohio Supreme Court.  *Wogenstahl,* 75 Ohio St.3d at 372.  Again, the Ohio Supreme Court rejected Mr. Wogenstahl's claim without specific comment.  See *Id.* at 352.  In rejecting this claim, the Hamilton County Court of Appeals said:

> In his second assignment of error, Wogenstahl objects to the trial court's decision to admit into evidence, during the guilt phase of the proceedings, a video tape of the scene where the victim's body was found, a school photograph depicting the victim in life, and a number of other photographs displaying the victim's corpse, taken either at the scene of its discovery or at the morgue. The challenged exhibits were improperly admitted by Wogenstahl's reckoning for one of two

84

reasons: (1) they were not relevant to a legitimate issue in dispute at trial, or (2) they were, in content, unduly repetitive, gruesome, and inflammatory.

It is well settled that the admission of photographic evidence, even in a capital prosecution, remains largely within the discretion of the trial court, subject to the following guidelines set down in *State v. Maurer* (1984), 15 Ohio St.3d 239, 473 N.E.2d 768  paragraph seven of the syllabus:

> Properly authenticated photographs, even if gruesome, are admissible in a capital prosecution if relevant and of probative value in assisting the trier of fact to determine the issues or are illustrative of testimony and other evidence, as long as the danger of material prejudice to a defendant is outweighed by their probative value and the photographs are not repetitive or cumulative in number.

In the case *sub judice,* we are convinced that all the challenged exhibits easily met the threshold standard of relevancy below.  This left the trial court essentially with the task of engaging in the familiar weighing process to determine whether the potential prejudicial effect of the evidence, either by its content or its repetitiveness, was outweighed by its clear probative value.  Having reviewed the exhibits as they have been made a part of the record on appeal, we are not persuaded that the results of the trial court's weighing process in favor of admissibility amounted to an abuse of discretion. The court's ruling was not unreasonable, arbitrary, or unconscionable under the accepted standard for measuring the exercise of discretion in Ohio. See *Pembaur v. Leis* (1982), 1 Ohio St.3d 89, 437 N.E.2d 1199; *State v. Graham* (1979), 58 Ohio St.3d 350, 390 N.E.2d 805. Wogenstahl's second assignment of error is, accordingly, without merit.

*Wogenstahl,* 1994 WL 686898 at *2.

### **Clearly established federal law**

Apart from circumstances giving rise to deprivation of a specific constitutional right, trial error will result in a constitutional violation only where it so infected the trial with unfairness as to make the resulting conviction or sentence a denial of due process. *Donnelly v. DeChristoforo,*

85

416 U.S. 637, 643 (1974); *Broom,* 441 F.3d at 406. Only where the erroneous application of state law deprives a petitioner of a fundamental constitutional guarantee will a federal court inquire into the state court rulings. *Donnelly*, 416 U.S. at 643. State court rulings on the admission of evidence are not open to challenge in a federal habeas suit unless admission of the evidence undermines the fundamental fairness of the trial and thereby constitutes a violation of due process. *Pulley v. Harris,* 465 U.S. 37 (1984); *Broom, supra.* The Due Process Clause simply does not mandate that all government decisions comply with standards that assure perfect, error-free determinations. See *Mackey v. Montrym,* 433 U.S. 1, 14 (1979).

### Analysis

Mr. Wogenstahl takes issue with the trial court's admission of a total of twenty-eight photographs of Amber's body including seven of her body at the scene and twenty-one of her body at the morgue. Mr. Wogenstahl also takes issue with the trial court's admission of a videotape of the crime scene which includes footage of Amber's body. Mr. Wogenstahl argues that even if the improper admission of numerous photographs or the admission of the videotape each standing alone did not result in a constitutionally infirm trial, the cumulative effect of the exhibits did result in a fundamentally unfair trial.

State's Exhibit 57 is a group of seven photographs marked A through G. Those photographs depict the scene where Amber's body was found. These photos were used by witnesses when describing the condition of the scene as well as the condition of Amber's body. See, *e.g.,* Transcript of Proceedings, Vol. XI at 1388-91. In addition, Dr. Robert Webster, a botanist, used the photos during his testimony to identify the plant material found in the area where Amber's body was found as well at the plant material found on Amber's body. *Id.* at 1326-64. Each of the

photographs is taken from a different angle and they depict the not only the area where Amber's body was found, but also the condition of her clothing. They are not repetitive or excessive nor do they depict anything of a gory or gruesome nature.

State's Exhibit 58 is a group of photos marked A through N and State's Exhibit 59 is a group of photos marked A through G. The photos in Exhibit 58 depict the condition of Amber's body when it arrived at the morgue and the photos in Exhibit 59 show Amber's body at the morgue after it was cleaned. Dr. Michael Kenny, the coroner who responded to the scene where Amber's body was found and who performed the autopsy on Amber, used those photos during his testimony to describe the locations and depth of the stabbing injuries Amber sustained as well as the internal damage the stab wounds caused. *Id.* at 1389; 1394-1414. In addition, Dr. Kenny used the photos to describe the defensive injuries Amber sustained on her hands and arms as well as the blunt trauma injuries to her head. *Id.* Again, the photos depict Amber's body at different angles, they are not repetitive, nor are they gory or gruesome.

State's Exhibit 55 is a videotape of the scene where Amber's body was found. It illustrates not only Amber's body as it was found, but also the vegetation in the immediate area of Amber's body, and the general area including the vegetation and the road that runs along the secluded area where Amber's body was found. Only a part of the videotape was played for the jury and it was played with the sound turned off. *Id.*, Vol. XIII at 1709; 1711.

Witnesses described Jamison Creek Road and indicated how remote and winding it is. Perhaps more importantly, however, the presence on Mr. Wogenstahl's jacket and shoes of plant material located in the general Jamison Creek Road as well in the area where Amber's body was located was critical to the state's case against Mr. Wogenstahl.

For example, Harold Borgman testified  that at the time relevant to this action, he lived on Jamison Creek Road.  *Id.* at 1645.  Mr. Borgman described Jamison Creek Road as a fairly crooked, winding road.  *Id.* at 1646.  Mr. Borgman testified that at about 3:15 a.m. on Sunday, November 24, 1991, he observed an automobile on Jamison Creek Road that was moving very slowly and which stopped about where "the guardrail is or right before or ... west of the guardrail..." and then pulled off the road.  *Id.* 1649-51.  Mr. Borgman then testified that on Wednesday, November 27, 1991, he told Sergeant Kenny Greves from the Indiana State Police who was a neighbor, about what he had observed on Sunday, and that he and Sgt. Greves drove to the area where he (Mr. Borgman) had seen the automobile.  *Id.* at 1655-57.  Mr. Borgman also testified that Sgt. Greves went down the hill, came back about five (5) minutes later, and told Mr. Borgman that he had "found the body."  *Id.* at 1657.

Significantly, Sgt. Greves' testimony confirmed Mr. Borgman's testimony.  *Id.* at 1663-71.  In addition, Sgt. Greves described the area where Mr. Borgman had seen the car and the hill he went down as "very heavy twiny", a "very heavy thicket area ... [with] a lot of cedar trees", and with a "lot of briers and stickers and overgrowth and all kinds of stuff".  *Id.* at 1667.  Finally, St. Greves described the area where he found Amber's body as having green overgrowth.  *Id.* at 1670.

With respect to the plant materials, William Dean, a criminalist in the Trace Evidence Section of the Hamilton County Coroner's Laboratory, testified that he examined a leather jacket which belonged to Mr. Wogenstahl, *see Id.*, Vol. 15 at 2186, and which had several torn areas.  *Id.*, Vol. X at 1164-65; 1178-81.  Mr. Dean testified further that upon microscopic examination, he found that the torn areas on the jacket contained some small bits of wood and vegetable material and

what he thought were the tips of broken off thorns. *Id.* Finally, Mr. Dean testified that he examined a pair of gym shoes belonging to Mr. Wogenstahl, *Id.*, Vol. 15 at 2186, and again found thorn tips. *Id.*, Vol. X at 1181-82.

            With respect to the issue of vegetation, Douglas Deedrick, a Special Agent with the F.B.I. who is assigned to the F.B.I. laboratory as an examiner in the Hair and Fibers Unit testified that he examined plant material taken from a leather jacket and plant material taken from shoes as well as samples of known plant cutting identified as coming from the scene where Amber's body was found. *Id.* at 1242-43; 1250; 1252. Mr. Deedrick then testified that the material taken from both the jacket and shoes had similarities with the plant material taken from the scene. *Id.* at 1253-64.

            Finally, Robert Webster, a research botanist, testified that there were no differences between the vegetation recovered from Mr. Wogenstahl's jacket and shoes and the type of vegetation in the area where Amber's body was found. *Id.*, Vol. XI at 1327-63.

            The videotape at issue provided the jury with assistance in understanding the testimony about the general area where Amber's body was located. Additionally, it aided with an understanding of the testimony about the plant materials in the general area of Jamison Creek Road as well as in the specific area where Amber was found.

            The Ohio Supreme Court's rejection of Mr. Wogenstahl's claim regarding the photographs and videotape is not contrary to clearly-established federal law. Therefore, Mr. Wogenstahl's Ground Seven should be overruled.

## **Ground Eight**

89

**Petitioner's right to due process of law under the Fourteenth Amendment to the United States Constitution and his right to be free from cruel and unusual punishment under the Eighth Amendment were violated by the trial court's admission of the testimony of Brian Wraxall because he lacked a college or medical degree to enable him  to render an expert opinion and because the results of his HLA and DQa test could only determine that the bloodstain from Petitioner's call [sic] was consistent with the victim's blood allotype.**

In Ground Eight, Mr. Wogenstahl alleges that the trial court erred by allowing Brian Wraxall to testify as an expert witness.  Mr. Wogenstahl's position is that it was error to do so because Mr. Wraxall does not have a college or medical degree, his opinion about a HLA DQa blood test was insufficient to prove that blood recovered from his (Mr. Wogenstahl's) vehicle was Amber Garrett's blood, and because his testimony was contradictory to a report from CellMark Laboratories.  The Respondent raises the defense of procedural default to the third subclaim, to wit: that Mr. Wraxall's  testimony was contrary to a report from CellMark.

Indeed, while Mr. Wogenstahl raised the first and second subclaims on direct appeal, see *infra*, he failed to raise the third subclaim on either direct appeal or in his post-conviction petition. Appendix, Vol. III at 695-851 and *Wogenstahl*, 1994 WL 686898 at *1-16; Appendix, Vol. V at 1153-1325 and *Wogenstahl,* 75 Ohio St.3d at 396-74;  Vol. VIII at 2013-74.  Mr. Wogenstahl does not dispute the Respondent's position that he in fact failed to raise that issue on direct appeal. (Doc. 19 at 211-16; Doc. 82).  While Mr. Wogenstahl claims that his defense counsel provided him with "unreasonable assistance", (Doc. 19 at 215),  he does not argue that there was cause for the default on the basis of ineffective assistance of counsel.  Therefore, the *Maupin* factors are satisfied and subclaim three is procedurally defaulted.

**State court opinion**

90

Mr. Wogenstahl raised the first and second subclaims of this Ground in the Ohio

Supreme Court as Proposition of Law No. 23 and that court rejected the claim as follows:

> In his twenty-third proposition of law, appellant suggests that forensic serologist Brian Wraxall lacked the proper academic qualifications to render an expert opinion concerning the HLA DQ Alpha ("Haldo Alpha") testing of the blood recovered from appellant's vehicle.  We disagree.
>
> With respect to Wraxall's qualifications, appellant established at trial that Wraxall had no college degree and was not a medical doctor. However, "[u]nder Evid.R. 702, an expert may be qualified by *knowledge, skill, experience, training, or education* to give an opinion which will assist the jury to understand the evidence and determine a fact at issue." (Emphasis added.) *State v. Beuke* (1988), 38 Ohio St.3d 29, 43, 526 N.E.2d 274, 289.  Here, the record reflects that Wraxall was educated in England where he achieved a Higher National Certificate in Applied Biology.  Wraxall testified that his education in England is approximately equivalent to the Bachelor of Science degree in the United States.  He has studied microbiology at a United States university and has attended numerous symposiums in the field of criminalistics.  He has published several papers in the field of bloodstain analysis.  From 1963 through 1977, Wraxall worked for the Metropolitan Police Forensic Science Laboratory in London.  He began working for the Serological Research Institute in 1978, and has over fourteen years of laboratory experience. Additionally, Wraxall has testified as an expert in twenty states, including Ohio.
>
> Although Wraxall lacks a college degree and is not a medical doctor, we find that the trial court did not abuse its discretion in allowing him to testify as an expert based upon his extensive background and experience in blood analysis.   Further, Wraxall's expert opinions were based on his personal testing of the blood samples that had been provided to him and, thus, the requirements of Evid.R. 703 have been satisfied.
>
> Next, appellant contends that Wraxall's testimony should have been stricken because Wraxall never offered an expert opinion that the blood recovered from appellant's vehicle was, in fact, Amber's blood. We find that appellant's arguments demonstrate a complete lack of understanding of the purposes of Wraxall's testimony.  Wraxall testified to a reasonable degree of scientific certainty that the blood

recovered from appellant's vehicle was consistent with the Haldo Alpha classification of a known sample of Amber's blood. He also testified to a reasonable degree of scientific certainty that the Haldo Alpha classification of Amber's blood occurs in approximately 5.3 percent of the Caucasian population. The prosecution did not offer Wraxall's testimony to establish specific identification of the source of the blood recovered from appellant's vehicle. The Haldo Alpha test was incapable of establishing specific identification. Rather, Wraxall's testimony was probative that the source of blood could have come from the victim, and was much more probative than the typical ABO blood grouping evidence that is routinely considered in criminal trials. The testimony excluded approximately ninety-five percent of the Caucasian population as potential sources of the bloodstain recovered from appellant's vehicle. Accordingly, we find no error in the admission of Wraxall's testimony.

Furthermore, appellant points to the fact that the evidence at trial established that appellant had purchased the 1978 Oldsmobile on November 18, 1991, *i.e.,* approximately a week before Amber's murder. On cross-examination, Wraxall conceded that it was impossible to determine the age of the bloodstain recovered from appellant's vehicle. In this regard, appellant contends that the trial court should have excluded the bloodstain evidence, since the age of the bloodstain could not be determined. However, we find that the question concerning the age of the bloodstain goes to the weight, and not to the admissibility, of the bloodstain evidence. In any event, appellant's arguments in this regard have been waived.

Accordingly, we reject appellant's twenty-third proposition of law.

*Wogenstahl,* 75 Ohio St.3d at 361-63.

### Clearly established federal law

As this Court noted in its discussion of Mr. Wogenstahl's Grounds Six and Seven, apart from circumstances giving rise to deprivation of a specific constitutional right, trial error will result in a constitutional violation only where it so infected the trial with unfairness as to make the resulting conviction or sentence a denial of due process. *Donnelly*, 416 U.S. at 643; *Broom,* 441 F.3d at 406. Only where the erroneous application of state law deprives a petitioner of a fundamental

92

constitutional guarantee will a federal court inquire into the state court rulings. *Donnelly*, 416 U.S. at 643. State court rulings on the admission of evidence are not open to challenge in a federal habeas suit unless admission of the evidence undermines the fundamental fairness of the trial and thereby constitutes a violation of due process. *Pulley*, 465 U.S. 37; *Broom, supra.* The Due Process Clause simply does not mandate that all government decisions comply with standards that assure perfect, error-free determinations. *Mackey*, 433 U.S. at 14.


    **<u>Analysis</u>**

        With respect to Mr. Wogenstahl's first subclaim in Ground Eight, the question is, of course, whether the trial court's decision to allow Mr. Wraxall to testify as an expert was error which rose to the level of a constitutional violation thereby denying Mr. Wogenstahl his due process rights.       It is true that Mr. Wraxall does not have a college degree from a school in the United States nor a medical degree from any school. Transcript, Vol. XV at 2255-56. However, his background and experience are extensive. Mr. Wraxall testified that he was educated in England where he obtained a Higher National Certificate in Applied Biology which covered the areas of biochemistry, microbiology, and physiology, that in 1963 he went to work for the Metropolitan Police Forensic Science Laboratory in London, England, where he received additional training which covered the areas of evidence handling, examination of hairs, fibers, blood and other body fluids, and that he came to the United States in 1977 to work on a research project in the area of blood stain analysis. *Id.* at 2043-45. Mr. Wraxall also testified that: (1) since he came to the United States, he has taken courses and studied the principles of molecular biology; (2) in 1978, he began working for Serological Research Institute where he continues to be employed; (3) he has testified

in courts in twenty States; and (4) specifically with respect to test results involving HLA DQA, he has testified as an expert. *Id.* In addition, Mr. Wraxall testified he has published about a dozen papers in the field of blood types and genetic markers, has presented papers at international meetings in various countries as well as in the United States, and that he belongs to the Forensic Science Society in England, the California Association of Criminalists, the Northwest Association of Forensic Scientists, the Electrophoresis Society, and the International Society for Forensic Hemogenetics. *Id.* at 2058-59.

Although Mr. Wraxall does not have a college or medical degree, in view of his education, both formal and continuing, in England and the United States, and his background and experience, if the issue were before it, this Court could not say that the trial court abused its discretion in allowing Mr. Wraxall to testify as an expert. See *Kumho Tire Co. v. Carmichael*, 526 U.S.137 (1999). Nevertheless, even if the trial court had erred under Ohio law, the admission of Mr. Wraxall's testimony would not rise to the level of a constitutional violation. As noted above, the question of error would not focus solely on the admission of Mr. Wraxall's testimony, but rather on whether such a trial error so infected the trial with unfairness as to make the resulting conviction or sentence a denial of due process. It would not. Mr. Wraxall's testimony notwithstanding, and as noted above, there was an enormous amount of evidence introduced at trial which supported a finding of Mr. Wogenstahl's guilt. Even an erroneous decision to allow Mr. Wraxall to testify as an expert would not have so infected the trial with unfairness as to make the resulting conviction or sentence a denial of due process.

Mr. Wogenstahl alleges in the second subclaim of his Ground Eight that the trial court erred in admitting Mr. Wraxall's testimony because his opinion about a HLA DQa blood test

94

was insufficient to prove that blood recovered from his (Mr. Wogenstahl's) vehicle was Amber Garrett's blood.

Mr. Wogenstahl is correct in that Mr. Wraxall did not testify that as a result of his testing he concluded that Amber Garrett was the source of the blood recovered from Mr. Wogenstahl's vehicle. However, Mr. Wraxall did testify that Amber Garrett had an HLA DQ Alpha 1.1, 3 and that such a classification occurs in approximately 5.3%, or one in nineteen, of the Caucasian population and 2.7%, or one in thirty-seven, of the black population. *Id.* at 2065. Mr. Wraxall also testified that the blood recovered from Mr. Wogenstahl's vehicle had an HLA DQ Alpha 1.1, 3 and that it was *consistent* with Amber Garrett's blood. *Id.* at 2073-74.

Mr. Wraxall's testimony simply established that Amber *could have been* the source of the blood recovered from Mr. Wogenstahl's vehicle. The state never represented to the jury that Mr. Wraxall would establish that Amber Garrett was definitely the source of the blood stain recovered from Mr. Wogenstahl's car. Even if the trial court had erred in admitting Mr. Wraxall's testimony about the source of the blood stain found in Mr. Wogenstahl's vehicle, in view of the other evidence of Mr. Wogenstahl's guilt, including the evidence which placed Amber in Mr. Wogenstahl's car, see *supra*, that error would not have risen to the level of a constitutional violation.

The Ohio Supreme Court's decision is not contrary to, nor an unreasonable application of, clearly established federal law and therefore Mr. Wogenstahl's Ground Eight should be denied.

## **Ground Nine**

**The trial court erred in providing instructions and verdict forms to the jury containing two alternatives–principal offender or prior calculation and design–that are mutually exclusive under Ohio law and in violation of Petitioner's constitutional rights as**

**guaranteed by the Fifth, Eighth and Fourteenth Amendments to
the United States Constitution.**

In this Ground, Mr. Wogenstahl argues that the jury instructions and verdict forms which the trial court used were improper under Ohio law because they contained the mutually exclusive alternatives of principal offender or prior calculation and design.

Mr. Wogenstahl did not raise this claim in his direct appeal or other state court proceedings. Appendix, Vol. III at 695-815, *Wogenstahl,* 1994 WL 686898 at *1-16; Appendix, Vol. V at 1153-1325, *Wogenstahl,* 75 Ohio St.3d at 369-74; Appendix, Vol. VIII at 2013-74. Pursuant to *Maupin*, this claim is procedurally defaulted. First, at the time of trial, Mr. Wogenstahl failed to object to the now complained-of instruction and verdict forms. Transcript Vol. 17 at 2640-42. In addition, Mr. Wogenstahl had the opportunity to raise this trial-related claim, which is based on the record, in the Ohio courts, but he failed to do so. Therefore, the first and second *Maupin* have been met. The third *Maupin* prong is satisfied because waiver is an adequate and independent state ground to bar *habeas* review. *Norris*, 146 F.3d at 314; *Rust*, 17 F.3d at 161.

Mr. Wogenstahl seems to argue that there was cause for this procedural default in that his appellate counsel provided ineffective assistance of counsel by failing to raise these errors and in failing to raise the claim of ineffective assistance of trial counsel. (Doc. 19 at 219-20).

Ineffective assistance of appellate counsel can be an excusing cause to avoid a state procedural default rule, but only if the ineffective assistance of appellate counsel claim is properly presented to the state courts in the first instance. *Edwards v. Carpenter,* 529 U.S. 446 (2000). However, Mr. Wogenstahl has not raised in his Petition any claim of ineffective assistance of appellate counsel. In the absence of an opportunity to address the question of the ineffectiveness of Mr. Wogenstahl's appellate counsel, this Court cannot say that is a basis for finding "cause" for

96

failure to raise before the Ohio courts his claim with respect to the jury instructions and verdict forms.

Mr Wogenstahl's Ground Nine is procedurally defaulted and should be denied on that basis.

### Ground Ten

**The trial court committed additional errors at trial which, either individually or cumulatively, violated Petitioner's constitutional rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

**i) The trial court erred in failing to provide a jury instruction regarding motive.**

**ii) The trial court erred in refusing to grant a mistrial after the prosecutor, in opening statement, improperly commented on Petitioner's defense of "alibi".**

**iii) The trial court erred in denying admission of various defense exhibit except those not objected to by the prosecution.**

Respondent argues that the three subclaims in Mr. Wogenstahl's Ground Ten are procedurally defaulted. Mr. Wogenstahl does not dispute that he failed to raise these claims on direct appeal, but seems to suggest that there was cause for the default based on allegedly ineffective assistance of both trial counsel and appellate counsel.

First, Mr. Wogenstahl did not raise subclaim (i) at all in the state courts. Specifically, Mr. Wogenstahl made no objection at the trial with respect to jury instruction on motive. Transcript Vol. 17 at 2640-42. In addition, Mr. Wogenstahl never raised the issue on direct appeal. Appendix Vol. III at 695-815; *Wogenstahl,* 1994 WL 686898 at *1-16; Appendix Vol. V at 1153-1325; *Wogenstahl,* 75 Ohio St.3d at 369-74. While Mr. Wogenstahl did include the 'motive jury instruction' claim in his first *Murnahan* motion, as noted above, the Ohio courts dismissed the

*Murnahan* motion on the basis that it was procedurally deficient. *Wogenstahl,* 75 Ohio St.3d at 275.

With respect to the other subclaims in Ground Ten, Mr. Wogenstahl raised subclaim (ii) as his twenty-sixth assignment of error and subclaim (iii) as his thirty-fourth assignment of error before the Court of Appeals and that court rejected those claims. Appendix Vol. III at 695-815; *Wogenstahl,* 1994 WL 686898 at *1-16. Mr. Wogenstahl failed to raise either issue in his appeal to the Ohio Supreme Court. Appendix Vol. V at 1153-1325; *Wogenstahl,* 75 Ohio St.3d at 369-74.

Pursuant to *Maupin*, the claims in Ground Ten are procedurally defaulted. Specifically, Mr. Wogenstahl failed to raise the claims before the Ohio Supreme Court on direct appeal although he had the opportunity to do so and he therefore waived those claims. Accordingly, the first two prongs of the *Maupin* analysis are satisfied. Additionally, the third *Maupin* prong is satisfied because, as noted above, waiver is an adequate and independent state ground to bar *habeas* review. *Norris*, 146 F.3d at 314; *Rust*, 17 F.3d at 161.

As noted above, Mr. Wogenstahl seems to argue that there was cause for the default in that his trial and appellate counsel were ineffective. (Doc. 19 at 222; 223; 227-28). While Mr. Wogenstahl has raised in these proceedings claims of ineffective assistance of trial counsel, none of those claims involve the issue of the 'motive jury instruction'. See, Grounds Three, Thirteen, subclaim vii of Ground Nineteen, and Ground Twenty-Three. Further, Mr. Wogenstahl has not raised in these proceedings any claim of ineffective appellate counsel. Therefore, this Court does not have the opportunity to determine the effectiveness of Mr. Wogenstahl's trial counsel on the issue of the jury instruction on motive nor the effectiveness of appellate counsel. Counsels' alleged ineffectiveness, then, cannot provide cause for Mr. Wogenstahl's procedural default of his claim that his Constitutional rights were violated as he alleges in Ground Ten.

Mr. Wogenstahl's Ground Ten is procedurally defaulted and should be rejected on that basis.

### Ground Eleven

**The prosecution committed misconduct to the prejudice of Petitioner in introducing inadmissible evidence at trial in violation of Petitioner's constitutional rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.**

**i) The prosecution committed misconduct in introducing the testimony of former inmate Bruce Wheeler.**

**ii) The prosecution committed misconduct in providing incorrect and misleading information to the court regarding the admissibility of a defense proffered expert report.**

**iii) The prosecution committed misconduct in improperly introducing evidence and arguments indicating that Petitioner was a "bad person" before Petitioner's character was placed in issue.**

**iv) The prosecution committed misconduct in improperly cross-examining the Petitioner by asking him if the states' [sic] witnesses were lying.**

Respondent argues that the first and second subclaims of Ground Eleven are procedurally defaulted. Mr. Wogenstahl does not dispute Respondent's position. (Doc. 19 at 228-31; Doc. 82).

Respondent is correct in her argument as to subclaims (i) and (ii). Mr. Wogenstahl presented subclaim (i) to the Hamilton County Court of Appeals as Assignment of Error No. XXX. Appendix, Vol. III at 695-815; *Wogenstahl,* 1994 WL 686898 at 12. However, he failed to raise that claim in his appeal to the Ohio Supreme Court nor did he raise it in post-conviction proceedings. Appendix, Vol. V at 1153-1325; *Wogenstahl,* 75 Ohio St.3d at 369-74; Appendix, Vol. VIII at 2013-

74.

With respect to subclaim (ii) of Ground Eleven, Mr. Wogenstahl failed to raise that issue on direct appeal to either the Hamilton County Court of Appeals or the Ohio Supreme Court. Appendix, Vol. III at 695-815; Vol. V at 1152-1325. Again, he did not raise it in his post-conviction petition. Appendix, Vol. VIII at 2013-74.

In addition, this Court notes that Mr. Wogenstahl failed to raise the issue contained in subclaim (iv) on either direct appeal or in his post-conviction petition. Appendix, Vol. III at 695-815, *Wogenstahl,* 1994 WL 686898 at *1-16; Appendix, Vol. V at 1153-1325, *Wogenstahl,* 75 Ohio St.3d at 369-74; Appendix, Vol. VIII at 2013-74. Indeed, Mr. Wogenstahl essentially admits that his appellate counsel did not raise that issue on direct appeal. (Doc. 19 at 233).

Under *Maupin, supra,* the first, second, and fourth subclaims contained in Ground Eleven are procedurally defaulted. Keeping in mind that he raised the first subclaim on direct appeal in the court of appeals, although not subclaim two or four, Mr. Wogenstahl failed to raise the first, second, or fourth subclaims on direct appeal in the Ohio Supreme Court. As a result of Mr. Wogenstahl's failure to do so, the first two prongs of *Maupin* are satisfied. Additionally, the third *Maupin* prong is satisfied because the procedural rule of waiver is an adequate and independent state ground on which Ohio can rely to foreclose review of a federal constitutional claim. *Norris,* 146 F.3d at 314; *Rust,* 17 F.3d at 161.

Finally, other than to suggest that there was cause for the default due to ineffective assistance of counsel, Mr. Wogenstahl does not make any argument that he has indeed established cause. (Doc. 19 at 231; ). As to a claim of ineffective assistance of trial counsel, even if Mr. Wogenstahl did argue that it was cause for the default, his argument would fail. Although Mr.

Wogenstahl has raised in these proceedings claims for ineffective assistance of trial counsel, none of those claims involve the issue raised in the second subclaim of Ground Eleven.  See, Grounds Three, Thirteen, Nineteen subclaims (vii) and (viii), and Twenty-Three.  Therefore, this Court has no occasion to review the effectiveness of trial counsel on the allegation in subclaim two. Counsels' ineffectiveness, then, cannot provide cause for the procedural default of Mr. Wogenstahl's subclaim two.

Mr. Wogenstahl argues in subclaim (iii) that it was misconduct for the prosecutor to introduce evidence and arguments indicating that he was a "bad person" before his character was placed in issue.  In Ground Eighteen, *infra,* Mr. Wogenstahl raises the same claim but in terms of trial court error.  For the same reasons that Mr. Wogenstahl's Ground Eighteen should be rejected, subclaim (iii) of Ground Eleven should also be rejected.

Mr. Wogenstahl's Ground Eleven should be rejected.

## Ground Twelve

**The prosecution committed misconduct at trial by making improper and prejudicial arguments to the jury in violation of Petitioner's constitutional rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

**i) The prosecutor committed prejudicial misconduct during opening argument by improperly shifting the burden of proof regarding the defense of "alibi".**

**ii) The prosecutor committed prejudicial misconduct in improperly vouching for the credibility of state witnesses.**

**iii) The prosecutor committed prejudicial misconduct by denigrating defense counsel in closing argument.**

101

**iv) The prosecutor committed prejudicial misconduct by confronting and questioning Petitioner during closing argument.**

**v) The prosecutor committed prejudicial misconduct by stating his personal opinion that Petitioner was lying.**

**vi) The prosecutor also violated Petitioner's constitutional rights at trial by offering his personal beliefs regarding numerous facts.**

**vii) The prosecutor committed misconduct by arguing facts not in evidence.**

**viii) The prosecutor committed misconduct by insinuating that Petitioner had threatened witnesses.**

**ix) The prosecutor committed prejudicial misconduct by commenting on the defense's failure to call witnesses.**

**x) The prosecutor committed misconduct inflaming the passions and prejudices of the jury.**

**xi) Petitioner's right under the Sixth and Fourteenth Amendment to effective assistance of counsel was violated by his trial counsel's failure to object to the prosecutorial misconduct at closing argument.**

**xii) The trial court erred in not ruling on defense counsel's objections to improper prosecutorial arguments during closing arguments (at both trial and sentencing).**

**xiii) The cumulative effect of the prosecutorial misconduct at closing argument violated Petitioner's constitutional rights.**

Respondent argues that subclaim (i) is procedurally defaulted. Mr. Wogenstahl does not dispute the Respondent's argument, but seems to suggest that the ineffective assistance of his appellate counsel was cause for the default. (Doc. 19 at 234-35).

Mr. Wogenstahl raised subclaim (i) in his Twenty-Sixth Assignment of Error in the court of appeals. Appendix, Vol III at 695-815; *Wogenstahl,* 1994 WL 686898 at *10. However, he did not raise it on direct appeal to the Ohio Supreme Court. Appendix, Vol. V at 1153-1325;

102

*Wogenstahl,* 75 Ohio St.3d at 369-74.  Nor did he raise it in the post-conviction proceedings. Appendix, Vol. VIII at 2013-74.

The first two *Maupin* prongs have been met with respect to subclaim (i). Specifically, Mr. Wogenstahl failed to pursue through the direct appeal process the claim of prosecutorial misconduct based on his allegation that the prosecutor committed prejudicial misconduct during opening argument by improperly shifting the burden of proof regarding the defense of "alibi".  The third *Maupin* prong is satisfied because, while he had the opportunity to raise this trial record-based claim, he did not and therefore waived his opportunity to do so.  As noted above, waiver is an adequate and independent state ground to bar federal *habeas* review. *Norris,* 146 F.3d at 314; *Rust,* 17 F.3d at 161.

Mr. Wogenstahl's position seems to be that his appellate counsel were ineffective for failing to raise this issue on direct appeal thereby providing cause for the default.  However, as already noted, Mr. Wogenstahl has not raised any claims of ineffective assistance of appellate counsel in his Petition or Amended Petition before this Court.  Accordingly, the issue of appeal counsels' ineffectiveness is not properly before this Court and it therefore cannot provide cause for the default.

This Court concludes that subclaim (i) of Ground Twelve is procedurally defaulted.

**State court opinion**

Although in the state court of appeals Mr. Wogenstahl raised arguments of prosecutorial misconduct based on the prosecutors' closing arguments, with the exception of the issue contained subclaim (iv), none of his claims before that court are similar to the ones before this Court.  Appendix, Vol. III at 695-815; *Wogenstahl,* 1994 WL 686898 at *13-14.  Mr. Wogenstahl

103

did raise subclaims (ii) through (xiii) in Proposition of Law No. 28 on direct appeal to the Ohio

Supreme Court. *Id.*, Vol. V at 1301-1313; *Wogenstahl,* 75 Ohio St.3d at 344-74. However, that court

rejected Mr. Wogenstahl's claim without analysis or comment.  *Id.* Mr. Wogenstahl did not raise this

issue in his post-conviction Petition.   Appendix, Vol. VIII at 2013-74.   Thus, because Mr.

Wogenstahl fairly presented his claim of prosecutorial misconduct as it relates to closing argument,

the Ohio Supreme Court's failure to address the claim leaves this Court in the position of addressing

that portion of Mr. Wogenstahl's claim *de novo*.[9]  *McKenzie v. Smith*, 326 F. 3d 721, 727 (6th Cir.

2003)(when "there are no results, let alone reasoning, to which this court can defer . . ., any attempt

to determine whether the state court decision was contrary to, or involved an unreasonable

application of clearly established federal law would be futile"); *Maples v. Stegall*, 340 F. 3d 433,

437 (6th Cir. 2003), relying on *Wiggins v. Smith,* 539 U.S. 510, 534-38 (2003).

**Clearly established federal law**

On habeas corpus review, the standard to be applied to claims of prosecutorial

misconduct is whether the conduct "so infected the trial with unfairness as to make the resulting

conviction a denial of due process", *Donnelly* , 416 U.S. at 643 (1974); *Darden,* 477 U.S. 168

(1986); *Kincade v. Sparkman*, 175 F.3d 444 (6th Cir. 1999), or whether it was "so egregious as to

render the entire trial fundamentally unfair." *Cook v. Bordenkircher*, 602 F. 2d 117 (6th Cir. 1979);

accord *Summitt v. Bordenkircher*, 608 F.2d 247 (6th Cir. 1979), *aff'd sub nom*, *Watkins v. Sowders*,

449 U.S. 341 (1981);  *v. Seabold*, 704 F.2d 910 (6th Cir. 1983).  To decide this question, the court

must first decide whether the complained-of conduct was in fact improper. *Frazier v. Huffman*, 343

---

[9]While Respondent might have argued that these claims were not fairly presented to the
Ohio courts because the Ohio Supreme Court will not consider on appeal claims not made in the
court of appeals, no such argument is made in the Return of Writ and the Court declines to raise
it *sua sponte*, assuming the Court has authority to do so.

F.3d 780 (6th Cir. 2003), *citing United States v. Carter*, 236 F. 3d 777, 783 (6th Cir. 2001).  A four-factor test is then applicable to any conduct the Court finds inappropriate:  (1) the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; (2) whether they are isolated or extensive; (3)  whether they were deliberately or accidentally placed before the jury; and (4) the strength of the competent proof to establish the guilt of the accused.  *Id.*; see also, *Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000).  The court must decide whether the prosecutor's statement likely had a bearing on the outcome of the trial in light of the strength of the competent proof of guilt. *Serra v. Michigan Department of Corrections,* 4 F.3d 1348, 1355-56 (6th Cir. 1993), *citing,  Angel v. Overberg*, 682 F.2d 605, 608 (6th Cir. 1982).  The misconduct must be so gross as probably to prejudice the defendant.  *Pritchett v. Pitcher*, 117 F. 3d 959, 964 (6th Cir.), *cert. denied*, 522 U.S. 1001 (1997); *United States v. Ashworth,* 836 F. 2d 260, 267 (6th Cir. 1988). The touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor. *Smith v. Phillips*, 455 U.S. 209, 219 (1982).  In addition, an examination of alleged prosecutorial misconduct is performed in the context of the trial as a whole.  *United States v. Beverly,* 369 F.3d 516, 543 (6th Cir.), *cert. denied,* 543 U.S. 910 (2004), citing *United States v. Young,* 470 U.S. 1, 12 (1985) and *United States v. Francis*, 170 F.3d 546, 553 (6th Cir. 1999).  The relevant inquiry is whether the prosecutor's comments "so infected the trial with unfairness so as to make the resulting conviction a denial of due process." *Darden v. Wainwright,* 477 U.S. 168, 171 (1986).

> In determining whether prosecutorial misconduct mandates habeas relief, we apply the harmless error standard. *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997). An error is found to be harmless unless it "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 638, 123 L. Ed. 2d 353, 113 S. Ct. 1710 (1993).

*Bates v. Bell*, 402 F. 3d 635 (6th Cir., 2005).

### Analysis

In subclaim (ii), Mr. Wogenstahl argues that the prosecutor committed prejudicial misconduct by improperly vouching for the credibility of state witnesses Bruce Wheeler, Kathy Roth, and F.B.I. Agent Doug Deedrick.

Ordinarily, a prosecutor may not express a personal opinion concerning the guilt of the defendant or the credibility of trial witnesses because such personal assurances of guilt or vouching for the veracity of witnesses by the state's representative exceeds the legitimate advocate's role by improperly inviting the jurors to convict the defendant on a basis other than a neutral independent assessment of the record proof. *Caldwell v. Russell,* 181 F.3d 731, 737, (6th Cir. 1999), abrogated on other grounds by the AEDPA as recognized in, *Mackey v. Dutton,* 217 F.3d 399, 406 (6th Cir. 2000), *cert. denied,* 531 U.S. 1087 (2001). By contrast, a state's attorney is free to argue that the jury should arrive at a particular conclusion based upon the record evidence, including the conclusion that the evidence proves the defendant's guilt. *Caldwell,* 181 F.3d at 737-38 (citations omitted).

In his guilt phase closing argument referring to the state's witnesses, the prosecutor said:

> ...
> They didn't lie and they are not mistaken. These people are honest people who as soon as they learned where Amber Garrett's body had been found and remembered that they had been out that night to that road and remembered that they had seen this car and they had seen this man and they call the police and they came forward. They are honest people who are just telling you what they know. You could believe them or you could believe this burglar, this robber, this thief who is in here before you today.

106

> ...

Transcript, Vol. 17 at 2450.

> As to Kathy Roth, the prosecutor said:
>
> ...
> You saw her on the stand, saw her on the stand and saw her again. Look at this person, and looking him right in the eye and say that is the guy. Did she show you any hesitation? She was certain. Again, did Kathy Roth look to you who would make that kind of statement unless she was absolutely positive that she was right and come in here and say yeah, that's him? She is not and she didn't do that.
> ...

Id. at 2442.

> With respect to Bruce Wheeler, the prosecutor argued:
>
> ...
> Without holding Bruce Wheeler up as a model citizen, without defining what he did and what he is serving time for, I will tell you again you should believe him.
> ...
> I am not telling you that you should like Bruce Wheeler, that you should think that he is a great person. No. But should you believe him? Yes. Because he was telling the truth.
> ...

Id. at 2464; 2469.

> Finally, in reference to F.B.I Agent Deedrick, the prosecutor said:
>
> ...
> Well, you heard the testimony of Special Agent Doug Deedrick. He has got a little more experience than Jeffrey Wogenstahl. In fact, during the time that he testified I had to admit that I have never seen a witness with as much expertise in a particular area that is knowledgeable on his subject matter a Special Agent Deedrick. Here's a person who runs the most advanced crime lab in the world and who teaches forensic technicians how to make comparisons of trace evidence.
> ...

Id. at 2457.

Assuming without deciding that the prosecutor's complained-of remarks were improper, the relevant question becomes whether the alleged improper comments so infected Mr. Wogenstahl's trial with unfairness as to make his resulting conviction and death sentence a denial of due process. To answer that question, the Court must apply the four-part *Frazier* test.

As to the first prong of the *Frazier* test—whether the prosecutor's remarks tended to mislead the jury or prejudice the defendant—this Court notes that the prosecutor's remarks were generally based on the evidence of record. For example, in his general remarks about the state's witnesses, the prosecutor summarized the testimony elicited from witnesses including Vickie Mozena, (Transcript, Vol. XI at 1438-1508), Harold Borgman, (*Id.*, Vol. XIII at 1645-62), Brian Noel, (*Id.,* Vol. XII at 1508-46), Kathy Roth, (*Id.* at 1553-95), and Frederick Harms. *Id.* at 1546-53. Those witnesses essentially testified that they had seen a vehicle, identified as Mr. Wogenstahl's, in the early morning hours of November 24, 1991, on Jamison Road between Harrison, Ohio, and Bright, Indiana, in the area where Amber Garret's body was recovered. They also essentially testified that they did not appreciate the importance of what they had seen until after Amber's body was discovered.

Similarly, the prosecutor accurately described Ms. Roth's testimony. Specifically, Ms. Roth testified that that while driving on Jamison Road toward Bright, Indiana, near the location of Mr. Borgman's residence, she saw a man wearing a brown leather jacket and blue jeans standing near a parked car off to the side of Jamison Road. *Id.,* Vol. XII at 1553-95. In addition, Ms. Roth made an in-court identification of Mr. Wogenstahl as the man she saw. *Id.*

While the prosecutor's comments about Mr. Wheeler's credibility may be somewhat more problematic, they nevertheless accurately described Mr. Wheeler's testimony. For example,

Mr. Wheeler testified that he had received no consideration from the State in exchange for his testimony at Mr. Wogenstahl's trial.  *Id.*, Vol. XV at 2132-2209.  Mr. Wheeler testified that he, in fact, had pled guilty as charged in the matter for which he was being incarcerated at the Hamilton County Jail at the time Mr. Wogenstahl was confined at that facility.  *Id.*  Mr. Wheeler also essentially testified that as a result of his providing testimony, he would be labeled as a snitch in prison which would likely subject him to harassment by other inmates.  *Id.*

Finally, Agent Deedrick testified to his qualifications including his extensive training and background in the examination of trace evidence including having worked on over 4,000 cases, his experience as the training coordinator in the FBI laboratory in the Hairs and Fibers Unit, as an instructor at the FBI school at Quantico, and his experience of testifying in courts over 400 times.  *Id.*, Vol. 10 at 1242-1326.

In light of this testimony, the first *Frazier* factor weighs in Mr. Wogenstahl's favor.  That is because, while the prosecutor's comments were essentially based on the evidence, his suggestion to the jury that they should believe the state's witnesses because they "didn't lie" and were "telling the truth" may have invited the jury to rely on the prosecutor's determination of the witnesses' credibility rather than making their own determination.

The second *Frazier* factor is whether the prosecutor's remarks were isolated or extensive.  First, the Court notes that the prosecutor's initial closing argument in the penalty phase runs some fifty-five pages in the transcript.  *Id.*, Vol. XVII at 2419-74.[10]  The prosecutor's remarks

---

[10]  In addition, the prosecutor's rebuttal argument is thirty-three (33) transcript pages in length.  *Id.* at 2571-2604.

about which Mr. Wogenstahl complains are approximately forty-four (44) lines in length.[11]  *Id.* at 2450, L. 3-13 (general comments); 2442, L. 8-18 (comments about Ms. Roth); 2464, L. 15-18 and 2469, L. 17-21 (comments about Mr. Wheeler); 2457, L. 1-13 (comments about Agent Deedrick). Even assuming that the prosecutor's comments about which Mr. Wogenstahl complains were improper, it is clear that they were not the central focus of the prosecutor's argument. This Court concludes that the complained-of comments were isolated and certainly not extensive. Therefore the second *Frazier* factor weighs against Mr. Wogenstahl.

This Court's review of the transcript leads it to conclude that the prosecutor did not make the complained-of comments deliberately.  The Court reaches this conclusion based on the fact that, as noted above, the comments were not extensive and were not the central focus of the prosecutor's lengthy closing argument.  The third *Frazier* factor weighs against Mr. Wogenstahl.

The final *Frazier* factor also weight against Mr. Wogenstahl.  Specifically, as this Court has noted above, there was an enormous amount of evidence of Mr. Wogenstahl's guilt introduced at trial.  See, Ground Five, *supra.*

This Court concludes that, based on a weighing to the *Frazier* factors, the prosecutor's complained-of comments during his closing argument were not so egregious as to render Mr. Wogenstahl's trial fundamentally unfair.

In subclaim (iii), Mr. Wogenstahl alleges that the prosecutor committed prejudicial misconduct when, during closing argument, he denigrated his counsel.  Specifically, Mr. Wogenstahl alleges that it was improper for the prosecutor to say defense counsel was: (1) using a "pretty common technique...throwing red pepper in your eyes continuously trying to confuse you", *Id.* at

---

[11]  A transcript page contains twenty-five (25) numbered lines.  Therefore, forty-four (44) lines is fewer than two (2) pages.

2571; (2) throwing "more red pepper in the eyes", *Id.* at 2573, 2575, 2582; (3) for making objections to the court, *Id.* at 2575; (4) "misleading you and attempting to mislead you", *Id.* at 2425; (5) "lying with statistics"; *Id.* at 2599; (6) arguing to the jury about how the victim would bleed when stabbed (referring to defense counsel Dale Schmidt as "Dr. Schmidt"), *Id.* at 2598; and (7) for not calling a Bureau of Criminal Investigations witness themselves. *Id.,* at 2573. Mr. Wogenstahl's position is that disparaging remarks by the prosecution attacking the credibility or integrity of defense counsel requires habeas relief where they were sufficiently prejudicial to deny a defendant a fair trial.

First, the Court notes that none of the comments about which Mr. Wogenstahl complains was an attack on the credibility or integrity of defense counsel. Rather, the prosecutor was simply responding to Mr. Wogenstahl's counsel's closing argument. Nevertheless, the Court applies the four-part *Frazier* test to determined whether, even assuming that the prosecutor's comments were improper, those comments deprived Mr. Wogenstahl a fair trial.

The first *Frazier* factor—the degree to which the remarks complained of have a tendency to mislead the jury—does not weigh in Mr. Wogenstahl's favor. The prosecutor's comments were a fair response to defense counsel's closing argument. For example, Mr. Wogenstahl's trial counsel cast doubt on the testimony which the state's witnesses gave. See. *e.g.,* Transcript, Vol. XVII at 2486-86; 2492-93; 2513-20. In addition, Mr. Wogenstahl's counsel suggested that police investigators fabricated evidence. *Id.* at 2497-2500. Finally, Mr. Wogenstahl's counsel essentially acknowledged that during his closing argument, he was confusing the issues. *Id.* at 2511.

Similarly, the second *Frazier* factor does not weigh in Mr. Wogenstahl's favor. The

prosecutor's rebuttal closing argument during which he made all but one of the complained of comments is approximately 34 transcript pages in length[12].  The complained-of comments are approximately 20 lines in length, less than an entire transcript page.  That leads this Court to conclude that the complained-of comments were not extensive.

The Court will assume that the prosecutor made the comments intentionally and that therefore the third *Frazier* factor weighs in Mr. Wogenstahl's favor.

As this Court has noted several times,  there was an enormous amount of evidence of Mr. Wogenstahl's guilt introduced at trial.  See, Ground Five, *supra.*  Therefore, the last *Frazier* factor does not weigh in Mr. Wogenstahl's favor.

This Court concludes that the prosecutor's comments about which Mr. Wogenstahl complains in subclaim (iii), even if inappropriate, did not deprive Mr. Wogenstahl of a fair trial.

Mr. Wogenstahl argues in subclaim (iv) that the prosecutor committed prejudicial misconduct by confronting and questioning him (Mr. Wogenstahl) during closing argument.  Mr. Wogenstahl claims that the prosecutor "turned and looked directly at [him] and confrontationally asked: "I just want to ask you, why did you have to kill that little girl who had not done anything to you?"

As noted above, the Hamilton County Court of Appeals addressed this claim on direct appeal:

> In the thirty-third assignment of error, Wogenstahl brings into question remarks made by the prosecution at various stages of the arguments given to the jury.  His claims of impropriety must be judged in light of the general rule that affords wide latitude to counsel in the delivery of argument as long as the commentary is grounded

---

[12]  The prosecutor made the complained-of comment, "misleading you and attempting to mislead you" during his closing argument.  *Id.,* at 2425.

in the evidence adduced at trial and the ambit of what may reasonably be inferred therefrom.  *State v. Slagle* (1992), 65 Ohio St.3d 597, 605 N.E.2d 916; *State v. Lott*, (1990), 51 Ohio St.3d 100, 555 N.E.2d 293.

The first instance cited by Wogenstahl involved what, in context, we construe to have been in some material part a call for justice. It was not, at the time it occurred, met with a specific objection from the defense.  In our view, there are two reasons why it cannot serve as the basis for reversible error: (1) the Ohio Supreme Court has said that there is nothing inherently wrong with a call for justice, *State v. Evans,* (1992), 63 Ohio St.3d 231, 586 N.E.2d 1042; and (2) to the extent that the prosecutor may have inappropriately injected himself personally into the scenario drawn for the jurors, the error, if any, was neither prejudicial nor plain.

*Wogenstahl,* 1994 WL 686898 at *13.

Because there is a state court decision on the merits of this subclaim, the standard of review which this Court must apply is whether that decision is contrary to, or an unreasonable application of, clearly established federal law.

Assuming that the prosecutor committed misconduct in the way Mr. Wogenstahl alleges in subclaim (iv), applying the four-part *Frazier* test, the Court concludes the misconduct did not so infect the proceedings as to deny Mr. Wogenstahl a fair trial.

The Court will assume that the first *Frazier* factor weighs in Mr. Wogenstahl's favor. The  second factor, however, does not.  As noted above, the prosecutor's closing argument was extensive.  The complained-of comment, however, was not.  Specifically, the comment accounts for a total of three lines in the trial transcript.  Transcript, Vol. XVII at 2471-72.  The third *Frazier* factor  arguably weight in Mr. Wogenstahl's favor.  Specifically, it appears to this Court that the prosecutor deliberately placed the complained-of comment before the jury.  Finally, as noted several times already, there was very substantial evidence against Mr. Wogenstahl.  Therefore, the fourth *Frazier* factor does not weigh in his favor.  This Court concludes that in view of the isolated nature

113

of the comment and the amount of evidence of Mr. Wogenstahl's guilt, his subclaim (iv) is without merit.

Mr. Wogenstahl argues in subclaim (v) that the prosecutor committed prejudicial misconduct by stating his personal opinion that Mr. Wogenstahl was a liar.

It is not improper in closing argument to make comments that are based on the record. *Caldwell, supra.* A prosecutor may assert a defendant is lying during closing argument when emphasizing discrepancies between the evidence and the defendant's testimony. *United States v. Veal,* 23 F.3d 985 (6th Cir. 1994).

The record does not support Mr. Wogenstahl's claims that the prosecutor stated his personal opinion that Mr. Wogenstahl was a liar. Rather, the prosecutor was careful to tie his comments to the evidence that had been introduced. For example, in arguing Mr. Wogenstahl's believability to the jury, the prosecutor specifically referred to Mr. Wogenstahl's prior record which included crimes involving dishonesty. Transcript, Vol. XVII at 2593. Further, the prosecutor pointed out the differences between Mr. Wogenstahl's version of the facts and the version provided by the other witnesses. See, *e.g., Id.* at 2595-2600. The prosecutor did not suggest to the jury that Mr. Wogenstahl should not be believed because he stood accused of a crime. Rather, the prosecutor based his argument on the record evidence and the discrepancies therein. The Court concludes that there was not prosecutorial misconduct as Mr. Wogenstahl claims in subclaim (v). The state court's decision as to the claim contained in subclaim (v) is therefore not contrary to, or an unreasonable application of, clearly established federal law.

Mr. Wogenstahl alleges in subclaim (vi) that the prosecutor committed prejudicial misconduct at trial by offering his personal beliefs regarding numerous facts. Specifically, Mr.

Wogenstahl complains of the following statements the prosecutor made: (1) "You know, as I went through this case I found real foundations for these accusations that Jeff Wogenstahl committed these offenses"; (2) "I think you need to ask the question why... Well, I think it's because the defendant, this man right here, came by that house at 3:00 a.m. and took Eric out of the apartment"; and (3) "I know why he went there. I know exactly why he went there".[13]

While it is permissible for a prosecutor to make such statements as, "I believe the evidence shows defendant's guilt", it is not permissible for a prosecutor to state, "I believe the defendant is guilty." *Caldwell,* 181 F.3d at 738 (citation omitted).

Mr. Wogenstahl has considered the complained-of comments in isolation. A review of the context in which the prosecutor made the comments about which Mr. Wogenstahl complains reveals that the prosecutor did not improperly offer his personal opinion about Mr. Wogenstahl's guilt.

Just prior to making the first and second comments about which Mr. Wogenstahl complains, the prosecutor stated:

> I want you to remember during voir dire, folks, we asked you to decide this case on the evidence you hear. All the evidence presented from thirty something State witnesses, and I don't know how many defense witnesses, and all the exhibits you will have in evidence, I want you to think about all that evidence that was presented to you over the last two and a half weeks or so and I want to ask you, who does all that evidence point to as the perpetrator of these offenses? Who does all that evidence point to as the person who went into that Garrett residence, who took Amber out and who took her life?

Transcript, Vol. XVII at 2430-31.

Immediately subsequent to making the first comment, the prosecutor said: "Two

---

[13] The prosecutor made the first two comments during closing argument of the guilt phase and made the third one during his guilt-phase rebuttal argument.

foundations support the conclusion that he is the person that entered the Garrett residence, that he's the person that kidnaped Amber Garrett and that he's the person that killed her." *Id.* at 2431. The prosecutor then reviewed the evidence which he argued supported that conclusion. Similarly, when the prosecutor made the second comment, he referenced the evidence which had been introduced at trial. *Id.*

The prosecutor tied the first and second comments to the evidence which had been presented and because he properly told the jury that they were to decide the case on the evidence and his comments were not an invitation for the jurors to decide the case on anything but the evidence they had heard in the courtroom.

Similarly, the prosecutor surrounded the third comment with references to the evidence as well as an invitation to the jury to consider the evidence, particularly the conflicting version of the events which Mr. Wogenstahl gave various individuals. *Id.* at 2586-89. The prosecutor specifically reminded the jury that they would have the evidence in the jury room and at that time they would be able to reach their conclusions. *Id.* at 2587. Again, the prosecutor's comment was not an invitation for the jury to decide the case on anything but the evidence it had heard in the courtroom. The prosecutor's comments were not improper and there was no prosecutorial misconduct as alleged by Mr. Wogenstahl in subclaim (vi).

In subclaim (vii), Mr. Wogenstahl argues that the prosecutor committed misconduct by arguing facts not in evidence including: (1) "I mean it's kind of hard to act like a real big man when you ... steal a 10 year-old to have sex with her."; (2) [in reference to Mr. Wogenstahl's jacket] "I will tell you what did this. The Clorox. That is what did this."; and (3) "the [blood] type that Amber Garrett was which also, if you recall, was the exact type of blood found behind him [Mr.

Wogenstahl]. They are identical.  It's the same person."

Indeed, in his closing argument, the prosecutor said:

... Wheeler was reporting what Wogenstahl said to him.  No one is saying that Wogenstahl didn't puff up his story.  I mean, it's kind of hard to act  like a real big man when you get a 16-year-old out of the house and you steal a 10-year-old to have sex with her.

Transcript, Vol. XVII at 2596.

As noted above, Mr. Wheeler testified that Mr. Wogenstahl told him (Wheeler) that

he (Wogenstahl) had taken Amber Garrett to have sex with her and that he had "stuck it in her".  The

prosecutor's comment that Mr. Wogenstahl took Amber to have sex with her was based on the

evidence introduced through Mr. Wheeler's testimony.

Similarly, the prosecutor's statement about the Clorox was based on the evidence

introduced at trial.  Indeed, during closing argument, the prosecutor said:

The same cat he used to explain the damage to his coat.  All this staining on my coat came from my cat urinating on it.  If you had seen a cat urinate and cleaning it up and it might smell, but there's no trace of it on the rug, otherwise, everybody that has a cat, their rug would look like this.

I will tell you what did this [to the jacket].  The Clorox.  That is what did it.  In response to Mr. Dieters' question the defendant was asked yesterday, did you put Clorox or bleach on that jacket?  Do you remember his answer?  His answer yesterday was of course not.  I would not do that to my prized jacket.  It would turn it white, Yes, it would.  It would turn it white just like this. That is what it would do.

Id. at 2461-62.

In addition to Mr. Wogenstahl's leather jacket being admitted into evidence, see, Id.,

Vol. XV at 2186, there was evidence which supported the inference that Clorox had been used to

clean the jacket.  First, there was the jacket the lining  which, the prosecutor pointed out, had turned

117

color.  Second, Officer Lindsay testified that when he retrieved Mr. Wogenstahl's jacket from the

bedroom closet, it was wet and the lining was discolored.  *Id.,* Vol. XIII at 1673-93.  Third, Jeffrey

Schaefer, a criminalist with the Trace Evidence section of the Hamilton County Coroner's

Laboratory during the time relevant to this matter, testified that bleach was capable of removing

evidence of blood stains.  *Id.*, Vol. XIV at 1867-1962.   Fourth, a not-full bottle of Clorox bleach

was recovered from Mr. Wogenstahl's apartment.  *Id.*, Vol. XV at 2194-95. Finally, as noted above,

Mr. Wheeler testified that Mr. Wogenstahl had told him that he (Mr. Wogenstahl) had been slick and

covered up the evidence.  In light of that evidence, it was not improper for the prosecutor to argue

that the evidence indicated that Mr. Wogenstahl had used Clorox on his leather jacket.

Mr. Wogenstahl's final argument in subclaim (vii) is that the prosecutor made the

following allegedly improper comment: "The type that Amber Garrett was which also, if you recall,

was the exact type of blood found back behind him [Petitioner].  They are identical. ... It's the same

person."

Again, Mr. Wogenstahl has taken the prosecutor's comments in isolation.  What the

prosecutor actually said was:

> The blood in that car...we have the ABO system.  We had testimony
> about the four groups: A, B, AB, and O.  Four groups.  All the
> people, especially Amber and defendant Wogenstahl, have type O
> blood.  That test would not have told us anything.  Frankly, that was
> not done and did not take all the blood away so we could not test it
> further.  They did the HLA DQ Alpha test which could deal with very
> small minute quantities of blood.  In this blood classification system
> there is twenty-one types of types that everyone falls into.  Not one
> but twenty-one.  The type that Amber Garrett was which also, if you
> recall, was the exact type of blood found back behind him was the
> 1.1, 3.  They are identical.  That occurs in five percent of the
> Caucasian population.  Mr. Schmidt says 19 to 1, boy, that is not very
> good odds. ... It's a very narrow cast.  It's the same person.

118

*Id.*, Vol. XVII at 2598-99.

As noted above,  Mr. Wraxall testified that Amber Garrett had an HLA DQ Alpha 1.1, 3 and that the blood recovered from Mr. Wogenstahl's vehicle had an HLA DQ Alpha 1.1, 3. When the prosecutor used the phrase, "[t]hey are identical", he was referring to Amber's HLA DQ Alpha of 1.1, 3 and the recovered blood's HLA DQ Alpha of 1.1, 3.  The prosecutor's comment was based on the evidence and he accurately described Amber's and the recovered blood's HLA DQ Alpha as identical.  Accordingly, the prosecutor did not commit misconduct.

In subclaim (viii), Mr. Wogenstahl alleges that the prosecutor committed misconduct when he insinuated that he (Mr. Wogenstahl) had threatened witnesses.  Mr. Wogenstahl's position is that the prosecutor argued at length about an alleged threat he made to Mr. Wheeler, his former fellow inmate.

During closing argument the prosecutor said:

The defendant testified yesterday and even presented a witness that sometime after he came to the Justice Center he voluntarily put himself in solitary confinement.  I am sure you remember that testimony.  I don't doubt that.  But remember he did it after he was back for some period of time.  He didn't do it his first day.  I think the correction's [sic] officer that he called as a witness said it could have been as long as [a] month after he got back.  What precipitated that, what precipitated Jeffrey Wogenstahl to ask that?  Well, you remember the testimony of Bruce Wheeler, There was a guy over there named Bies, B-i-e-s, who was on trial for killing a little boy named Aaron Raines, and one day during that trial an inmate from the Justice Center was called as a State's witness and he testified against Bies and this defendant went berserk over that and could not believe that an inmate would testify against another inmate.  I think the words he used was that is bullshit.  Don't they know that for a hundred dollars you could have somebody killed in prison?

He kicked doors and slammed things and came to Bruce Wheeler with a piece of paper that he had written, a contract I guess or a release.  I have never talked about my case.  Now, Bruce, if you sign

> this you will be cool and you will be all right.  If you [ ] don't sign it
> we're going to have problems.  If I ever see you in court I will rip
> your throat out.  That is what he told him.

*Id.* at 2469-71.

Mr. Wheeler testified that when Mr. Wogenstahl learned that Mr. Bies' fellow inmate had testified against Mr. Bies, he (Mr. Wogenstahl) "got mad", "kicked the garbage can and kicked the door", and said, "that is fucking bullshit.  People don't understand you could have someone killed for a hundred dollars in prison".  *Id.,* Vol. 15 at 2153-54.  In addition, Mr. Wheeler testified that sometime after that incident, Mr. Wogenstahl approached Mr. Wheeler with "a piece of paper he wanted [Mr. Wheeler] to sign saying he never said anything incriminating against myself", that Mr. Wogenstahl did that "in a threatening way saying you better sign it or we will have problems", and that Mr. Wogenstahl made the threat "if I see you in the courtroom I will rip the windpipe out of your throat."  *Id.* at 2154-55.

The prosecutor's comments accurately reflect Mr. Wheeler's testimony and it was not misconduct for the prosecutor to make those comments.

Mr. Wogenstahl argues in subclaim (ix) that the prosecutor committed misconduct by commenting on the defense's failure to call witnesses.  Mr. Wogenstahl takes issue with the following remarks the prosecutor made in his closing argument:

> They have every right, as we do, to subpoena any witness in the
> world, and if the guy from BCI [Bureau of Criminal Investigations]
> is so darn important why didn't they subpoena him?  It's totally
> irrelevant.  If it was so important to Wogenstahl's case bring him in.

*Id.,* Vol. XVII at 2573-74.  Mr. Wogenstahl's position is that this statement misled the jury to believe, contrary to law, that he (Mr. Wogenstahl) had a burden of proof.

Mr. Wogenstahl raised this claim in part (7) of subclaim (iii).  For the same reasons

120

discussed in relation to that claim, *supra,* this Court concludes that Mr. Wogenstahl's subclaim (ix) is without merit.

In subclaim (x), Mr. Wogenstahl alleges that the prosecutor committed misconduct by inflaming the passions and prejudices of the jury.  Mr. Wogenstahl points to the following remarks the prosecutor made during closing argument:

> Sometimes, I feel like I could hear Amber.  Sometimes I feel like I could hear her crying saying stop, please stop, saying help me.  Sometimes I feel like I could honestly hear that voice.
> ...
> I just want to ask you [Petitioner].  Why did you do it?  Why did you have to kill that little girl who had not done anything to you?
> ...
> You know what else I hear her doing?  I hear her calling out for justice.

*Id.* at 2471-72.

As noted above in the discussion of subclaim (iv), the Ohio court of appeals addressed Mr. Wogenstahl's claim that the prosecutor committed misconduct by calling for justice.  For the same reasons this Court rejected subclaim (iv), it rejects subclaim (x).

Mr. Wogenstahl argues in subclaim (xi) that his trial counsel were ineffective for failing to object to the prosecutorial misconduct at closing argument.

First, even assuming that Mr. Wogenstahl had properly made a claim of ineffective assistance of trial counsel on this basis, because none of his prosecutorial misconduct claims have merit, there could not have been ineffective assistance of counsel for failure to object to such conduct.

In subclaim (xii), Mr. Wogenstahl alleges that the trial court erred in not ruling on defense counsel's objections to improper prosecutorial arguments during closing arguments at both

121

trial and sentencing.  Mr. Wogenstahl specifically identifies the following comments which the prosecutor made: (1) improper argument that defense did not ask witness Vicki Mozena about the person that came into the store (*Id.* at 2446); (2) improper argument that defense counsel could have called a witness from BCI (*Id.* at 2574); (3) improper argument at sentencing that defense counsel was there to justify what [Mr. Wogenstahl] had done (*Id.* at 2804); (4) improper argument at sentencing regarding [Mr. Wogenstahl's] unsworn statement (prosecutor stated that because [Mr. Wogenstahl] could not be asked any "tough questions...it had no weight")(*Id.* at 2835; (5) improper argument regarding defense counsel's previously stricken statement that "If I though he did it...." (*Id.* at 2840).

First, Mr. Wogenstahl never raised on direct appeal, nor in his post-conviction petition, the claims he brings in parts (1), (3), (4), and (5) of subclaim (xii).  Appendix, Vol. III at 695-815, *Wogenstahl,* 1994 WL 686898 at *1-16; Appendix, Vol. V at 1153-1325, *Wogenstahl,* 75 Ohio St.3d at 369-74; Appendix, Vol. VIII at 2013-74, 1998 WL 206561 at *1-3.  In other words, Mr. Wogenstahl had the opportunity to raise these trial-related subclaims in the Ohio, but he failed to do so.  Therefore, the first and second *Maupin* prongs have been met.  The third *Maupin* prong is satisfied because, as noted above, the procedural rule of waiver is an adequate and independent state ground.  *Norris, supra; Rust, supra.*  Therefore, the claims in parts (1), (3), (4), and (5) of subclaim (xii) are procedurally defaulted.

As to part (2) of subclaim (xii), Mr. Wogenstahl now couches in terms of trial court error the same issue that he has alleged as prosecutorial misconduct in part (7) of subclaim (iii) and in subclaim (ix).  For the same reasons discussed in relation to those claims, *supra,* this Court concludes that Mr. Wogenstahl's part (2) of subclaim (xii) is without merit.

122

Mr. Wogenstahl's final subclaim in Ground Twelve is that the cumulative effect of the prosecutorial misconduct at closing argument violate his constitutional rights. First, there can be no cumulative error when there is no error to cumulate. Second, the Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief. *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002), *cert. denied,* 538 U.S. 947 (2003). "[W]e have held that, post-AEDPA, not even constitutional errors that would not individually support habeas relief can be cumulated to support habeas relief." *Moore v. Parker,* 425 F.3d 250, 256 (6th Cir. 2005), citing *Scott v. Elo,* 302 F.3d 598, 607 (6th Cir. 2002), *cert. denied,* 537 U.S. 1192 (2003) and *Lorraine, supra.* Mr. Wogenstahl's subclaim (xiii) is without merit.

Mr. Wogenstahl's Ground Twelve should be rejected because it is procedurally defaulted in part and otherwise without merit.

### Ground Thirteen

**Petitioner's defense counsel provided ineffective assistance of counsel due to numerous failures and deficiencies in performance at trial which, either individually or cumulatively, violated Petitioner's constitutional rights as guaranteed by the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.**

**i) Defense counsel failed to impeach the testimony of state's expert Brian Wraxall regarding the possible sources of semen found on the victim's comforter.**

**ii) Defense counsel failed to call a witness from Cellmark Diagnostics for purposes of impeaching the testimony of state's expert Brain [sic] Wraxall.**

**iii) Defense counsel failed to investigate potential exculpatory evidence through the use [of] blood visualization enhancement techniques to confirm the lack of blood in Petitioner's car.**

123

**iv) Defense counsel failed to request proper instructions and verdict forms consistent with state law pursuant to Ohio Revised Code section 2929.04A7 and its two mutually exclusive alternatives (principle offender or prior calculation and design).**

**v) Defense counsel was ineffective in determining to submit the specification issue regarding Petitioner's prior burglary conviction to the jury instead of the court.**

**vi) Defense counsel performed deficiently at trial in making prejudicial comments during closing argument against the interests of their client.**

**vii) Defense counsel was ineffective in stipulating to the admission into evidence of a crack cocaine pipe taken from Petitioner's apartment.**

The Respondent argues that all of the subclaims contained in Ground Thirteen are procedurally defaulted. Mr. Wogenstahl does not take issue with the Respondent's position. However, Mr. Wogenstahl seems to argue that there is cause for the default by virtue of the ineffectiveness of his appellate counsel.

Although Mr. Wogenstahl presented subclaim (i) to the Ohio court on direct appeal, Appendix Vol. III at 695-815; *Id.* Vol. V at 1153-1325, and in his first *Murnahan* motion which the Ohio Courts dismissed as procedurally deficient, *Id.* at 1733-1842, he did not present it in terms of an ineffective assistance of counsel claim.

Similarly, although he raised it in his first procedurally deficient *Murnahan* motion, *Id.*, Mr. Wogenstahl failed to raise subclaim (ii) on direct appeal to the Ohio courts. *Id.* Vol. III at 695-815; *Id.* Vol. V at 1152-1325.

While Mr. Wogenstahl raised subclaim (iii) as an underlying claim to his *Brady* and prosecutorial misconduct claims, he never raised it as an ineffective assistance of counsel claim. *Id.*

124

Mr. Wogenstahl did not raise subclaim (iv) to the Ohio Supreme Court on direct appeal. *Id.*

Mr. Wogenstahl raised subclaim (v) on direct appeal to the Hamilton County Court of Appeals as his Assignment of Error No. XXII, *Id.* Vol. II at 695-814, but he did not raise it when he appealed to the Ohio Supreme Court. *Id.* Vol. V at 1152-1325.

With respect to subclaim (vi), although Mr. Wogenstahl raised it in his first *Murnahan* motion which was dismissed as procedurally deficient, he never raised it on direct appeal. *Id.*; *Id.* at Vol. II at 695-814.

Finally, again, although Mr. Wogenstahl raised subclaim (vii) in his first *Murnahan* motion which the Ohio Courts dismissed as procedurally deficient, he never raised it on direct appeal to the Ohio courts. *Id.*; *Id.* Vol. V at 1152-1325.

Mr. Wogenstahl had the opportunity to raise in the Ohio courts on direct appeal these trial-related subclaims which are based on the record, but he failed to do so. Therefore, the first and second *Maupin* prongs have been met. The third *Maupin* prong is satisfied because, as noted above, the procedural rule of waiver is an adequate and independent state ground. *Norris, supra; Rust, supra.*

Mr. Wogenstahl seems to argue that ineffective assistance of appellate counsel provides cause for the default. However, as already noted, Mr. Wogenstahl has not raised any claims of ineffective assistance of appellate counsel in his Petition or Amended Petition before this Court. Accordingly, this Court issue of appeal counsels' ineffectiveness is not properly before this Court and it therefore cannot provide cause for the default.

Mr. Wogenstahl's Ground Thirteen is procedurally defaulted and it should be rejected

125

on that basis.

### Ground Fourteen

**The trial court's error at sentencing in providing an improper jury instruction that the jury's verdict had to be unanimous resulted in a violation of Petitioner's constitutional rights as guaranteed by the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.**

In support of this Ground, Mr. Wogenstahl essentially argues that the trial court's mitigation phase instruction to the jury that its verdict had to be unanimous was improper because while a verdict for death must be unanimous, a verdict for a life sentence need not be unanimous.

Respondent argues that Mr. Wogenstahl's Ground Fourteen is procedurally defaulted. (Doc. 16 at 144-45).

Mr. Wogenstahl concedes that his trial counsel did not object to the allegedly offending instruction.  (Doc. 14 at 118, ¶214; Doc.19 at 276).  In addition, Mr. Wogenstahl admits that his appellate counsel did not raise on direct appeal either a claim with respect to the instruction or a claim of ineffective assistance of trial counsel for failing to object to the instruction at trial. *Id.*; Doc. 14 at ¶215.   However, while Mr. Wogenstahl  recognizes that his jury instruction claim is procedurally defaulted,  his position is that counsels' ineffective assistance provides cause for the default.  (Doc. 19 at 276-77).

Although Mr. Wogenstahl has raised in these proceedings claims for ineffective assistance of trial counsel, none of those claims involve the issue of the allegedly offending jury instruction presently under discussion.  See Grounds Three, Thirteen, Nineteen subclaims vii and viii, and Twenty-Three.  In addition, Mr. Wogenstahl has raised absolutely no claims of ineffective assistance of appellate counsel in these proceedings.  Therefore, this Court has no occasion to review

126

the effectiveness of either trial counsel or appellate counsel as to the jury instruction. Counsels'

ineffectiveness, then, cannot provide cause for the procedural default of Mr. Wogenstahl's claim that

his Constitutional rights were violated by the trial court's error at sentencing in providing an

improper jury instruction that the jury's death verdict had to be unanimous.

Mr. Wogenstahls's Ground Fourteen is procedurally defaulted and should be denied.

### Ground Fifteen

**Petitioner was denied his Eighth Amendment right to be free from cruel and unusual punishment and his Fourteenth Amendment right to due process of law by the failure to merge multiple, duplicative aggravating circumstances for weighing against mitigating factors by the jury, the sentencing court, the court of appeals, and the state supreme court.**

Mr. Wogenstahl argues in support of this Ground that the failure to merge his three

death penalty specifications was unnecessarily cumulative and therefore violated his due process

rights. Mr. Wogenstahl's position is that the failure to merge the specifications resulted in an

arbitrary and capricious death penalty proceeding.

### State court opinion

In addressing this claim, the Ohio Supreme Court said:

In his first proposition of law, appellant contends that the trial court should have merged the three aggravating circumstances prior to the penalty phase since, according to appellant, the three aggravating circumstances were duplicative. We disagree.

In *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph five of the syllabus, this court held that:

"In the penalty phase of a capital prosecution, where two or more aggravating circumstances arise from the same act or indivisible course of conduct and are thus duplicative, the duplicative aggravating circumstances will be merged for purposes of sentencing. Should this merging of aggravating

127

circumstances take place upon appellate review of a death sentence, resentencing is not automatically required where the reviewing court independently determines that the remaining aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt and that the jury's consideration of duplicative aggravating circumstances in the penalty phase did not affect the verdict."

Here, the three aggravating circumstances appellant was found guilty of committing were not duplicative.   The evidence at trial, if accepted, established that appellant broke into an occupied structure to kidnap ten-year- old Amber Garrett.   He forcibly removed Amber from the apartment to use her for his own sexual gratification. Appellant physically restrained Amber and bound her arms in the clothing she was wearing.   A knife was held to Amber's neck.   She was transported in appellant's vehicle across the Ohio-Indiana border. At some point, appellant killed Amber when he realized that he could not return her to the apartment without being identified as the perpetrator of the aggravated burglary and/or kidnaping offenses.

In *State v. Waddy* (1992), 63 Ohio St.3d 424, 448, 588 N.E.2d 819, 837, we recognized that aggravated burglary is not implicit within kidnaping, and that kidnaping is not implicit within aggravated burglary.   In *Waddy*, we held that although Waddy had been convicted of two R.C. 2929.04(A)(7) death penalty specifications (*i.e.,* aggravated burglary and kidnaping), the specifications were not duplicative. *Id.*   We reach the same conclusion here.   Further, the R.C. 2929.04(A)(3) aggravating circumstance in the case at bar can clearly be viewed as independent of the two R.C. 2929.04(A)(7) aggravating circumstances appellant was found guilty of committing. The aggravating circumstances appellant was found guilty of committing did not arise out of the same act or indivisible course of conduct. Therefore, merger was not required.   Moreover, given the dearth of mitigating evidence in this case, we are convinced beyond a reasonable doubt that the jury would have reached the same verdict in the penalty phase even if the three aggravating circumstances had been merged.

Accordingly, we reject appellant's first proposition of law.  Similarly, we reject the arguments in support of appellant's second, third, and fourth propositions of law which assume that the aggravating circumstances appellant was found guilty of committing should have been merged at trial and on appeal.

128

*Wogenstahl,* 75 Ohio St.3d at 366.

**Clearly established federal law**

Because death "is so profoundly different from all other penalties," it cannot be imposed without individualizing the sentence. *Lockett v. Ohio ,* 438 U.S. 586, 605 (1978). Any death penalty statute must narrow the class of death-eligible defendants from those not death eligible. *Zant v. Stephens*, 462 U.S. 862 (1983). A state may choose either to legislatively limit the definition of death-eligible crimes, or it may broadly define capital offenses but narrow the defendants who actually receive a death sentence by using aggravating circumstances during the penalty phase. *Lowenfield v. Phelps,* 484 U.S. 231 (1987).

A violation of a state statute is insufficient ground, in and of itself, upon which to grant habeas relief. *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991).

**Analysis**

In its sentencing opinion, the trial court found the existence of three specifications of aggravating circumstances as to the charge of aggravated murder. Appendix, Vol. II at 000616-38. Those specifications included an aggravated murder during a kidnaping, O.R.C. §2929.04(A)(7), an aggravated murder during an aggravated burglary, O.R.C. §2929.04(A)(7), and an aggravated murder to escape detection. O.R.C. §2929.04(A)(3). Pursuant to Ohio law, if kidnaping, aggravated burglary, and escaping detection are allied offenses of similar import, merger was required. See *State v. Jenkins,* 15 Ohio St.3d 164 (1984), paragraph five of the syllabus. In other words, the trial court should have merged these specifications if they "arose from the same acts and were committed with the same animus". See *State v. Cooey,* 46 Ohio St.3d 20 (1989).

Burglary consists of trespassing in an occupied structure by force, stealth, or

129

deception with purpose to commit a theft offense or felony.  If the burglar inflicts physical harm on another, or the structure is a habitation in which any person was present, the offense is aggravated burglary.   Ohio Revised Code § 2911.11(A)(1)( and (3).  Kidnaping requires the removing of a person from one place to another.   Ohio Revised Code § 2905.01.  Finally, an effort to escape detection involves in individual's efforts to avoid being found or identified as the perpetrator of a criminal offense.  Ohio Revised Code § 2929.04.

Aggravated burglary is not implicit within kidnaping nor is kidnaping implicit within burglary.  See *State v. Waddy,* 63 Ohio St.3d 424 (1992).  Burglary does not involve the moving of a person from one place to another.  Kidnaping does not necessarily involve trespassing in an occupied structure by force, stealth, or deception.  Finally, escaping detection is not implicit within either kidnaping or aggravated burglary.  Therefore,  the trial court did not err when it failed to merge the specifications in Mr. Wogenstahl's case.  Nevertheless, even if the state court did err by failing to merge the specifications, as noted above, a violation of a state statute is insufficient ground, in and of itself, upon which to grant habeas relief.  The question is whether the error rises to the level of a constitutional violation.  In other words, the inquiry is whether the error resulted in the failure to individualize the sentence.  This Court concludes that it did not.

The evidence was sufficient to conclude that Mr. Wogenstahl committed aggravated burglary and kidnaping when he entered Amber Garrett's home where she and her siblings were sleeping, removed her from her home for the purpose of having sex with her, bound her with her clothing,  held a knife to her neck,  brutally stabbed her numerous times, and dumped her body in a deserted, wooded area of Jamison Creek Road when he realized that he would not be able to return Amber to her home without being seen.  With these facts in mind, this Court concludes that any one

130

of the specifications was sufficient to outweigh the paucity of mitigation evidence in this case. Therefore, the jury and Ohio courts would have reached the same conclusion even it the specifications had been merged. Mr. Wogenstahl's sentence was individualized and his Constitutional rights were not violated by the Ohio Courts' failure to merge the specifications.

The Ohio Supreme Court's decision is not contrary to, nor an unreasonable application of, clearly established federal law and therefore Mr. Wogenstahl's Ground Fifteen should be overruled.

### Ground Sixteen

**Petitioner's right to due process of law under the Fourteenth Amendment to the United States Constitution and his right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution were violated by the prosecutor's penalty phase closing argument to the jury that the nature and circumstances of the offense, which is a statutory mitigating factor under Ohio's death penalty law, be considered as aggravating circumstances and by the sentencing court's consideration and weighing of the nature and circumstances of the offense as nonstatutory mitigating circumstances in its sentencing opinion.**

In Ground Sixteen, Mr. Wogenstahl essentially brings a claim of prosecutorial misconduct. Specifically, Mr. Wogenstahl argues that during the penalty phase closing arguments, the prosecutors improperly commented on the nature and circumstances of the offense. Mr. Wogenstahl focuses his argument on his position that his trial counsel was ineffective for failing to object to the alleged improper comments and that his appellate counsel was ineffective for failing to raise that issue on appeal. Presumably because the Respondent raises a procedural default defense to this claim, Mr. Wogenstahl attempts to establish "cause" for the default of this claim so that this Court will address the merits of the claim.

131

As Mr. Wogenstahl tacitly admits, his trial counsel failed to object to comments he now complains about which the prosecutors made during their penalty phase closing arguments. Transcript, Vol. XIX at 2796-2807; 2831-42. However, Mr. Wogenstahl did raise the issue in his direct appeal to the court of appeals as part of his Assignment of Error XXXIII.  Appendix, Vol. III at 695-815; *Wogenstahl,* 1994 WL 686898 at *13-14.  In addition, Mr. Wogenstahl raised this claim in his Proposition of Law No. 13 on direct appeal to the Ohio Supreme Court.  Appendix, Vol. V at 1153-1325; *Wogenstahl,* 75 Ohio St.3d at 356; 370.  The Ohio Supreme Court noted that Mr. Wogenstahl failed to object to the prosecutors' comments and therefore had waived his claim; it nevertheless proceeded to address Mr. Wogenstahl's claim on the merits under the plain error doctrine. *Id.* at 356-61.  A state appellate court's review for plain error is enforcement, not waiver, of a procedural default.  *White v. Mitchell,* 431 F.3d 517, 524 (6th Cir. 2005); *Hinkle v. Randle,* 271 F. 3rd 239 (6th Cir. 2001), citing *Seymour v. Walker,* 224 F. 3rd 542, 557 (6th Cir. 2000)(plain error review does not constitute a waiver of procedural default); *accord, Mason v. Mitchell,* 320 F.3d 604 (6th Cir. 2003). As noted above, the Sixth Circuit has determined that waiver is an adequate  and independent state ground to bar *habeas* review.  *Norris,* 146 F.3d at 314; *Rust,* 17 F.3d at 161. Therefore this Ground for Relief is procedurally defaulted.

Because the Ohio Supreme Court went on to consider the merits of this claim albeit under the plain error rubric, this Court will also consider the merits in the alternative.

**State court opinion**

In addressing the issue of the prosecutors' comments during the penalty phase closing arguments, the Ohio Supreme Court stated:

> In his thirteenth proposition of law, appellant challenges a number of
> the prosecutor's comments during the initial closing argument in the

penalty phase. However, appellant never objected to the prosecutor's remarks at the time they were made. Therefore, we find that appellant's contentions of error based upon the state's initial closing argument have been waived. [FN2]. Accordingly, our review of appellant's contentions must proceed, if at all, under the plain error analysis of Crim. R. 52(B). Plain error does not exist unless it can be said that but for the error, the outcome of the trial would clearly have been otherwise. See, *e.g., State v. Wickline* (1990), 50 Ohio St.3d 114, 119-120, 552 N.E.2d 913, 919-20.

> FN2. We recognize that appellant moved for a mistrial at the conclusion of the state's initial closing argument based upon the prosecutor's alleged improper comments. The motion was denied. In this regard, appellant claims that he did "object" to the prosecutor's comments. However, "[i]mproper remarks of counsel during argument, unless so flagrantly improper as to prevent a fair trial, should be at once objected to and exception taken; otherwise error cannot be predicated upon the remarks alleged to have been improper. *State v. DeNicola* (1955), 163 Ohio St. 140, 56 O.O. 185, 126 N.E.2d 62, paragraph three of the syllabus. See, also, *State v. Johnson* (1989), 46 Ohio St.3d 96, 102, 545 N.E.2d 636, 642.

In the state's initial closing argument in the penalty phase, the prosecutor discussed the three statutory aggravating circumstances appellant was found guilty of committing. In discussing R.C. 2929.04(A)(7) kidnaping specification, the prosecutor stated:

> "The second aggravating circumstance becomes a lot more serious: the kidnaping of Amber Garrett. What I would like you to consider when you think back about that is what Amber Garrett went through during that kidnaping when she was taken out of her bed. It was a very cold night. All she had on was a little nightie and a pair of underwear. She did not have her glasses, she did not have her shoes.

> "At some point in time she woke up and she really did not know where she was. She was in his car and obviously she could not see well or she might have been able to recognize him at this point. What did she say to him? What went through her mind as she felt that knife pressed against her neck? We know from Dr. Kenny [the coroner] that there was

133

> not one or a couple but eleven superficial lacerations.  That
> would hurt.  It obviously hurt a lot.  This is a 10-year-old
> girl.  *That is the kidnaping.  That is the aggravated
> circumstance.*  What went through her mind while all that
> was going on?  That is something to consider."  (Emphasis
> added.)

The prosecutor's comments in this regard could be considered
objectionable for two reasons.   First, the prosecutor obviously
invited the jury to concentrate on what the victim experienced and
was thinking in her last moments of life.  As we recognized *State v.
Combs* (1991), 62 Ohio St.3d 278, 283, 581 N.E.2d 1071, 1077, such
argument could be considered error to the extent that it invites the
jury to speculate on facts not in evidence.  Second, we are somewhat
troubled by the prosecutor's statements:  "That is the kidnaping. That
is the aggravated circumstance."  These statements are legally
defensible, since the kidnaping was, in fact, the predicate for one of
the R.C. 2929.04(A) specifications of aggravating circumstances
alleged in the indictment.  However, the statements were made in the
midst of the prosecutor's description of some of the nature and
circumstances of the crime and, thus, could be construed as
suggesting that the nature and circumstances of the offense were
"aggravating circumstances."  In this regard, a much better approach
[FN3] for the closing argument would have been to entirely separate
the discussion of the statutory aggravating circumstances appellant
was found guilty of committing from the discussion of the nature and
circumstances of the crime.  For instance, the prosecutor could have
first listed the three statutory aggravating circumstances at issue in
the case as specified in the indictment.  *As a separate portion of the
argument to the jury,* the prosecutor could have then set forth a
description of all relevant facts and circumstances surrounding the
offense--*without referring to any such facts and circumstances as
"aggravating."*   Again, we emphasize that prosecutors need to
exercise an abundance of caution to avoid suggesting or implying that
the nature and circumstances of the offense are "aggravating
circumstances."

> FN3.  We recognize, of course, that we have the
> advantage of "Monday morning quarterbacking,"
> whereas the prosecutor was required to make his
> decisions and comments during the "heat of the
> battle."  We further recognize that our job, in this
> regard, is much easier than was his.

Next, the prosecutor went on to discuss the third statutory (R.C. 2929.04[A][3]) aggravating circumstance, to wit, a killing to escape detection.  In this part of the initial closing argument, the prosecutor again invited the jury to speculate concerning the victim's thoughts as she was being stabbed to death:  "Think of the savageness of the killing he actually inflicted on her;  ten or eleven knife wounds, and she was again alert and aware during this, going into her chest, going into her neck when she was able to fend some of these off.   There was a cut in her hand and one of the knife wounds went all the way through her arm.  Again, what went through that little girl's mind at that point?"   Clearly, the prosecutor should have refrained from encouraging the jury to speculate as to the victim's final thoughts.  Additionally, near the conclusion of the prosecutor's initial closing argument, he stated, "[a]nd what, if anything, did she do to deserve this?   *Those are the aggravating circumstances,* ladies and gentlemen, that he is guilty of and that you found him guilty of."  (Emphasis added.)   With respect to these remarks, it is not entirely clear whether the prosecutor was referring to the nature and circumstances of the offense on the one hand or to the three statutory aggravating circumstances that appellant was found guilty of committing on the other hand.   In this regard, we note that prosecutors should refrain from making any vague comments in the penalty phase concerning precisely what the aggravating circumstances are in a given case. Again, the only "aggravating circumstances" at issue in the penalty phase of a capital trial are the R.C. 2020.04(A) specifications of aggravating circumstances the defendant was found guilty of committing.

Additionally, appellant challenges a number of comments made by the prosecutor in the final closing argument in the penalty phase.  During the final closing argument, the prosecutor stated, in part:

   "Now what were the aggravating circumstances?  * * *

   " * * * Mr. Piepmeier [the prosecutor who presented the initial closing argument] explained it very eloquently what those aggravating things are. What kind of person would commit the burglary of a friend's house, knows they are not going to be there, and returns to their house to burglarize and kidnap?   What kind of person is that?   *What kind of aggravating circumstance is that?*

   "What kind of aggravated circumstance is it that a 31-year-old man when he's doing this burglary and right

135

before he gets the *baby-sitter out of the house on a cold November night with three small children in that apartment? Incredible aggravation.*

"*He returns and now knows nobody is there. This is aggravation.* This is balancing on the end of this scale the mitigation and it is a simple balancing test. *He returns and takes a 10-year-old girl, takes a sleeping 10-year-old girl from her warm bed which she is sharing with her little sister and her little brother. Incredible in terms of an aggravating circumstance in this crime.* He takes her sound asleep from her home or half-asleep so quickly on this freezing cold night and he removes her. *There is not time to have shoes put on her, a coat put on her and she is half blind without her glasses, and what kind of aggravation is it?* What kind of person would commit that kind of a crime?

"He throws her in the car. We know from the witnesses and the eyewitnesses that saw this person out on the road, that saw his car on the road which was a very tight time frame. He didn't get what he wanted from Amber and this vicious man, probably within thirty minutes of kidnaping her.

"*What aggravation do we further have? We have these hesitation marks on Amber's neck. I am sure you looked at and saw when you think of her. He stabs her eleven times. This is all on the scale side of aggravation. He stabs this little girl eleven times. The wound to the heart area is incredible in terms of aggravation.*

"*What did the coroner testify to? He ran a knife in her chest, withdrew it partially and then stuck it back in her. That is on the aggravation side against his mitigation. This exhibit that you saw back in the jury room depicts her struggle in trying to fight him. That is on the aggravation side. That is on the aggravation scale.*

"He wanted to make sure though so he takes a blunt object and probably a jack handle and delivers the shots to the head. She will never talk. For the purpose of escaping detection, just as Mike Piepmeier said in his opening statement. Isn't that incredibly consistent, isn't that incredibly consistent with the cleaning of the car, the cleaning of his clothes, the lies he told the police, the continued lies he told this courtroom and

136

even the lies he told you in this courtroom today?

> "*Killing Amber and that aggravation connected with it that you're weighing against his mitigation that was presented today.  He was cleaning, he was getting rid of the witness. It is the ultimate cleaning.  It was the ultimate selfish act. He made the decision to kill her.*"  (Emphasis added.)

Initially, we note that appellant failed to raise an objection to any of the prosecutor's remarks concerning what constituted "aggravation" in this case. Thus, appellant's arguments based upon the prosecutor's remarks have been waived.  Accordingly, our discretionary review of appellant's contentions must proceed, if at all, under the plain error analysis of Crim.R. 52(B).  See *Wickline, supra,* 50 Ohio St.3d 114, 119-120, 552 N.E.2d 913, 191-920.

We agree with appellant that the prosecutor's final closing argument was riddled with improper comments regarding the nature and circumstances of the offense.  Repeatedly, the prosecutor referred to the nature and circumstances of the offense as "aggravation" or "aggravating circumstances."  Worse yet, the prosecutor stated that such "aggravation" was to be balanced against the evidence presented in mitigation.   Such comments do not conform to Ohio's death penalty scheme for the reason stated in our discussion, *supra.*

However, while many of the prosecutor's comments in the closing arguments  (both the initial closing argument and the final closing argument) should not have been made, we nevertheless conclude that the errors did not rise to the level of plain error.   We are persuaded that the prosecutor's closing arguments to the jury made no difference in the outcome of the trial, particularly in light of the statutory aggravating circumstances appellant was found guilty of committing and the lack of credible mitigating evidence presented by appellant. Moreover, the trial court properly instructed the jury that the only "aggravating circumstances" at issue in this case were the three specifications of aggravating circumstances the jury had found appellant guilty of committing.   The instruction was very clear in this regard, and we assume that the jury followed the trial court's instructions.

We have been strongly urged, by some, to reverse appellant's death sentence based upon the prosecution's closing arguments in this case. To do so, it is argued, would send a very strong message that any reference to the nature and circumstances of the offense as

> "aggravating circumstances" is not acceptable *even where, as here,*
> *there is no material prejudice to the defendant.* We decline to do so,
> trusting that our detailed clarification of this issue will suffice to put
> prosecutors and trial judges on notice of what is acceptable and what
> is not.

*Wogenstahl,* 75 Ohio St.3d at 356-61.

### Clearly established federal law

In its consideration of Mr. Wogenstahl's Ground Twelve, this Court identified and

discussed the clearly established federal law applicable to claims of prosecutorial misconduct. The

Court will not repeat itself. Rather, that discussion is incorporated herein by reference.

Mr. Wogenstahl's claims in Ground Sixteen focus on alleged prosecutorial

misconduct during the penalty phase. The Sixth Circuit has described the relevant inquiry in claims

of penalty phase prosecutorial misconduct claims:

> In the context of a death penalty sentencing hearing ... the question
> of error or effect is more complex than in traditional trials. Rather
> than determining whether a constitutional error would have pushed
> a jury from a "not guilty" verdict to a "guilty" verdict, we must
> attempt to discover whether the constitutional error influenced the
> jury's decision between life and death.

*Bates,* 402 F. 3d 635.

### Analysis

In discussing the prosecutors' closing arguments during the penalty phase, *supra,* the

Ohio Supreme Court accurately quoted those arguments. Vol. XIX at 2796-2807; 2831-42.

During both the prosecutors' and defense counsels' closing remarks, the trial judge

said to the jury:

> Ladies and Gentlemen of the jury, we will tell you as we have told

138

you before and tell you again, what counsel says to you in final
argument, in their argument is not evidence. The evidence on which
you will decide this case is what you heard from the witness stand,
plus the exhibits. But, they can make reasonable inferences based
upon what the evidence is. ...

...

... What counsel says to you in closing argument is not evidence.
Because this is the particular penalty phase I am going to grant
counsel some latitude in arguing. But, again, I do give you the same
instruction. What they say to you in closing argument is not
evidence, it's not the law. What you will decide this case on is,
number one, the law that I give to you and. number two, is the
evidence that you hear in this courtroom. The evidence is what you
heard from this witness stand, plus the exhibits which have been
admitted during the course of this trial. ...

...

... But, again, what counsel says to you in closing argument is not
evidence. The evidence that you will decide this case on is what you
heard from the witness stand, plus the exhibits which have been
introduced.

In addition, they can make references to the law, but you are going to
decide the case on the law that I give to you. I am giving them some
latitude but you're getting pretty close to the end of the latitude. I
will let you proceed.

...

Ladies and gentlemen, the previous instruction that I have given you.
What counsel says in the arguments is not evidence. The evidence on
which you will make the decision is what you heard from the witness
stand, plus the law that I give to you. However, in this phase of the
proceeding we do allow some latitude.

...

Again, ladies and gentlemen of the jury, what counsel says to you in
final argument is not evidence. We have been giving counsel some
latitude. We will allow you to proceed, but pointing out to you,
again, what they say is not evidence and it is not the law on what you
decide on this case. You make your decisions on what you heard
from the witness box, plus any exhibits.

*Id.* at 1804; 2817; 2821-22; 2835; 2840.

After closing arguments, the trial court instructed the jury, in part, as follows:

Now what is and what is not evidence in this proceeding? ... Again, the opening statements of the attorneys, and closing arguments which you have just heard are not evidence.  The opening statements and the closing arguments by the attorneys are designed to assist you, but they are not evidence.

...

The attorneys have a duty to vigorously represent the interests of their respective clients.  But, remember, what the attorneys say is not evidence.

...

I repeat that the purpose of this proceeding is to have you decide whether or not the aggravating circumstances the defendant was found guilty of committing are sufficient to outweigh the factors in mitigation of the imposition of the sentence of death.

What are Aggravating Circumstances?  In this particular case, the Aggravating Circumstances are precisely set out in the specifications contained in your guilty verdict forms as to each count of the indictment.  They are as follows:

(1) The defendant, Jeffrey A, Wogenstahl, committed the offense of Aggravate Murder of Amber Garrett while Jeffrey A, Wogenstahl was committing, or attempting to commit, or fleeing immediately after committing the offense of kidnaping, and Jeffrey A. Wogenstahl was the principal offender in the commission of the Aggravated Murder or if not the principal offender, committed the Aggravated Murder with prior calculation and design.

(2) The defendant, Jeffrey A. Wogenstahl, committed the offense of Aggravated Murder of Amber Garrett while Jeffrey Wogenstahl was committing, or attempting to commit, or fleeing immediately after committing the offense of Aggravated Burglary, and Jeffrey A. Wogenstahl was the principal offender in the commission of the Aggravated Murder or if not the principal offender, committed the Aggravated Murder with prior calculation and design.

(3) The defendant, Jeffrey A. Wogenstahl, committed the offense of Aggravated Murder of Amber Garrett for the purpose of escaping detection, apprehension, trial, or punishment for another offense committed by him, to wit: Kidnaping and/or Aggravated Burglary.

*Id.* at 2846-47; 2848; 2850-51.

Applying the *Carter* factors to this case, this Court concludes that while the

140

prosecutors arguably made improper comments on the issue of "aggravating factors", any such comments did not so infect the process as to rise to the level of a constitutional violation by denying Mr. Wogenstahl due process or a fair trial.

First, as to the first two *Carter* factors, while it is arguable that the prosecutors' complained-of remarks had a tendency to mislead the jury and were more than isolated in nature, as noted above the trial judge cautioned the jury no fewer than five times during the attorneys' closing arguments that the attorneys' remarks were not evidence, that evidence was what they heard from the witness stand and the exhibits admitted into evidence, and that they were to decide the case on the facts as the jury found them and the law the trial judge would give them. In addition, the trial judge instructed the jury as to the definition of evidence and that the attorneys' comments were not evidence. Finally, the trial court clearly instructed the jury as to the aggravating circumstances that the jury was to consider in its deliberations. These two *Carter* factors do not weigh in Mr. Wogenstahl's favor.

The third *Carter* factor is somewhat problematic for a habeas court to resolve. It is difficult to determine from the four corners of a trial transcript and without benefit of first hand observations during the actual trial of the matter, whether a prosecutor made certain remarks deliberately or accidently. As the Ohio Supreme Court noted, a reviewing court has the advantage of "Monday morning quarterbacking," whereas the prosecutors were required to make decisions and comments during the "heat of the battle." However, this Court will assume *arguendo* that the prosecutors made the complained of remarks deliberately and will therefore assume that this factor weighs in favor of Mr. Wogenstahl's position.

Applying the fourth and final *Carter* factor, this Court noted in its discussion of Mr.

141

Wogenstahl's Ground Five that there was a very substantial amount of evidence introduced at trial—including witness testimony and forensic evidence—upon which a trier of fact could base a guilty verdict. This factor does not weigh in favor of Mr. Wogenstahl's claim of prosecutorial misconduct.

Finally, in reviewing the alleged prosecutorial misconduct in the context of the trial as a whole, this Court again notes that in addition to cautioning the jury during the attorneys' penalty phase closing arguments, the trial judge  instructed the jury as to what evidence it was to consider as well as on the issue of aggravating circumstances.

The Ohio Supreme Court's decision is not contrary to, nor an unreasonable application of, clearly established federal law and therefore Mr. Wogenstahl's Ground Sixteen should be rejected.

### Ground Seventeen

**Petitioner's right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution and his right to due process under the Fourteenth Amendment were violated by the trial court's failure to make an individualized sentencing determination as shown by its incorporating verbatim into its sentencing opinion identical language from the prosecutor's opening statement and from sentencing opinions of other judges in other death penalty cases and from the sentencing opinion of the same judge in other death penalty cases.**

### State court opinion

 Although he did not raise this precise issue on direct appeal to the court of appeals, Mr. Wogenstahl raised it in his Fifth Proposition of Law on direct appeal to the Ohio Supreme Court.  *Wogenstahl,* 75 Ohio St.3d at 370.  Again, the Ohio Supreme Court rejected Mr. Wogenstahl's claim without specific comment.  See *Id.* at 352.  The Respondent does not argue that

142

this claim is procedurally defaulted.   At this juncture, this Court again notes that if the state court does not rule on a federal claim before it, federal review of that claim is *de novo*, rather than deferential. *McKenzie.* 326 F.3d at 727; see also, *Maples,* 340 F.3d 433.  This Court, then, address Mr. Wogenstahl's Ground Seventeen *de novo.*

### Clearly established federal law

The Constitution  requires that a court considering imposition of the death sentence give individualized consideration to the nature and circumstances of the particular offense and to the history, character, and background of the individual offender.  *Woodson v. North Carolina,* 428 U.S. 280, 304 (1976).  In a capital case, the need for treating the defendant with that degree of respect due to the uniqueness of the individual is far more important than in noncapital cases. *Lockett v. Ohio,* 438 U.S. 586, 605 (1978).   The unavailability of corrective or modifying mechanisms with respect to an executed capital sentence underscores the need for individualized consideration as a constitutional requirement in imposing the death sentence.  *Id.*

Under Ohio Revised Code § 2929.05(A), the Ohio appellate courts are required to "independently weigh" the aggravating circumstances against the mitigating factors.  *Cooey v. Coyle,* 289 F.3d 882, 888 (6th Cir. 2002), *cert. denied,* 538 U.S. 947 (2003), citing Ohio Revised Code § 2929.05(A).  A sentencing error which the sentencer makes can be cured by appellate reweighing.  *Clemons v. Mississippi,* 494 U.S. 738 (1990).  Although not required to do so by the Constitution, once it elects to reweigh, the state appellate court must "give each defendant an individualized and reliable sentencing determination based on the defendant's circumstances, his background and crime." *Cooey, supra,* citing, *Clemons*, 494 U.S. at 749.  Reweighing by the Ohio Supreme Court under Ohio Revised Code § 2929.05(A) satisfies the requirements of *Clemons.*

*Baston v. Bagley,* 420 F.3d 632, 637 (6th Cir. 2005), *cert. denied,* ___ U.S. ___, 126 S.Ct. 2294 (2006).

**Analysis**

The trial court's sentencing opinion in this case is twenty-two (22) pages in length. Appendix, Vol. II at 616-37.  Although Mr. Wogenstahl does not specifically identify the language in that opinion to which he objects, he refers this Court's attention to the brief he filed on direct appeal to the Ohio Supreme Court and specifically to his "argument in support of proposition of law at pages 21-26".  (Doc. 19 at 284).

In his Ohio Supreme Court direct appeal brief, it appears that Mr. Wogenstahl refers to the trial court's use of following language in one paragraph of its sentencing opinion:

> The Court further finds that Defendant's killing of Amber Garrett, a ten-year-old child and a fifth grade elementary school student who was kidnapped from her home with no way to defend herself, was a completely unnecessary and cold-blooded act.  This killing evidenced the particularly cruel, calculating, and malicious outlook of Defendant.

Appendix, Vol. V at 1208-09; *Id.,* Vol. II at 625.  Mr. Wogenstahl's position is that this language is either identical to or at least similar to the language in other sentencing opinions the court, or other courts, have used, as well as to the prosecutor's opening statement.

In its sentencing opinion, the trial court specifically reviewed the evidence that had been introduced, the aggravating circumstances, and the mitigating factors.  *Id.* at 616-38.  After engaging in a weighing process, the court determined that the aggravating circumstances outweighed the mitigating factors.  Mr. Wogenstahl does not point out how the trial court erred in its weighing process.

Nevertheless, even assuming that the trial court erred in its sentencing opinion by

"borrowing" language from other opinions and/or the prosecutor's opening statement, and assuming that such "borrowing" is improper, which is doubtful, *see, United States v. ElPaso Natural Gas Co.,* 376 U.S. 651, 656 (1961)(those findings, though not the product of the workings of the district judge's mind, are formally his and will stand if supported by the evidence), both the appeals court and the Ohio Supreme Court engaged in an independent weighing pursuant to Ohio Revised Code § 2929.05(A). See *Wogenstahl,* WL 686898 at *17 ; *Wogenstahl*, 75 Ohio St. at 368. As noted above, any alleged sentencing error which the sentencer makes can be cured by appellate reweighing. See *Clemons, supra.*

Mr. Wogenstahl's Ground Seventeen should be rejected.

### Ground Eighteen

**Petitioner's right to due process of law under the Fourteenth Amendment to the United States Constitution and his right to be free from cruel and unusual punishment under the Eighth Amendment were violated by the trial court's admission of evidence at the penalty phase of the trial that Petitioner had been convicted of robbing a UDF, that he had been convicted of public indecency, that he had violated his parole, and that he had been investigated for making sexual advances to his sister, thereby allowing the jury to consider invalid nonstatutory aggravating circumstances.**

With respect to Ground Eighteen, Mr. Wogenstahl argues that during the penalty phase, the trial court erred by admitting evidence of prior bad acts and character. Mr. Wogenstahl's position is that the error resulted in a violation of his rights under the Eighth and Fourteenth Amendments.

Mr. Wogenstahl did not raise this issue in the Hamilton County Court of Appeals on direct appeal. Appendix, Vol. III at 695-815; *Wogenstahl,* 1994 WL 686898 at *1-16. Mr. Wogenstahl did raise this claim in his Proposition of Law No. 12 and his Proposition of Law No.

145

20 before the Ohio Supreme Court. Appendix, Vol. V at 1153-1325; *Wogenstahl,* 75 Ohio St.3d at 371-72. The Ohio Supreme Court, however, rejected Mr. Wogenstahl's claims without comment. *Id.* at 344-74. Therefore, this Court reviews Mr. Wogenstahl's Ground Eighteen *de novo. Williams,* 460 F.3d at 796.

### Clearly established federal law

As the Court noted in its discussion of Mr. Wogenstahl's Ground Six, *supra*, trial court errors in state procedure and/or evidentiary law do not rise to the level of federal constitutional claims warranting relief in a *habeas* action unless the error renders the proceeding so fundamentally unfair as to deprive the petitioner of due process under the Fourteenth Amendment. *Broom,* 441 F.3d at 405-06. Generally, state court evidentiary ruling cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Id.*

### Analysis

Mr. Wogenstahl claims that his constitutional rights were violated by the trial court's penalty phase admission of evidence establishing that he had previously been convicted of robbing a UDF and of public indecency.

Ohio law provides that in a capital sentencing proceeding, the jury shall weigh against the aggravating circumstances, among other things, the nature and circumstances of the offense, the history, character, and background of the offender. *Powell v. Collins,* 332 F.3d 376, 395 (6th Cir. 2003).

During the mitigation phase of his trial, Mr. Wogenstahl called Mabel Long as a witness on his behalf. Transcript, Vol. XIX at 2694-2703. Ms. Long testified on direct examination

146

that she has known Mr. Wogenstahl since she was three years old, that sometime in 1985, Mr. Wogenstahl entered her house when nobody was home and took some money, that she had never had any problems with him, that she didn't know him to be violent, that since 1985, he had changed for the better,  that he was a "good person", and that she didn't "think he could harm anybody's children." *Id.*

On cross-examination, the prosecutor asked Ms. Long if she was aware of Mr. Wogenstahl's two prior convictions, one for robbery and one for public indecency. *Id.* Ms. Long testified that she was aware of Mr. Wogenstahl's conviction for robbery, but that she was not aware of the public indecency conviction. *Id.* Ms. Long also testified that the fact that Mr. Wogenstahl was convicted of public indecency caused her to change her opinion about him. *Id.* Ms. Long testified further on cross-examination that she did not know that Mr. Wogenstahl had violated parole a couple of times. *Id.* Finally, Ms. Long testified that having such information did not change her opinion about Mr. Wogenstahl, that she continued to think that he was "still a good person", and that there wasn't anything she could hear about him that would change her mind that he was a good person. *Id.*

It is clear that the purpose of Ms. Long's testimony was to attempt to establish Mr. Wogenstahl's good character. Ohio R. Evid. 405, which addresses the methods of proving character, provides, in part, that when evidence of character of a person is admissible, proof may be made by testimony in the form of an opinion and that on cross-examination, inquiry is allowable into relevant specific instances of conduct. Ohio R. Evid. 405(A). In addition, the Rule provides that when character is an essential element of a charge, claim, or defense, proof may be made of specific instances of the individual's conduct. Ohio R. Evid. 405(B).

147

Ms. Long testified about Mr. Wogenstahl's character when she said she thought Mr. Wogenstahl was "a good person".  Under Ohio R. Evid. 405, The prosecutor properly cross-examined Ms. Long as to Mr. Wogenstahl's prior convictions as well as his parole violations and therefore the trial court properly admitted that evidence.

Mr. Wogenstahl also challenges the presentation of testimony from a parole officer with respect to his parole violations.

On rebuttal in the penalty phase, Patrick Hennessey testified that he was a parole officer who sometimes supervised Mr. Wogenstahl beginning in July, 1991. *Id.* at 2762-80. Mr. Hennessey also testified that Mr. Wogenstahl had a history of being on parole three times, once each in 1984, 1990, 1991. *Id.*  Mr. Hennessey testified further that Mr. Wogenstahl violated parole in 1990 when he was terminated from a halfway house program for alcohol abuse and again in 1991 for alcohol and drug use. *Id.*

> Parole generally involves the release of a prisoner from confinement in a state penal or reformatory institution with supervision then vested in the Department of Rehabilitation and Correction. ... As the term "parole" implies, the one released upon parole must, as a condition precedent to his release *promise* to observe certain terms and conditions.  As such, a violation of parole constitutes a specific instance of failure to keep his word.  Such failure is almost always "probative of truthfulness or untruthfulness" and is therefore an appropriate subject for impeachment-oriented cross-examination.

*State v. Greer,* 39 Ohio St.3d 236, 242-43 (1988), *cert. denied,* 490 U.S. 1028 (1989)(emphasis in original).

As noted above, Mr. Wogenstahl placed his character at issue in the penalty phase by presenting a character witness. Therefore, the prosecutor properly presented evidence as to Mr. Wogenstahl's history of parole violations because they were specific instances of conduct as well

148

as probative of truthfulness.  The trial court did not err by admitting Mr. Hennessey's testimony.

Mr. Wogenstahl also challenges the trial court's admission of evidence that he had been investigated for making sexual advances to his sister.

Mr. Wogenstahl called his mother, Vera Wogenstahl, and his father, Allen Wogenstahl, as witnesses during the penalty phase. Transcript, Vol. XIX at 2716-28; 2728-40. Mrs. Wogenstahl testified on cross-examination that when Mr. Wogenstahl  was released from prison in 1991, she thought it was in his best interest to live in a halfway house rather than her home primarily because of the unavailability of transportation in the area where the Wogenstahl family lived.  *Id.* at 2721-28.   Mrs. Wogenstahl also testified that as far as she knew, there was never any specific problem between her daughter and Mr. Wogenstahl. *Id.*  Finally, Mrs. Wogenstahl testified that "we never called the police" for any incident involving Mr. Wogenstahl coming home drunk and making sexual advances to her daughter.  *Id.*

Mr. Allen Wogenstahl testified on direct examination that that when Mr. Wogenstahl was being paroled, he (Allen) thought that it would be better if Mr. Wogenstahl lived in a halfway house because of transportation problems.  *Id.* at 2731-32.  In addition, Mr. A. Wogenstahl testified that in addition to the transportation problems, he had a daughter who lived at home and did not want to be at home with Mr. Wogenstahl and that he (A. Wogenstahl) did not think it was fair to make his daughter leave so that Mr. Wogenstahl could live there when he was paroled.  *Id.*  On cross-examination, Mr. A. Wogenstahl testified that he did not know what the problem was between his daughter and Mr. Wogenstahl, that he saw no problem, and that when he was informed of it, he took care of the situation and there was no further problem.  *Id.* at 2735-40.  Mr. A. Wogenstahl testified further that he had been informed that there was "some sort of pass" involved in the

149

problem, that at the time of the "pass", he did not call the police to have Mr. Wogenstahl removed from the home, and that he was not informed of the incident until a long time after it occurred. *Id.*

On rebuttal, the state called as a witness James Stump who testified that he had previously worked as a Deputy Hamilton County Sheriff, that in the late summer or early fall of 1981, he was dispatched to the Wogenstahl residence where he spoke with one of the adults, or perhaps both, and that he was asked to enter the house and remove Jeffrey Wogenstahl from the premises. *Id.* at 2784-91. Mr. Stump also testified that he entered the house, found Mr. Wogenstahl, and removed him from the premises. *Id.* Mr. Stump testified further that during this process, he saw a young girl, possibly about 15 or 16 years-old, who appeared to be very distraught and emotionally upset. *Id.* Finally, Mr. Stump testified that to his knowledge there were never any charges brought against Mr. Wogenstahl as a result of the incident. *Id.*

As with Ms. Long's testimony, it is clear that the primary purpose of presenting Mrs. Wogenstahl's and Mr. Allen Wogenstahl's testimony was to establish Mr. Wogenstahl's good character and show that Mr. Wogenstahl had changed for the better when he was released on parole in about 1991. Mrs. Wogenstahl and Mr. Allen Wogenstahl both testified that because of transportation problems, they thought it was in Mr. Wogenstahl's best interest for him to live in a halfway house when he was released on parole 1991. The prosecutor properly cross examined both Mrs. Wogenstahl and Mr. Allen Wogenstahl as to their credibility especially as to their testimony that they believed that because of transportation issues, living in a halfway house was in Mr. Wogenstahl's best interest. In addition, there was a proper basis for impeaching Mr. Allen Wogenstahl's credibility by calling Mr. Stump to testify that he had been called to the Wogenstahl home to remove Mr. Wogenstahl from the premises. Because there were proper bases for

impeaching Mrs. Wogenstahl and Mr. Allen Wogenstahl by cross-examining them on the issue of the incident between Mr. Wogenstahl and his sister as well as for introducing evidence that contradicted Mr. Allen Wogenstahl's testimony on the issue of calling to police to have Mr. Wogenstahl removed from the home, the trial court did not err by allowing the jury to hear that testimony.

Because the trial court did not err by admitting the challenged testimony, there could not be any error which rises to the level of a constitutional violation.

Mr. Wogenstahl's Ground Eighteen should be rejected on the basis that it is meritless because the admission of the complained-of evidence was not improper and was not contrary to clearly established federal law.

### Ground Nineteen

**Petitioner's right to due process of law under the Fourteenth Amendment to the United States Constitution and his right to be free from cruel and unusual punishment under the Eighth Amendment were violated by the following additional trial court errors at sentencing:**

**i) The trial court erred in instructing the jury that two of the aggravating circumstances included the mutually exclusive alternatives of "principal offender" and "prior calculation and design".**

**ii) The trial court erred in instructing the jury orally and by verdict forms regarding their making merely a "recommendation" to [the] court;**

**iii) The trial court erred in denying the defense request for a jury instruction regarding residual doubt.**

**iv) The trial court erred in denying the defense request for a jury instruction regarding the Petitioner at minimum to serve full 20 or 30 years if given life sentence.**

**v) The trial court erred in denying the defense request for a jury instruction regarding consideration of mercy.**

**vi) The trial court erred in denying the defense motion to argue first and last at sentencing.**

**vii) Petitioner suffered prejudice from the ineffective assistance of counsel for failing to request an instruction regarding residual doubt.**

**viii) Petitioner suffered prejudice from ineffective assistance of appellate counsel for failing to raise a claim on appeal claims ii, vi, and vii above within this Ground (Nineteen).**

Respondent raises the defense of procedural default as to subclaims (iii), (iv), (vii), and (viii). Mr. Wogenstahl does not challenge Respondent's position nor does he attempt to argue that there was cause for any waiver. (Doc. 19 at 287-98).

Although he had the opportunity to do so, Mr. Wogenstahl failed to raise trial-based subclaims (iii), (iv), (vii), or (viii) on direct appeal or in his post-conviction Petition. Appendix, Vol. III at 695-815; *Wogenstahl,* 1994 WL 686898 at *1-16; Appendix, Vol. V at 1153-1325; *Wogenstahl,* 75 Ohio St.3d at 369-74; Appendix, Vol. VIII at 2013-74. Therefore, the first and second prongs of *Maupin* are satisfied. In addition, the third *Maupin* prong is satisfied. Mr. Wogenstahl's failure to raise these subclaims in the state courts resulted in his waiver of those subclaim.. As already noted, the procedural rule of waiver is an adequate and independent state ground to bar habeas claims. *Norris, supra; Rust, supra.* As noted above, Mr. Wogenstahl does not argue that there was cause for the waiver of these subclaims. To the extent that Mr. Wogenstahl suggests that the ineffective assistance of trial and of appellate counsel provided cause for the default, as noted, Mr. Wogenstahl has not raised in these proceedings a claim of the ineffective assistance of trial counsel as to these claims. Further, as also noted, he has not raised in this Court

any claims of ineffective assistance of appellate counsel. Therefore, this Court has no occasion to address the effectiveness of counsel as to these subclaims.

This Court concludes that subclaims (iii), (iv), (vii), and (viii) are procedurally defaulted.

In addition to subclaims (iii), (iv), (vii), and (viii) being procedurally defaulted, this Court finds that subclaim (i) is procedurally defaulted as well.

Subclaim (i) of Ground Nineteen is a restatement of the claim Mr. Wogenstahl brought in Ground Nine. For the reasons given with respect to Ground Nine, *supra,* subclaim (i) is procedurally defaulted. The Court turns to the remaining subclaims of Ground Nineteen.

## Subclaim (ii)

### State court opinion

On direct appeal, Mr. Wogenstahl raised subclaim (ii) as his Proposition of Law No. 10 in the Ohio Supreme Court which that court rejected without opinion. *Wogenstahl,* Appendix, Vol. V at 1153-1325; *Wogenstahl,* 75 Ohio St.3d at 344-74. Mr. Wogenstahl also raised subclaim (ii) on direct appeal to the Hamilton County Court of Appeals. The court of appeals rejected the claim saying:

> In his ninth and tenth assignments of error, Wogenstahl brands as plain error jury instructions and a verdict form that referred to the jury's decision in the penalty phase of the proceedings as merely a recommendation, which, in Wogenstahl's view, had the effect of unacceptably diminishing the jurors' commitment to the task entrusted to them by law. We are convinced upon review of the record that the specific language chosen by the trial court did not give rise to error in a constitutional sense under the principal case cited by Wogenstahl, *Caldwell v. Mississippi* (1985), 472 U.S. 320, 105 S.Ct. 2633 and otherwise substantially comported with what has come to be accepted by Ohio courts under a line of cases beginning with *State v. Jenkins* (1984), 15 Ohio St.3d 154, 473 N.E.2d 264. See, *e.g.,*

153

> *State v. Landrum* (1990), 53 Ohio St.3d 107;  *State v. Buell* (1986), 22 Ohio St.3d 124, 489 N.E.2d 795; *State v. Beis,* (Mar. 30, 1994), Hamilton App. No. C-92084, unreported.    The ninth and tenth assignments of error are without merit.

*Wogenstahl,* 1994 WL 686868 at *5.

### **Clearly established federal law**

In *Mapes v. Coyle,* 171 F.3d 408 (6th Cir. 1999), the Sixth Circuit wrote:

> Pertinent to the first claim–the "recommendation" issue–the Supreme Court has recognized that there is a danger in leading a death-sentence jury to believe that the ultimate responsibility for a death sentence lies with appellate courts.  *See, Caldwell v. Mississippi,* 472 U.S. 320, 332-33 ... (1985).  In *Caldwell,* the prosecutor told a death-jury that a death sentence would really be determined by the state supreme court.  *Id.* at 323....  This violated the defendant's rights under the Eighth Amendment to be protected from cruel and unusual punishment primarily because it allowed the jury to believe that it could make an incorrect determination without harming the defendant, and because appellate courts are ill-equipped to accurately review such aggravation-mitigation determinations.  *Id.* at 330-32....

> However, in order to make out a *Caldwell* violation, a defendant must show that the prosecutor or trial judge improperly described the jury's role under state law in order to "water down" its responsibility.  *Kordenbrock v. Scroggy,* 919 F.2d 1091, 1101 (6th Cir. 1990).  In *Kordenbrock,* the prosecutor told the jury that a death-sentence verdict would merely be a recommendation to the trial judge.  State law provided that "the judge shall give the jury appropriate instructions, and the jury shall retire to determine whether any mitigating or aggravating circumstances ... exist and to recommend a sentence for the defendant.  Upon the findings of the jury, the judge shall fix a sentence within the limits prescribed by law."  *Id.* (quoting Ky.Rev.Stat.Ann. §523.025(1)(b)).    This court found no constitutional violation because the prosecutor's characterization was "technically ... correct[ ]."  *Id.*

In this case, Ohio law provides:

> Upon consideration of the relevant evidence raised at trial, the testimony, other evidence, statement of the offender, arguments of counsel, and, if applicable, the reports submitted pursuant to

division (D)(1) of this section, the trial jury ... shall determine whether the aggravating circumstances the offender was found guilty of committing are sufficient to outweigh the mitigating factors present in the case.  If the trial jury unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, the trial jury shall recommend to the court that the sentence of death be imposed on the offender.  Absent such a finding, the jury shall recommend that the offender be sentenced to [one of various terms of imprisonment].....

If the trial jury recommends that the offender be sentenced to life imprisonment with parole eligibility after serving twenty years of imprisonment or to life imprisonment with parole eligibility after serving thirty full years of imprisonment, the court shall impose the sentence recommended by the jury upon the offender.  It the trial jury recommends that the sentence of death be imposed upon the offender, the court shall [weigh independently the aggravating and mitigating factors, and impose the death penalty if the former outweigh the latter, and impose a life sentence otherwise.]

Ohio Rev.Code Ann. §2929.03(D)(2), Vol. I ...; *see Id.* at (D)(3).

Thus, while it is somewhat inaccurate to state that a sentencing jury "recommends" a life sentence when such a recommendation would be binding, we conclude that even if the trial judge's instruction was erroneous it could not have diminished the jury's sense of responsibility in *Caldwell* terms.  The only plausible way that Mapes's jury could have been lulled into a diminished sense of responsibility is if it erroneously believed that a death verdict would only be a recommendation.  However, that is an accurate statement of Ohio law.  Further, one of the primary dangers identified in *Caldwell*–that the entity to which the jury ceded responsibility could not adequately exercise that responsibility–is absent here.   In *Caldwell*, the state courts of appeals could not accurately assess the aggravating and mitigating factors presented in a sentencing hearing. In this case, it was the trial judge presiding over the hearing who reviewed the jury's determination.  There was no constitutional error.

*Id.* 414-15 .

**<u>Analysis</u>**

155

In support of Ground Nineteen, Mr. Wogenstahl argues that the trial court's comments and its instruction concerning the jury's recommendation of a sentence misled the jury in violation of *Caldwell*. Mr. Wogenstahl specifically points to the comments the trial court made to George Marinakis, the first prospective juror during voir dire:

> ...If you are selected to sit as a juror in this case, as we just told you there is a possibility of two trials or proceedings. The first trial would be to determine guilt or innocence. Depending upon what your decision is in the first case, there could be a second proceeding called the penalty phase.
>
> In that case, if there is one, you would be called upon to make a recommendation as to what the sentence should be. One of those recommendations could be a recommendation of the death penalty. I might point out to you that it should be noted that if there is a second proceeding or penalty phase this Court would instruct you at that time that *a jury* recommendation to the Court that the death penalty be imposed is just that, a recommendation, and is not binding upon the Court. The final decision as to whether the death penalty shall be imposed upon the defendant rests with this Court.
>
> Therefore, even if you would recommend the death penalty the law requires this Court to decide whether or not the defendant will actually be sentenced to death....

Transcript, Vol. VI at 262-63 (emphasis supplied).

Mr. Wogenstahl also points to the trial court's instruction to the jury at the close of the guilt phase: "Again, we expect we will hear the evidence – sometime early afternoon on Tuesday we expect that you will again be called upon to deliberate at which time you will then make a decision as to – or make a recommendation as to what the penalty is." *Id.*, Vol. XVIII at 2656.

Finally, Mr. Wogenstahl complains of the prosecutor's closing argument in which he said:

> Judge Nadel further is going to say to you that a jury recommendation to the Court that the death penalty be imposed is just

156

that, a recommendation, and is not binding upon the Court.  The final decision as to whether the death penalty shall be imposed on the defendant rests upon this Court, Judge Nadel.

Even if you would recommend the death penalty, Judge Nadel is going to tell you the law requires the Court to decide whether or not the defendant will actually be sentenced to death or life imprisonment.  Your decision is a recommendation. Your decision is a simple weighing process.

*Id.,* Vol. XIX at 2832-33.

At the close of the penalty phase, the trial court instructed the jury in part:

You must understand, however, that a jury recommendation to the Court that the death penalty be imposed is just that, a recommendation, and is not binding upon the Court.  The final decision as to whether the death penalty shall be imposed upon the defendant rests upon this Court after the Court follows certain additional procedures required by the laws of this State.

Therefore, even if you would recommend the death penalty, the law requires the Court to decide whether or not the defendant will actually be sentenced to death or to life imprisonment.

On the other hand, if after considering all of the relevant evidence admitted at the two trials, and the arguments of counsel, you find that the state of Ohio failed to prove that the aggravating circumstances which the defendant was found guilty of committing outweigh the mitigating factors, then you will return a verdict reflecting this decision.  In this event, you will determine which of the two possible life imprisonment sentence to recommend to the Court.

... [Here, the trial court instructed to the jury about the choices of life with parole eligibility after twenty years and life with parole eligibility after thirty years].

You must understand that if you make one of these particular recommendations, it will be binding upon the Court, and the Court must impose the specific life sentence you recommend.

*Id.* at 2854-55.

First, the Court notes that prospective juror Mr. Marinakis was not selected as a juror

157

in Mr. Wogenstahl's case. See Appendix, Vol. II at 606. Nevertheless, there is nothing in the trial

court's comments during voir dire or in its penalty phase instructions or in the prosecutor's closing

argument which offends *Caldwell* or *Mapes*. Indeed, the present matter is quite unlike the situation

in *Caldwell* where the prosecutor urged the jury not to view itself as finally determining whether Mr.

Caldwell would die because a death sentence would be reviewed for correctness by the state's

supreme court. Here, the trial court did not make any such suggestion to the jury either during voir

dire or during its penalty phase instructions. Nor did the trial court here create the impression that

an appellate court would be free to reverse a death sentence if it disagreed with the jury's conclusion

that death was appropriate. Rather, the court made accurate statements about, and gave accurate

instructions which reflected, Ohio law; that is, *a sentence of death* would be a recommendation to

the trial court and that in the event the jury recommends death, the trial court is required to make

its own independent examination to determine if the State proved beyond a reasonable doubt that

the aggravating circumstances outweigh the mitigating factors.

   The state court's decision rejecting Mr. Wogenstahl's claim that the trial court

improperly led the jury to believe that it was not responsible for its death penalty verdict was not

contrary to nor an unreasonable application of, clearly established federal law.


### Subclaim (v)

#### State court opinion

   In subclaim (v), Mr. Wogenstahl alleges that the trial court erred by denying his

request for a jury instruction regarding the consideration of mercy. Mr. Wogenstahl raised that

claim on direct appeal as Proposition of Law No. 8 in the Ohio Supreme Court and the court rejected

the claim without opinion. *Wogenstahl,* 75 Ohio St.3d at 344-74. Mr. Wogenstahl also raised the

claim on direct appeal in the Hamilton County Court of Appeals as Assignment of Error No. XIX.

In rejecting that assignment of error, the state court said:

> In the nineteenth assignment of error, Wogenstahl asserts that the
> trial court erred in overruling his motion for the court to instruct the
> jury to consider mercy in their mitigation-phase deliberations. This
> argument is rejected upon the authority of *State v. Lorraine* (1993),
> 66 Ohio St.3d 414, 417-418, 613 N.E.2d 212, 216-217.[14]

*Wogenstahl,* 1994 WL 686898 at *7.

### Clearly established federal law

The controlling Supreme Court precedent is *California v. Brown,* 479 U.S. 538

(1987). In that case, the Court found that a caution to the jury that they "must not be swayed by

mere sentiment, conjecture, sympathy, passion, prejudice, public opinion, or public feeling" did not

violate the Constitution. *Id.* at 542-43. The plurality found a reasonable juror was unlikely to single

out the word "sympathy" from this list. Chief Justice Rehnquist wrote:

> The Eight Amendment jurisprudence of this Court establishes two
> separate prerequisites to a valid death sentence. First, sentencers may
> not be given unbridled discretion in determining the fates of those
> charged with capital offenses. The Constitution instead requires that
> death penalty statutes be structured so as to prevent the penalty from
> being administered in an arbitrary and unpredictable fashion. *Gregg
> v. Georgia,* 428 U.S. 153 ... (1976); *Furman v. Georgia,* 408 U.S. 238
> ... (1972). Second, even though the sentencer's discretion must be
> restricted, the capital defendant generally must be allowed to
> introduce any relevant mitigating evidence regarding his "'character
> or record and any of the circumstances of the offense.'"*Eddings,
> supra,* 455 U.S. at 110 ... *quoting Lockett, supra,* 436 U.S. at 604 ...
> . Consideration of such evidence is a "constitutionally indispensable

---

[14] In *Lorraine,* the Ohio Supreme Court held that permitting a jury to consider mercy, which is not a
mitigating factor, and thus irrelevant to sentencing would violate the well-established principle that the death penalty
must not be administered in an arbitrary, capricious or unpredictable manner. 66 Ohio St.3d at 417 (citations
omitted).

> part of the process of inflicting the penalty of death." *Woodson v.*
> *North Carolina, supra,* 428 U.S. at 304 ... (opinion of Stewart,
> Powell, and Stevens, JJ.).  The instruction given by the trial court in
> this case violates neither of these constitutional principles.

479 U.S. at 541.

The plurality in *Brown* believed that the reasonable juror would hear this instruction

"as a directive to ignore only the sort of sympathy that would be totally divorced from the evidence

adduced during the penalty phase." *Id.* at 542.

Justice O'Connor concurred, agreeing with the Chief Justice that the case presented

squarely the tension between the two death penalty principles he had enumerated[15].  Justice

O'Connor expounded on the difference between acceptable evaluation of mitigating evidence and

the sort of consideration excluded by the instruction in question as follows:

> In my view, evidence about the defendant's background and
> character is relevant because of the belief, long held by this society,
> that defendants who commit criminal acts that are attributable to a
> disadvantaged background, or to emotional and mental problems,
> may be less culpable than defendants who have no such excuse. ...
> Thus the sentence imposed at the penalty state should reflect a
> reasoned moral response to the defendant's background, character,
> and crime rather than mere sympathy or emotion.
> ... [T]he individualized assessment of the appropriateness of the death
> penalty is a moral inquiry into the culpability of the defendant, and
> not an emotional response to the mitigating evidence.

*Id.* at 545.

The Supreme Court has continued to decline to disapprove of instructions directing

jurors not to be influenced by sympathy, mercy, or passion in deciding on the appropriate sentence

---

[15] Justice O'Connor's concurrence was necessary to the decision.  "When a fragmented Court decides a
case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be
viewed as that position taken by those members who concurred in the judgment on the narrowest grounds. ...'"
*Marks v. United States*, 430 U.S. 188 (1977), *quoting Gregg v. Georgia,* 428 U.S. at 153.

for the capital defendant.  *See Saffle v. Parks,* 494 U.S. 484 (1990).  Indeed, a sentencer must

*rationally* distinguish between those individuals for whom death is an appropriate sanction and those

for whom it is not.  *See Spaziano v. Florida,* 468 U.S. 447, 460 (1984)(emphasis supplied).

### Analysis

A jury must, of course, listen sympathetically to the mitigating evidence.  That is,

they are required to accept as mitigating those factors which the Supreme Court has held are proper

to be considered in mitigation, but they may not exercise general sympathy.  That ensures that the

death penalty is not administered in an arbitrary and unpredictable manner.  As noted above, the

Supreme Court has declined to disapprove of instructions directing jurors not to be influenced by

sympathy, mercy, or passion in deciding on the appropriate sentence for the capital defendant.

Contrary to Mr. Wogenstahl's claim that the trial court erred by denying his request to instruct the

jury that it was permissible to consider "mercy" in deciding his sentence, the law is clear that failure

to give such an instruction does not offend the Constitution.

### Subclaim (vi)

#### State court opinion

Mr. Wogenstahl argues that death sentences would be more reliable if it is the

accused who argues first and last to the jury at the penalty phase.  His position is that "while the

state has the burden of proof at the penalty phase, in a very real sense it is the accused who bears the

burden of persuasion." Mr. Wogenstahl did not raise this issue on direct appeal to the Hamilton

County Court of Appeals.  He did, however, it on direct appeal to the Ohio Supreme Court as

Proposition of Law No. 16.  Appendix, Vol. V at 1153-1325; *Wogenstahl,* 75 Ohio St.3d at 371.

However, the Ohio Supreme Court rejected that claim without opinion.  *Id.* at 344-74.  Because the

state court failed to adjudicate this claim on the merits, this Court conducts an independent review

of the claim.  *Williams*, *supra.*

### Clearly established federal law

The states have wide latitude to structure sentencing procedures.  *Smith v. Mitchell,*

348 F.3d 177, 210 (6th Cir. 2003), *cert. denied,* 543 U.S. 841 (2004), citing *Boyde v. California,* 494

U.S. 370, 376 (1990).  Further, states are granted wide latitude extending to evidentiary rules at

sentencing proceedings.  *Ramano v. Oklahoma,* 512 U.S. 1, 6 (1994); see also, *Gregg v. Georgia,*

428 U.S. 153, 203 (1976)(approving wide ranging evidence and argument at presentence hearing).

### Analysis

This Court is at a loss as to how the Ohio practice of permitting the State to argue

first and last in the mitigation phase of trial would implicate a federal constitutional right.

Nevertheless, to the extent that Mr. Wogenstahl states a constitutional claim cognizable on habeas,

it is foreclosed by the above-cited clearly established federal law.

Mr. Wogenstahl's Ground Nineteen should be rejected on the basis that subclaims

(i), (iii)(iv), (vii), and (viii) are procedurally defaulted and subclaims (ii), (v), and (vi) are without

merit.

### Ground Twenty

**Petitioner was denied his Fourteenth amendment right to due
process of law and his Eighth Amendment right to be free from
cruel and unusual punishment by the trial court's refusal to
admit and to let the jury consider at the penalty phase of the trial
the forensic reports proffered by Petitioner**.

In support of this Ground, Mr. Wogenstahl argues that the trial court erred by failing

to admit into evidence at the close of the penalty phase Defendant's Exhibits 1, 2, 3, 18, and 20.

Mr. Wogenstahl acknowledges that his appellate counsel did not raise this claim on direct appeal, thereby acknowledging that it is procedurally defaulted. (Doc. 14 at 132, ¶254; Doc. 19 at 301). However, Mr. Wogenstahl suggests that appellate counsels' ineffectiveness provides cause for the default. (Doc. 82 at 33-45).

As noted above, Mr. Wogenstahl has raised absolutely no claims of ineffective assistance of appellate counsel in these proceedings. Therefore, this Court has no occasion to review the effectiveness of appellate counsel. Counsels' ineffectiveness, then, cannot provide cause for the procedural default of Mr. Wogenstahl's claim that his Constitutional rights were violated by the trial court's alleged error with respect to the admission of Defendant's Exhibits 1, 2, 3, 18, and 20.

Mr. Wogenstahl's Ground Twenty is not well taken and should be denied.

### Ground Twenty-One

**Petitioner's right to due process of law under the Fourteenth Amendment to the United States Constitution and his right to be free from cruel and unusual punishment under the Eighth Amendment were violated by the prosecution's misconduct in introducing at the penalty phase of the trial evidence that Petitioner had been convicted of robbing a UDF, that he had been convicted of public indecency, that he had violated his parole, and that he had been investigated for making sexual advances to his sister, thereby introducing invalid nonstatutory aggravating circumstances for the jury's consideration.**

With respect to Mr. Wogenstahl's claim in Ground Twenty-One, the Respondent raises the defense of procedural default. Mr. Wogenstahl does not take issue with the Respondent's argument nor does he argue any basis for the cause of a default. (Doc. 19 at 202-03).

This Court concludes that under *Maupin*, Mr. Wogenstahl's Ground Twenty-One is procedurally defaulted. First, although Mr. Wogenstahl raised this evidentiary claim in his direct

163

appeal, he raised it as a claim of trial court error and not as a claim of prosecutorial misconduct. *Wogenstahl,* 75 Ohio St.3d at 370; Appendix, Vol. V at 1153-1325. In addition, Mr. Wogenstahl's failure to raise this claim as a claim of prosecutorial misconduct resulted in his waiver of the claim in the state appellate process. As already noted, the procedural rule of waiver is an adequate and independent state ground to bar habeas claims. *Norris, supra; Rust, supra.* Finally, as noted above, Mr. Wogenstahl has failed to even attempt to establish cause for the waiver.

Additionally, this Court notes that the claims Mr. Wogenstahl raises in Ground Twenty-One are essentially the same as the ones he raised in Ground Eighteen. The only difference is that in Ground Eighteen Mr. Wogenstahl couched the claims in terms of trial court error while here he couches them in terms of prosecutorial misconduct. Nevertheless, Mr. Wogenstahl's Ground Twenty-One is procedurally defaulted and should be rejected on that ground.

### Ground Twenty-Two

**Petitioner was denied his Fourteenth Amendment right to due process of law and his Eighth Amendment right to be free from cruel and unusual punishment by prosecutorial misconduct during the penalty phase closing argument by improperly commenting on Petitioner's unsworn statement, by suggesting to the jury that defense counsel believed Petitioner was guilty, by stating that the defense mitigation was to ask the jury to ignore the judge's instructions, and by appealing to the passions of the jury.**

**i) The prosecutor improperly commented on Petitioner's unsworn statement.**

**ii) The prosecutor suggested to the jury that defense counsel believed Petitioner was guilty.**

**iii) The prosecutor stated that the defense mitigation was to ask the jury to ignore the jury instructions.**

**iv) The prosecutor appealed to the passions of the jury.**

164

In Ground Twenty-Two, Mr. Wogenstahl again alleges incidents of prosecutorial misconduct. First, the Court notes that in his Ground Twelve, Mr. Wogenstahl raised claims of prosecutorial misconduct. Although he raised in subclaim (x) of Ground Twelve a "passions of the jury" claim, in this Ground, Mr. Wogenstahl points to a different section of the prosecutor's closing argument. Therefore, the two claims are different.

Respondent argues that subclaims (i), (iii), and (iv) of Ground Twenty-Two are procedurally defaulted. Mr. Wogenstahl does not take issue with Respondent's position and does not attempt to establish "cause" for the default. (Doc. 19 at 303-08; Doc. 82).

This Court agrees that subclaim (iii) is procedurally defaulted. Mr. Wogenstahl failed to bring that claim on direct appeal nor did he raise the issue in his post-conviction petition. Appendix, Vol. III at 695-815; *Wogenstahl,* 1994 WL 686898 at *1-16; Appendix, Vol. V at 1153-1325; *Wogenstahl,* 75 Ohio St.3d at 369-74; Appendix, Vol. Viii at 2013-74; 1998 WL 306561 at *1-3. The first two prongs of *Maupin* are satisfied. Additionally, the third *Maupin* prong is met because waiver is an adequate and independent state ground to bar habeas review. *Norris,* 146 F.3d at 314; *Rust,* 17 F.3d at 161.

Mr. Wogenstahl included subclaims (i), and (iv) in his Assignment of Error No. XXXIII in his appeal to the Hamilton County Court of Appeals and in his Proposition of Law No. 13 in his appeal to the Ohio Supreme Court. Appendix, Vol. III at 695-815; *Wogenstahl,* 1994 WL 686898 at *1-16; Appendix, Vol. V at 1153-1325; 75 Ohio St.3d at 369-71. In addressing those claims, the Ohio Supreme Court noted that at trial Mr. Wogenstahl never objected to the complained-of comments and therefore he had waived his contentions of error. *Id.* at 56-57[16]. In

_____

[16] Although the Ohio Supreme Court nevertheless went on to review some of Mr. Wogenstahl's claims under the "plain error" standard, it did not address the claims involved in subclaims (i) or (iv).

165

doing so, the court applied the procedural rule of waiver which, as noted, is an adequate and independent ground to bar habeas review[17].   Subclaims (i) and (iv) are therefore procedurally defaulted.[18]

In subclaim (ii), Mr. Wogenstahl argues that the prosecutor committed misconduct when he suggested that Mr. Wogenstahl's counsel believed he (Mr. Wogenstahl) was guilty.  Mr. Wogenstahl points to the following comments the prosecutor made during his penalty phase rebuttal argument:

> As attorneys we are prohibited from telling you what our personal feelings are in a case.  It's against the rules.  Those rules were violated by the defense quite a bit.  But one thing that stands out in my mind in particular is Mr. Schmidt in the guilt phase made a very improper comment to you.  He stated that if I though he [Mr. Wogenstahl] did it ...

Transcript, Vol. XIX at 2839-40.

### State court opinion

The Ohio Supreme Court rejected without comment Mr. Wogenstahl's claim on this issue.  *Wogenstahl,* 75 Ohio St.3d at 356-60.   The court of appeals, however, rejected Mr. Wogenstahl's claim of error stating:

> In the final instance [of alleged improper comments by the prosecutor], the argument in question was abandoned by the prosecutor when the trial court sustained a defense objection, and

---

[17] Additionally, the Court notes that Ohio's contemporaneous objection rule — that parties must preserve errors for appeal by calling them to the attention of the trial court at a time when the error could have been avoided or corrected — is an adequate and independent state ground that bars federal habeas review absent a showing of cause and prejudice. *Mason v. Mitchell*, 320 F.3d 604, 635 (6th Cir. 2003)(citation omitted)

[18] In reaching this conclusion, the Court is aware that Mr. Wogenstahl raised a "passions of the jury" claim in subclaim (x) of Ground Twelve.  However, that claim was based on a part of the prosecutor's closing argument in the guilt phase as opposed to the penalty phase.

there is otherwise nothing from what remains in the record to support
a conclusion that a line of impropriety had actually been crossed.

*Wogenstahl*, 1994 WL 686898 at *14.

### Clearly established federal law

In its discussion and analysis of Ground Twelve, *supra*, this Court discussed the

clearly established federal law applicable to claims of prosecutorial misconduct.  That discussion

is incorporated herein by reference.

### Analysis

During Mr. Wogenstahl's counsel's guilt phase closing argument, the following took

place:

> [Mr. Wogenstahl's counsel]: ...  I will point him [Mr. Wogenstahl]
> out to you just like the prosecutor, all right.  If I thought he did it I
> will tell you to convict him and put him in the chair.
>
> [Prosecutor]: Objection.
>
> [Court]: All right. Go ahead.
>
> [Mr. Wogenstahl's counsel]: But if he didn't do it, ladies and
> gentlemen, I'm going to tell you you have got to add this evidence up
> and you have got to find, from what I'm seeing, you have got to find
> him not guilty.
>
> [Court]: Ladies and gentlemen, I do want to give you one brief
> instruction.  There was an objection in reference to something
> [defense counsel] said.  We are going to instruct you that during this
> first proceeding of guilt or innocence, as we will tell you later when
> we instruct you, that penalty is not a consideration in your
> deliberations in this particular proceeding.  So, therefore, the remark
> by Mr. Schmidt as to penalty should be disregarded by you.
> ...

Transcript, Vol. XVII at 2539-40.

Contrary to Mr. Wogenstahl's argument, the prosecutor did not tell the jury during

167

his penalty phase rebuttal argument that Mr. Wogenstahl's counsel believed he (Mr. Wogenstahl)

was guilty.  Rather, prior to objection, the prosecutor had started to accurately quote defense

counsel's guilt phase closing argument.  Defense counsel indeed said to the jury, "If I thought he

did it...".

        Nevertheless, Mr. Wogenstahl's counsel objected to the prosecutor's complained-of

statement:

> [Mr. Wogenstahl's counsel]: Your Honor, I am going to object to
> that.  The Court already sustained the objection on it and instructed
> the jury not to pay attention to it and now he wants to bring this up
> again.
>
> [Court]: Again, ladies and gentlemen of the jury, what counsel says
> to you in final argument is not evidence.  We have been giving
> counsel some latitude. We will allow you to proceed, but pointing out
> to you, again, what they say is not evidence and it's not the law on
> what you decide on this case.  You make your decisions on what you
> heard from the witness box, plus any exhibits.

*Id.,* Vol. XIX at 2840.  At that point, the prosecutor abandoned his argument.  *Id.* at 2841.

        Even assuming that the prosecutor did engage in misconduct, it did not rise to the

level of depriving Mr. Wogenstahl of a fair trial.  An application of the four-part *Frazier* test

indicates that the first prong—the degree to which the remark complained of had a tendency to

mislead the jury and prejudice Mr. Wogenstahl—weighs against Mr. Wogenstahl.  Specifically, the

prosecutor was accurately quoting defense counsel's prior argument.  Additionally, upon objection,

the trial court instructed the jury that counsels' arguments were not evidence and that they were to

decide the case based on the evidence introduced at trial.  Similarly, the second *Frazier* prong

weighs against Mr. Wogenstahl. Specifically, the prosecutor's comment about defense counsel's

statement was isolated.  The fourth prong of the *Frazier* test also weighs against Mr. Wogenstahl.

As noted several times, there was a very substantial amount of evidence against Mr. Wogenstahl. Even if the third *Frazier* prong, whether the comment was accidently placed before the jury or deliberately made, weighed in favor of Mr. Wogenstahl, it would not be enough to outweigh the other *Frazier* factors.

The Ohio court's decision on the issue contained in subclaim (ii) was not contrary to or an unreasonable application of clearly established federal law.

Mr. Wogenstahl's Ground Twenty-Two should be rejected on the bases that subsections (i), (iii), and (iv) are procedurally defaulted and subsection (ii) is without merit.

## Ground Twenty-Three

**Petitioner's right to the effective assistance of counsel under the Sixth Amendment to the United States Constitution, his right to due process of law under the Fourteenth Amendment and his right to be free from cruel and unusual punishment under the Eighth Amendment were violated by trial counsel's failure to adequately investigate and prepare for the penalty phase hearing and for their deficient performance at the penalty phase hearing.**

In support of this Ground, Mr. Wogenstahl argues at length that his trial counsel inadequately prepared mitigation witnesses and improperly examined those witnesses. Respondent raises the defense of procedural default.

Although he was represented on direct appeal by new counsel, Mr. Wogenstahl did not raise this ineffective assistance of trial counsel claim on direct appeal to the Hamilton County Court of Appeals. Appendix, Vol. III at 695-815; see *also, Wogenstahl,* 1994 Westlaw 686898 at *1-16.. Similarly, Mr. Wogenstahl did not raise this claim on direct appeal to the Ohio Supreme Court. Appendix, Vol. V at 1153-1325; see also, *Wogenstahl,* 75 Ohio St.3d at 369-74. Mr. Wogenstahl did, however, raise this claim as his Fifth Claim in his post-conviction Petition.

Appendix, Vol. VIII at 2013-74.  In affirming the trial court's denial of Mr. Wogenstahl's Petition, the court of appeals specifically addressed, and rejected, Mr. Wogenstahl's ineffective assistance of trial counsel claim:

> The Ohio Supreme Court, in *State v. Cole* (1982), 2 Ohio St.3d 112, 443 N.E.2d 169, syllabus, held that *res judicata* is an appropriate basis for the dismissal of a postconviction claim alleging counsel's ineffectiveness at trial, when the petitioner was represented by new counsel on direct appeal and the issue could fairly have been determined without evidence dehors the record.  See, also, *State v. Carter* (Nov. 14, 1977), Hamilton App. No. C-960718, unreported. The record indicates that appellant was represented by new counsel on appeal.  The postconviction challenges made with respect to counsel's trial performance were not supported by sufficient evidence dehors the record and/or presented matters that either were or could have been raised on direct appeal.  Consequently, we hold that appellant's claims for relief assailing trial counsel's performance were properly subject to dismissal without an evidentiary hearing under the doctrine of *res judicata*.  See *State v. Perry* (1967), 10 Ohio St.2d 175, 226 N.E.2d 104; *State v. Cole, supra.*

*Wogenstahl,* 1998 WL 306561 at *2.

The first and second prongs of the *Maupin* test have been satisfied with respect to this Ground.  First, in an Ohio case, failure to raise an ineffective assistance of trial counsel claim on direct appeal when one is represented by new counsel is a procedural default.  *Terrell v. Morris,* 493 U.S. 1 (1989).  Mr. Wogenstahl, although represented by new counsel on appeal, failed to raise this issue on direct appeal.   Next, when Mr. Wogenstahl attempted to raise the claim in his post-conviction Petition, the Ohio Supreme Court specifically relied on *res judicata* in rejecting the claim.  As noted above, Ohio's *res judicata* rule has been repeatedly upheld in the Sixth Circuit as an adequate and independent state rule. *Mason,* 320 F.3d at 628.   Indeed, the Sixth Circuit "has consistently held that Ohio's doctrine of *res judicata* is an adequate and independent state ground to justify default".  *Carter v. Mitchell,* 443 F.3d 517, 538  (6th Cir. 2006).  All of the prongs of the

170

*Maupin* test have been satisfied.

Mr. Wogenstahl had not argued not attempted to establish cause for the default of the claims contained in Ground Twenty-Three.

This Court concludes that the claim in Ground Twenty-Three is procedurally defaulted and it should therefore be rejected.

### Ground Twenty-Four

**Petitioner's right to due process of law under the Fourteenth Amendment to the United States Constitution and his right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution were violated by the state courts' denial of Petitioner's request to have the DNA remaining from the bloodstain obtained from Petitioner's car submitted for a new, identity specific DNA test that could definitively determine the source of the bloodstain.**

The Respondent argues that this Ground is procedurally defaulted and Mr. Wogenstahl does not take issue with the Respondent's position. (Doc. 19 at 323-27; Doc. 82). This Court concludes that under a *Maupin* analysis, this claim is procedurally defaulted.

Mr. Wogenstahl failed to raise this issue on direct appeal to the Court of Appeals or to the Ohio Supreme Court. The first time that he raised it was in post-conviction relief proceedings as his First Claim. Appendix, Vol. VIII at 2013-74. In affirming the trial court's denial of Mr. Wogenstahl's petition for post-conviction relief, the court of appeals determined that Mr. Wogenstahl's claim was in the nature of a request for discovery rather than for a constitutional deprivation that occurred at trial. *Id.,* Vol. VIII at 2269-74. The court determined that Mr. Wogenstahl had failed to articulate cause for discovery under state law.

Although Mr. Wogenstahl had ample opportunity to raise this issue on direct appeal, he failed to do so. Therefore, the first two prongs of the *Maupin* analysis are satisfied. Additionally,

the third *Maupin* prong is satisfied because waiver is an adequate and independent state ground to bar habeas review. *Norris,* 146 F.3d at 314; *Rust*, 17 F.3d at 161.

Mr. Wogenstahl did raise his DNA-related claim as a substantive constitutional claim in his motion for leave to file a motion for a new trial. *Id.,* Vol. IX at 2360-74. However, in affirming the trial court's denial of that motion, the court of appeals rejected the claim on the basis of *res judicata. Id.,* Vol. IX at 2460-66. As noted above, Ohio's *res judicata* rule has been repeatedly upheld in the Sixth Circuit as an adequate and independent state rule sufficient to bar habeas review. *Mason,* 320 F.3d at 628; *Carter,* 443 F.3d at 538. Under the *Maupin* standard, this claim is also procedurally defaulted. Indeed, Mr. Wogenstahl does not argues that this claim is not procedurally defaulted nor does he argue that there is cause for the default.

Mr. Wogenstahl's Ground Twenty-Four is procedurally defaulted and should be denied on that basis.

### Ground Twenty-Five

**The imposition of a sentence of death on Petitioner violates his Eighth Amendment right to be free from cruel and unusual punishment and his Fourteenth Amendment right to fundamental fairness when there is insufficient evidence that the aggravating circumstances outweigh the mitigating factors and the sentence of death is disproportionate to the offense.**

**i) There is insufficient evidence that the aggravating circumstances outweigh the mitigating factors.**

**ii) The sentence of death is excessive and not proportional to the offense.**

The claim that Mr. Wogenstahl raises in his Twenty-Fifth Ground for relief is essentially a sufficiency-of-the-evidence claim. Mr. Wogenstahl claims that there was insufficient evidence that the aggravating circumstances outweighed the mitigating factors. Additionally, Mr.

172

Wogenstahl argues that his death sentence was not proportional to the crime he committed and that

Ohio law failed to provide him with adequate appellate review as to proportionality.

**State court opinion**

In addressing Mr. Wogenstahl's claim that he now raises in Ground Twenty-Five,

the Ohio Supreme Court said:

> Having considered each of appellant's propositions of law, we must now independently review the death sentence for appropriateness (also raised in appellant's twenty-seventh proposition of law) and proportionality. Again, we find that the three specifications of aggravating circumstances appellant was found guilty of committing are clearly shown on the record before us.
>
> In mitigation, appellant presented the testimony of friends, family and others. The witnesses were aware of appellant's criminal history, and testified that appellant had reformed his life and had changed for the better in the months preceding the murder. In an unsworn statement, appellant proclaimed his innocence, challenged the state's evidence, and expressed sympathy to Amber's family. Defense counsel urged the jury to consider, as mitigating, that Amber Garrett died quickly and that she was neither raped nor tortured. Moreover, defense counsel urged the jury to spare appellant's life and suggested that the real killer was yet to be identified.
>
> The trial court and court of appeals apparently found no credible mitigating evidence and, upon a review of the record, neither do we. Accordingly, we find that the aggravating circumstances appellant was found guilty of committing outweigh the evidence presented in mitigation beyond a reasonable doubt.
>
> As our final task, we have undertaken a comparison of the death sentence in this case to those cases in which we have previously imposed the death penalty. We have previously imposed the death sentence in cases involving murder during the course of a kidnaping (see, *e.g. Scudder, supra*, 71 Ohio St.3d 263, 643 N.E.2d 524) murder during the course of an aggravated burglary (see, *e.g. State v. Bonnell* [1991]. 61 Ohio St.3d 179, 573 N.E.2d1082),and murder to escape detection (see, *e.g.,State v. Burke,* [1995], 73 Ohio St.3d 399, 653 N.E.2d 242. Appellant's death sentence is neither excessive nor disproportionate.

173

*Wogenstahl,* 75 Ohio St.3d at 368.

### Clearly established federal law

The law which addresses the issue of sufficiency of the evidence was discussed with respect to the claims Mr. Wogenstahl raised in Ground Five and applies here. In addition, this Court notes that the United States Constitution does not require that a sentencing authority use standards to evaluate and weight aggravating or mitigating circumstances. *Tuilaepa v. California*, 512 U.S. 967, 979 (1994); *see also, Walton v. Arizona*, 497 U.S. 639, 649-50 (1990); *Proffitt v. Florida*, 428 U.S. 242, 257-59 (1976). Indeed, the sentencer may be given "unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty". *Tuilaepa,* 512 U.S. at 979-80, *quoting, Zant v. Stephens,* 462 U.S. 862, 875 (1983). Within constitutional limits, the States enjoy their traditional latitude to prescribe the method by which those who commit murder shall be punished. *Blystone v. Pennsylvania,* 494 U.S. 299, 309 (1990); *Romano v. Oklahoma,* 512 U.S. 1, 7 (1994). The presence of aggravating circumstances serves the purpose of limiting the class of death-eligible defendants and the Eighth Amendment does not require that such circumstances be further refined or defined by [the sentencer]. *Blystone,* 494 U.S. at 307, *citing, Lowenfield,* 484 U.S. at 244.

In *Woodson v. North Carolina,* 428 U.S. 280 (1976), the Supreme Court held that a state may not *automatically* require that the death penalty be imposed for certain murders. However, the Court has also held that *Woodson* does not preclude death sentencing statutes which, like Ohio's, require the imposition of death if statutory aggravating circumstances are found to outweigh mitigating factors. *Blystone,* 494 U.S. at 305. In addition, federal habeas review of a state court's application of a constitutionally narrowed aggravating circumstance is limited, at most, to

174

determining whether the state court's finding was so arbitrary or capricious as to constitute an independent due process or Eighth Amendment violation.  *Lewis v. Jeffers,* 497 U.S. 764, 780 (1990).

Appellate court re-weighing of aggravating circumstances and mitigating factors may be used to cure a trial court's consideration of an invalid aggravating circumstance where other valid aggravating circumstances remain.  *Romano,* 512 U.S. at 11; *see also Clemons v. Mississippi,* 494 U.S. 738 (1990).  Whenever a sentence of death is imposed by a trial court in Ohio, an independent reweighing of the aggravating circumstances and mitigating factors by the Ohio Supreme Court is mandated by statute.  Ohio Rev. Code § 2929.05(A).

**<u>Analysis</u>**

The thrust of Mr. Wogenstahl's argument is that certain evidence introduced at trial, including testimony about the bloodstain recovered from his vehicle, the testimony of FBI special agent Deedrick, and the fact that there was no blood found in his vehicle, simply failed to establish the aggravating circumstances of which he was convicted.  However, Mr. Wogenstahl ignores the significant amount of evidence which, as discussed in relation to his Ground Five, supported the jury's verdict, including its conclusion that the aggravating circumstances outweighed the mitigating factors.

Pursuant to Ohio Revised Code § 2929.05(A), the Ohio Supreme Court independently reexamined and reweighed the aggravating circumstances and mitigating factors in Mr. Wogenstahl's case.  Therefore, even assuming *arguendo* that the trial court, as well as the Hamilton County Court of Appeals, had erred in the weighing of aggravating circumstances against mitigating factors, the Ohio Supreme Court's reweighing would cure such error.

175

In its reweighing process, the Ohio Supreme Court first noted the aggravating circumstance of which Mr. Wogenstahl was convicted included the commission of murder during a kidnaping, the commission of murder during an aggravated burglary, and the commission of murder to avoid detection and prosecution. The court then carefully reviewed and discussed the mitigating factors which specifically related to Mr. Wogenstahl including the testimony of Mr. Wogenstahl's friends, family members and others who testified that they were aware of Mr. Wogenstahl's criminal history but that their opinions were that he had reformed his life and had changed for the better during the months before the murder. The court also considered Mr. Wogenstahl's unsworn statement to the jury in which he continued to proclaim his innocence, continued to challenge the evidence against him, and in which he expressed sympathy to Amber's family. In doing so, the court determined that each of the mitigating factors was entitled to little weight.

The Ohio Supreme Court followed the dictates of *Clemons* in that it gave individualized consideration to Mr. Carter's circumstances, his background, and the crime. See *Cooey*, 289 F.3d at 891. The Ohio Supreme Court's decision on this issue is not contrary to or an unreasonable application of clearly established federal law. Mr. Wogenstahl's Ground Twenty-Five should be rejected on the basis it is meritless.

### Ground Twenty-Six

**Various aspects of the Ohio Death Penalty scheme violate provisions of the Eighth and Fourteenth Amendments to the United States Constitution.**

In his Ground Twenty-Six, Mr. Wogenstahl presents numerous challenges to the Ohio death penalty scheme. Mr. Wogenstahl claims that the scheme is unconstitutional because it:

176

1) is applied in an arbitrary and capricious fashion as it permits prosecutors to exercise discretion in deciding who will be charged with capital offenses;

2) fails to require premeditation or deliberation as the culpable mental state for defendants in all capital cases;

3) sets forth no standard of proof to be applied in determining the existence of mitigating factors;

4) fails to give the jury a standard with which to balance the mitigating factors against the aggravating circumstances;

5) fails to give the jury a comprehensible standard with which to balance the mitigating factors against the aggravating circumstances in that the standard confusingly and unintelligible meshes a "beyond a reasonable doubt" standard with a "preponderance of the evidence" (simply outweighing) standard;

6) [permits] the consideration of aggravating circumstances at the guilt phase of the trial;

7) does not give the sentencing authority the option to impose a life sentence, or give mercy, when it finds that the aggravating circumstances outweigh the mitigating factors;

8) [it requires] a bifurcated trial with the same jury;

9) in conjunction with Crim. R. 11(C)(3), encourages defendants to waive their fundamental rights and enter guilty pleas;

10) is a mandatory death penalty;

11) fails to provide for adequate appellate review;

12) [provides for] execution by means of electrocution [which] constitutes cruel and unusual punishment;

13) allows the use of the same operative fact to first evaluate what would be "ordinary" murder to aggravated murder, and then to capital, death-eligible aggravated murder thereby permitting the state to: (1) obtain a death sentence upon less proof in a felony murder case than in a case involving prior calculation and design, although both crimes are ostensible equally culpable under the Ohio Revised

177

Code; and (2) obtain a death sentence while failing to narrow the capital class to those murderers for whom the death penalty is constitutionally appropriate;

14) is so devoid of penological justification that it results in the gratuitous infliction of suffering, and consequently there is no rational state interest served by the ultimate sanction;

15) is inflicted disproportionately upon those who kill whites as opposed to those who kill blacks and within Hamilton County, Ohio the death penalty is selectively imposed, rendering the penalty as applied in Hamilton County arbitrary and capricious on the one hand, and the product of racial discrimination on the other; and

16) violates international law.

### State court opinion

Mr. Wogenstahl raised several challenges to the Ohio death penalty scheme in his various propositions of law on direct appeal to the Ohio Supreme Court.  See, *Wogenstahl,* 75 Ohio St.3d at 369-74; Appendix, Vol. V at 1153-1325.  The Ohio Supreme Court rejected all of those challenges.  *Wogenstahl,* 75 Ohio St.3d 344.

### Clearly established federal law and Analysis

First, the Court notes that Mr. Wogenstahl, of course, can raise only those challenges to the constitutionality of capital punishment and Ohio's death penalty statute that he fairly presented on direct appeal to the Ohio courts.  See *Buell v. Mitchell*, 274 F.3d 337, 367 (6th Cir. 2001).  Any claims that Mr. Wogenstahl has not so presented are procedurally defaulted.  Mr. Wogenstahl failed to raise on direct appeal subclaims 2, 3, 5, 6, 8, and 12 contained in Ground Twenty-Six.  Additionally, the challenge Mr. Wogenstahl makes in subclaim 12 is moot in that the current version of Ohio's death penalty scheme provides for execution in Ohio only by lethal injection.  *See* O.R.C. §2949.22 (eff. Nov. 21, 2001).

178

Second, this Court notes that the Sixth Circuit has continued to reject challenges to the constitutionality of Ohio's death penalty statutes including many of the challenges Mr. Wogenstahl raises in his Petition.  See *Buell, supra.; Scott v. Mitchell,* 209 F.3d 854, 884-85 (6th Cir.), *cert. denied,* 531 U.S. 1021 (2000).

The Court now turns to Mr. Wogenstahl's specific challenges to the Ohio death penalty statutes which challenges are not procedurally defaulted .

Mr. Wogenstahl's first challenge is that the Ohio death penalty scheme is unconstitutional because it is applied in an arbitrary and capricious fashion as it permits prosecutors to exercise discretion in deciding who will be charged with capital offenses.  The Sixth Circuit has rejected this claim in *Buell,* 274 F.3d at 367.

Mr. Wogenstahl argues that the Ohio death penalty statutes are unconstitutional because they fail to give the jury a standard with which to balance the mitigating factors against the aggravating circumstances.  On the authority of *Tuilaepa,* 512 U.S. at 979, Mr. Wogenstahl's argument is not well taken.  See also, *Zant,* 462 U.S. at 875.

Mr. Wogenstahl alleges next that the Ohio death penalty scheme is unconstitutional because it does not give the sentencing authority the option to impose a life sentence, or give mercy, when it finds that the aggravating circumstances outweigh the mitigating factors.  This argument is rejected on the authority of *Blystone, supra* [494 U.S. 299] and *Boyde, supra* [494 U.S. 390].

The next challenge to the Ohio death penalty scheme Mr. Wogenstahl brings is that it is unconstitutional because it encourages defendants to waive their fundamental rights and enter guilty pleas.  Assuming *arguendo* that Mr. Wogenstahl, who did not plead guilty, has standing to raise this claim, it is not well taken on the authority of *Corbitt v. New Jersey,* 439 U.S. 212 (1978).

179

Mr. Wogenstahl argues that the Ohio death penalty scheme is unconstitutional because it provides for a mandatory death sentence. On the authority of *Buchanan v. Angelone,* 522 U.S. 269, 276 (1998), this argument is not well taken. See also, *Walton v. Arizona,* 497 U.S. 639 (1990).

Next, Mr. Wogenstahl claims that the Ohio death penalty statutes are unconstitutional because they fail to provide for adequate appellate review. In *Coleman v. Mitchell,* 268 F.3d 417 (6th Cir. 2001), *cert. denied sub nom, Coleman v. Bagley,* 535 U.S. 1031 (2002), on the authority of, *inter alia, McClesky v. Kemp*, 481 U.S. 270 (1987), the Sixth Circuit rejected a similar challenge to the Ohio statutes.

Mr. Wogenstahl essentially argues that the Ohio death penalty scheme is unconstitutional on the basis that it allows imposition of a death sentence upon less proof in a felony murder case than in a case involving prior calculation and design and while failing to narrow the capital class to those murderers for whom the death penalty is constitutionally appropriate. This argument is rejected on the authority of *Lowenfield, supra* [484 U.S. 231] and *Tinson v. Arizona,* 481 U.S. 137 (1987).

The next challenge to the Ohio death penalty scheme that Mr. Wogenstahl makes is that it is unconstitutional because it is so devoid of penological justification that it results in the gratuitous infliction of suffering and consequently there is no rational state interest served by the ultimate sanction. On the authority of *Gregg, supra* [429 U.S. 153] Mr. Wogenstahl's argument is not well taken. See also, *Madrigal v. Bagley,* 276 F.Supp.2d 744 (N.D.Ohio 2003), *aff'd,* 413 F.3d 548 (6th Cir. 2005).

Mr. Wogenstahl argues next that the Ohio death penalty statutes are unconstitutional

180

as applied in Hamilton County, Ohio, because they result in death penalties that are arbitrary and capricious on the one hand and the product of racial discrimination on the other. In *United States v. Armstrong,* 571 U.S. 456, 464 (1996), the Court determined that if a prosecutor has probable cause to believe that an accused committed an offense, the decision whether to prosecute and what charges to file or bring before the grand jury generally rests entirely within the prosecutor's discretion. Pursuant to the equal protection application of the Due Process Clause of the Fifth Amendment, a prosecutor's decision whether to prosecute may not be based upon an unjustifiable standard such as race, religion, or other arbitrary classification. *Id.* at 457 (citation omitted). In order to prove a selective prosecution claim, the claimant must show that the prosecutorial policy had a discriminatory effect and was motivated by a discriminatory purpose. *Id.* To establish discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted. *Id.*(citations omitted). The fact that a prosecutor has the power not to charge capital felonies does not indicate that the prosecutor exercised his discretion in a standardless manner that violates the Constitution. See *Gregg,* 428 U.S. at 187. Mr. Wogenstahl's argument is not well taken.

Mr. Wogenstahl's final challenge to the Ohio death penalty scheme is that it violates various international laws and treaties. The Sixth Circuit has rejected this argument. *Buell,* 274 F.3d at 370; see also, *Coleman,* 268 F.3d at 443. On the authority of *Buell* and *Coleman*, Mr. Wogenstahl's argument is not well taken.

The Ohio Supreme Court's determination that the Ohio death penalty scheme is not unconstitutional is not contrary to, nor an unreasonable application of, clearly established federal law and therefore Mr. Wogenstahl's Ground Twenty-Six should be rejected.

### Ground Twenty-Seven

**The cumulative effect of all the errors at trial and sentencing violated Petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.**

### State court opinion

Mr. Wogenstahl did not raise this claim in the Hamilton County Court of Appeals on direct appeal but he did   raise it on direct appeal to the Ohio Supreme Court as Proposition of Law No. 32.  *Wogenstahl,* 75 Ohio St.3d at 374.  That court rejected the claim without specific comment. Therefore, this Court reviews the claim *de novo.  Williams, supra.*

### Clearly established federal law

The Constitution entitles a criminal defendant to a fair trial, not a perfect one. *Delaware v. VanArsdall*, 475 U.S. 673, 681 (1986).  Indeed, there can be no such thing as an error-free, perfect trial.  *United States v. Hastings,* 461 U.S. 499, 508-09 (1983).

As noted above, the Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief.  *Lorraine,* 291 F.3d at 447, and post-AEDPA, not even constitutional errors that would not individually support habeas relief can be cumulated to support habeas relief.  *Moore,* 425 F.3d at  256;  *Lorraine, supra.*

### Analysis

First, this Court has determined that many of the Grounds which Mr. Wogenstahl raises in his Petition are procedurally defaulted.  Second, the Court has also determined that those Grounds that are not procedurally defaulted are meritless.  There cannot be a cumulative effect of errors when there are no errors.  Nevertheless,  even if this Court were to find that the alleged errors

182

about which he complains rose to the level of a constitutional violation, which it has not, Mr. Wogenstahl's claim of cumulative error is not cognizable in federal habeas as a distinct claim. *Moore, supra; Lorraine, supra.*  Therefore, Mr. Wogenstahl's Ground Twenty-Seven should be rejected.

### Ground Twenty-Eight

**Petitioner is actually innocent; execution of the sentence of death would violate the Eighth Amendment to the United States Constitution and fundamental considerations of justice.**

Mr. Wogenstahl failed to raise this claim in the Ohio courts. However, even assuming that the claim is not procedurally defaulted, it fails.

"Actual innocence" is not itself a constitutional claim justifying habeas relief, but instead is a gateway through which a habeas petitioner must pass to have his otherwise procedurally barred constitutional claim considered on the merits.  *Herrera v. Collins,* 506 U.S. 390 (1993).  The Supreme Court has never held that habeas relief is available on a freestanding claim of actual innocence. See *Id.* at 404-05.  In any event, Mr. Wogenstahl has failed to produce evidence of actual innocence which would allow his exoneration of that basis even if such a basis should be recognized by the Supreme Court.

Mr. Wogenstahl's Ground Twenty-Eight should be denied.

183

## Conclusion

Based on the foregoing analysis, it is respectfully recommended that Petitioner

Jeffrey A. Wogenstahl's Petition for Writ of Habeas Corpus be dismissed with prejudice.


January 2, 2007.

s/ Michael R. Merz
Chief United States Magistrate Judge

# NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(e), this period is automatically extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within ten days after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See United States v. Walters*, 638 F. 2d 947 (6th Cir., 1981); *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).


J:\Death Penalty\Wogenstahl v. Mitchell\Wogenstahl_Merits_R&R. final wpd.wpd